IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.: 1:26-cv-3340

CRAIG MICHAEL BINGERT,
Address filed under seal;
JARED PAUL CANTRELL,
Address filed under seal;
HOLLY DIONNE CHRISTENSEN,
Address filed under seal;
SCOTT RAY L. CHRISTENSEN,
Address filed under seal;
CHAD ALLEN HEATHCOTE,
Address filed under seal;
JOSEPH LEE HOWE,
Address filed under seal;
MICAIAH PHILIP JOSEPH,
Address filed under seal;
MICHAEL ANDREW MACKRELL,
Address filed under seal;
RONALD THOMAS MELE,
Address filed under seal;
MICHAEL STEVEN PERKINS,
Address filed under seal;
KENNETH BRUCE RADER, II,
Address filed under seal;
KENNETH JOHN REDA,
Address filed under seal;
MICHAEL NELSON SPARKS,
Address filed under seal;
CASEY JANE TRYON-CASTRO,
Address filed under seal;

Plaintiffs,

v.

UNITED STATES OF AMERICA,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Defendant.
_______________________________/

## COMPLAINT PURSUANT TO THE FEDERAL TORT CLAIMS ACT

The Plaintiffs, Craig Michael Bingert, Jared Paul Cantrell, Holly Dionne Christensen, Scott Ray L. Christensen, Chad Allen Heathcote, Joseph Lee Howe, Micaiah Philip Joseph, Michael Andrew Mackrell, Ronald Thomas Mele, Michael Steven Perkins, Kenneth Bruce Rader, II, Kenneth John Reda, Michael Nelson Sparks, and Casey Jane Tryon-Castro (hereinafter collectively referred to as the "J6ers"), by and through their undersigned counsel, hereby file their Complaint against the Defendant, the United States of America, and allege as follows:

### Jurisdiction and Venue

1. This Court has subject-matter jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA) and 28 U.S.C. § 1331 (federal question).

2. Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1402(b) because most of the acts and omissions giving rise individually to each of the Plaintiffs' claims occurred in this District, where the supposed infringements occurred at the Capitol and prosecutions were initiated, investigated, and litigated.

### Exhaustion of Administrative Remedies

3. Pursuant to 28 U.S.C. § 2675(a), the J6ers timely filed administrative claims with the United States, the Federal Bureau of Investigation or other appropriate federal agencies and they have fully exhausted all administrative remedies required by the Federal Tort Claims Act ("FTCA"). More than six months have elapsed since the presentment of the SF-95 claim forms without final disposition by the agencies, or the claims were denied.

### Parties

***Plaintiffs***



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

4. Craig Michael Bingert is a citizen of the State of Texas.

5. Jared Paul Cantrell is a citizen of the State of Indiana.

6. Holly Dionne Christensen is a citizen of the State of Washington.

7. Scott Ray L. Christensen is a citizen of the State of Washington.

8. Chad Allen Heathcote is a citizen of the State of Iowa.

9. Joseph Lee Howe is a citizen of the Commonwealth of Kentucky.

10. Micaiah Philip Joseph is a citizen of the Commonwealth of Virginia.

11. Michael Andrew Mackrell is a citizen of the State of Ohio.

12. Ronald Thomas Mele is a citizen of the State of Texas.

13. Michael Steven Perkins is a citizen of the State of Florida.

14. Kenneth Bruce Rader, II is a citizen of the State of Iowa.

15. Kenneth John Reda is a citizen of the State of Florida.

16. Michael Nelson Sparks is a citizen of the Commonwealth of Kentucky.

17. Casey Jane Tryon-Castro is a citizen of the Commonwealth of Virginia.

***Defendant***

18. The Defendant, United States of America, is sued under the FTCA for the tortious acts and omissions of its employees, including Capitol Police, Washington, D.C. Metropolitan Police Attorney General Merrick Garland, U.S. Attorney Matthew Graves, FBI Director Christopher Wray, and Assistant U.S. Attorneys Ashley Akers, Victoria Sheets, and Candace Wong, acting within the scope of their federal employment.

## **The Biggest Crime in American History**

***Prefatory Statement***



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

19. The J6ers are patriotic American citizens who witnessed, as did most of the nation, the reporting on the Presidential Election of 2020 (hereinafter referred to as the "Election"). As is explained below, each of the Plaintiffs knew and understood by what they saw and learned that the Election had been rigged and they were concerned that their country was being wrongfully taken.

20. On January 6, 2021 (hereinafter referred to also as "January 6th" or "J6"), the protesters who were in attendance on the Capitol grounds and/or building (hereinafter referred to as the "J6ers") innocently traveled to Washington, D.C. as they were anxious to learn whatever they could and to connect with like-minded patriots who had the same concerns and who were there to peacefully protest the rigging of the Election. For almost all of the J6ers, their involvement was peaceful as they stood in groups who were in prayer and/or who sang patriotic songs such as God Bless America .

21. Unfortunately, the events which started peacefully turned into mayhem. On the West side of the Capitol Building, Metropolitan Police began to bombard the crowds with teargas and percussion grenades. Ultimately, they used SG gas, and everything went from bad to worse, resulting in four deaths and other injuries to J6ers, while the Capitol Police and the Metropolitan Police suffered only a few minor injuries, such as one who had a broken finger.

22. J6ers were waived into the Capitol Building by the Capitol Police, and for the most part, they acted peacefully.

23. Yet, after the events of the day, false news was circulated of 5 deaths of police officers and accusations that the J6ers were insurrectionists. Ultimately, the Garland DOJ prosecuted the J6ers in dreadful ways, in conjunction with the District Court judges and magistrate

judges who worked together to wrongfully imprison and wrongfully try and sentence innocent J6ers and others.

24. In this regard, only one Magistrate Judge showed any connection with those responsible for the rigging of the Election. Other than that one individual, who may or may not have influenced the rest of the D.C. federal bench, there is no evidence that the judges of the court consciously knew that they were aiding and abetting the enemy. The wrongdoing done by the bench was probably far more innocent than many suspect, as it was the nature and purpose of the occurrences on January 6th.

25. What the federal bench and the rest of the American people did not know was that the events which occurred on January 6th did not begin on that date. In fact, the breaking of the windows of the Capitol Building and the inducing of the J6ers to enter the grounds and the building had been planned long before Election Day.

26. To understand what occurred, one must zoom out to the proverbial 30,000 feet and understand the historical and global context of what occurred. The population of the United States is approximately 4% of the world's population, and yet, it has approximately 27% of the global GNP. Following World War II, the United States has been the most powerful economy and military force on Earth, and remains so to this day, despite foreign and domestic influences which are intended and determined to destroy the United States.

27. For many decades the government of the United States encouraged endless wars, exporting of our manufacturing base, and movement toward global governance.

28. As a result, foreign powers, especially China, prospered and fundamental institutions of the United States became infiltrated by both foreign interests and domestic actors whose interests aligned with global governance.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

29. Over time, in the last decades, global interests have infiltrated and become more common and more involved in different governmental agencies, and normal American life, including the American educational system from K-1 through higher learning; the American traditional media; most of social media; aspects of big business; and certain churches.

30. Before Donald J. Trump came to office, although there were differences between the American political parties, each subscribed to these policies, supporting by example, the U.N., W.H.O., the World Economic Forum, and globalism. Donald J. Trump presented a fundamental change to "America First" and to "Make America Great Again," or "MAGA," and a majority of Americans responded to the call to conservatism and nationalism.

31. In effect, Donald J. Trump emerged to control the Republican Party which had its base disgorged, leaving that globalist minority knows as "Republicans in Name Only" or "RINOs" as a minority. Meanwhile, the Democrat Party held the banner of globalism to the extent that its policies were extreme. For example, it embraced the U.N., W.H.O., the World Economic Forum, China, and open borders. In fact, it encouraged virtues of utopia, where all people are equal and programs such as being Woke, or embracing "Diversity, Equity, and Inclusion," or "DEI," were pitted against conservatism and making America First.

32. As a result of the dichotomy between the ways of Donald J. Trump and the Globalists, the nation became emotionally divided where hatred toward Donald J. Trump actually was given an unofficial but well-known psychological designation in the MAGA counterculture of "Trump Derangement Syndrome," and while the conservatives are constrained by beliefs which required adhesion to the doctrines of religion, the U.S. Constitution, and the rule of law, the Globalists, though greatly outnumbered, are not so constrained.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

33. As Donald J. Trump was consolidating his base in the Republican Party, the Globalists rose in influence and control of the Democrat Party, giving them more than a base. It gives them a means of gaining and taking control of the United States.

34. At this juncture, the Globalists have not only infiltrated the Democrat Party, but it has infiltrated all aspects of government including members of our judiciary and the U.S. Department of Justice, and they are active.

35. While the social tide was changing in the United States, foreign states, primarily China, Venezuela, and Serbia, together with anti-American interests, such as George Soros, Bill Gates, and the World Economic Forum, encouraged their efforts to cause confusion among Americans which played into the divergence of values. DEI became the Woke philosophy with an appearance of legitimacy for ideas which sometimes defied common sense. For instance, Boards of Education in various counties permitted and sometimes encouraged young children who were normal, and capable to being influenced to believe that they were of the opposite sex. This liberalization grew to the point where male-to-female transitioners would participate in women's sports to break all kinds of records.

36. For another example, of how the Left and the Right are incompatible. Where the Conservatives are in favor of equal opportunities for all races, the Globalists seek repentance from Caucasian males for bad acts supposedly of some of their ancestors.

37. In 2016, Donald J. Trump won the Presidential race. Instantaneously, false narratives were made and given credence, such as the "Russia Coalition" accusations against President Trump. Some Globalist FBI agents considered a plan to have a special prosecutor appointed to be an "insurance policy," the appointment of Meuller who spent $30 million



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

investigating, came up empty. Instead of unearthing Russian collusion and other crimes, Donald J. Trump was proven to have been law abiding.

38. However, the 2016 election of Donald J. Trump did lead to a great deal of social unrest and during the four years of his first term, a large percentage of Americans became susceptible to believing in positions contrary to the American way. These people formed a base in our society which foreign interests were able to wittingly and unwittingly enlist.

39. Worse were systems by those who governed China, Venezuela, Serbians, and others who developed machines with programs by which the outcome of the Election could be manipulated and determined.

40. Before 2020, the election equipment had been partially utilized, but in 2020, the foreign governments and all of their accomplices were set to rig the Presidential Election, and that is exactly what occurred. The election was rigged, and all who participated directly were guilty conspiring to overthrow the government of the United States by force, which was sedition pursuant to 18 U.S.C. §§ 2384; which was also the inciting, assisting, and engaging in insurrection against the authority of the laws of the United States a conspiracy to commit insurrection pursuant to 18 U.S.C. §§ 2383; which was also adhering to the enemies of the United States and giving them aid and comfort by participating in the takeover of the United States to commit conspiracy to commit treason pursuant to 18 U.S.C. §§ 2381.

41. In the case at bar, the general meeting of minds of groups which already existed, where the members of the groups, such as the D.C. Metropolitan Police, the Capitol Police, the lawyers who were part of the DOJ, the prison officials, and others who worked together for the common purpose of defeating the United States of America, or to cover-up the rigging of the 2020 Presidential Election were guilty of sedition, insurrection, and treason.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

42. As the enemies of the United States who participated in the massive foreign interference of the United States Presidential Election had made great infiltration of American Society, judges, attorneys, and other groups perhaps thought that they were doing a good thing by attempting to defeat the interests of the United States, but they were doing wrong, and acting against the interests of the government of the United States, which at the time was led by President Donald J. Trump.

***The Rigged Presidential Election of 2020***

43. This Complaint concerns a part of the planning, execution, and follow-up of the most widespread, most pervasive, most deep-seated, and overall, the greatest anti-American conspiracy in history by American citizens and other domestic participants, who worked cohesively for the best interests of foreign powers and to take over the government of the United States, not through overt military invasion, but rather by the insidious and surreptitious infiltration of the election system of the United States. The Americans who participated in this planning and execution of the planned events were participating in nothing less than a conspiracy to commit sedition, insurrection, and treason.

**The Development of the Enemy's Capability**

44. Following World War II, the United States became avid opponents of tyranny and Communism, contrary to other nations including China and Venezuela, which had become adversaries to the United States before the turn of the 21 st Century.

45. In the early 2000's, the leader of Venezuela, Hugo Chavez, developed coding for voting machines by programmers located in Serbia which could control the results of elections which were tabulated on machines made in China for the companies of Sequoia and Smartmatic.

46. In the year 2000, in Florida, ballots for the Presidential Election used chads which ultimately led to a failure of public confidence in punch voting machines and a substitute was in demand.

47. Meanwhile, the President of Venezuela, Hugo Chavez, was extremely unpopular and had been developing voting equipment which could be programed to cause the tabulation of the votes to be manipulated. In August of 2004, voting equipment was implemented in Venezuela for a recall election of President Chavez. Due to the machines, instead of being removed from office, Chavez won with 58% of the vote. By 2006, the machines programmed by Serbians for the Venezuelans had made their way to the United States where they were implemented for the 2008 Democrat primaries.

48. Over the next 14 years, the corrupted election equipment was sold to county clerks and other election officials throughout the United States. Contrary to what the companies, Smartmatic USA Corporation, Dominion Voting Systems, ES&S, and others, said, the machines were not "air gapped," meaning unable to communicate with other computers. In fact, the ES&S tabulators actually had phone chips, as cell phones do, on the motherboards and Dominion equipment were connected through VPN connections.

49. After Donald J. Trump won the Presidential Election in 2016, and it was clear he was going to change the status quo in terms of ending perpetual wars and shifting power from those in the government who controlled decisions to the office of the President, deep state individuals, especially some in the Democrat Party, and foreign governments, including a number in the EU, Britain, and others, perpetrated a fraud on the American people accusing President Trump of collusion with Vladimir Putin. When that attack on the Trump government of the United States failed, accusation after accusation causing impeachment and criminal charges to be brought



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

were all part of the plan to return the government to one more friendly and cooperative to the goals of China, the EU, and Great Britian.

50. Ultimately, the direction of the free world, in fact, the whole world, was to rest on the question of whether Donald J. Trump would be reelected in 2020. As it was obvious that Donald J. Trump would have trounced his opponent, Joseph Biden, who campaigned from his basement, and had a rally where 6 cars showed up, it became necessary for the foreign actors and domestic insurgents to use all efforts to rig the 2020 Presidential Election.

51. As a result, in 2020, the United States witnessed the "Summer of Love," which was a plan to implement civil unrest in Left wing cities, to which paid activists were employed.

52. Moreover, in the Autumn of 2019. A virus had been released from a laboratory in Wuhan, China. After the population of Wuhan was greatly infected, all commercial flights to all other cities in China from Wuhan were stopped. However, flights to the United States and Western Europe were encouraged. In this way, China intentionally attacked the United States with a biological weapon, knowing that it would cause massive deaths and a great change in the course of the 2020 U.S. Presidential Election.

53. As a result of the pandemic, states caused the rules to change, often illegally, and mail in ballots were permitted to an extent which could change the results of the Election from ballot harvesting and other methods of cheating. The machines, though, had the power to determine the results of the elections by ginning-up more votes than could ever be needed.

54. The rigging of the 2020 Presidential Election involved ballot harvesting and applying ballots in various races which were not provided by voters, either in person or by mail, but rather, were extra ballots prepared by criminals who put the ballots through the tabulators. Also, election equipment, such as the tabulators, although proclaimed by their manufacturers to be



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

"air gapped," were connected to data centers which manipulated the vote tallies, either through actual phone chips on the motherboards of the tabulators or through virtual private networks.

55. On the evening of November 3, 2020, Election Day, in 4 swing states, Donald Trump was ahead, and for no known reason, even though the counting of ballots had never been previously stopped in any state, in the 4 swing states, the counting was stopped. Then, while the counting was supposedly not occurring, there were additional votes counted over an instant, causing the graphs of the voting in each of those swing states to show a straight vertical line for Biden. As a result, the following morning, in each of the 4 swing states, Joe Biden was suddenly ahead. In all 4 swing states, the graph was very similar where Joe Biden received approximately 97% of the vote, which was not only statistically impossible, but it was obvious to most that something untoward had occurred.

56. Those who were not blinded by hatred toward Donald Trump were able to see instantly that the election results had been manipulated.

57. More evidence of the election fraud emerged including the video from a camera which had been on the ceiling of the counting room in Fulton County, Georgia. There, the counting was stopped late on November 3, 2020, because of false reports of a broken watermain. In fact, contrary to the excuse to stop the counting in Fulton County, Georgia, no watermain broke or was in need of repair. After it was thought by the public that everyone left the counting room, 4 people remained behind and they reached under the tables which were aproned to conceal what was under them. The 4 people in the room pulled hidden suitcases out from under the tables. They opened the suitcases which were filled with unfolded (therefore not mailed) ballots which they then proceeded to put through the ballot tabulators over and over again.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

58. Those who looked objectively at these issues were not fooled and they knew that the election system of the United States had been manipulated to give false conclusions of the tallies.

***Groups of Conspirators***

59. The individuals who created the theft of the Election involved leadership and actors who were engaged in ballot harvesting, manipulation of the adjudication of votes, and mainly in regard to the programing and manipulation by computers of the Election tallies. All of those individuals were seditionists and insurrectionists, and the American citizens who participated were traitors to the United States.

60. Over the last decades, more and more people have been swayed to help the foreign interests who are attempting to defeat the United States. For instance, the educational system of the United States is, to a great extent, now controlled by Globalist Woke leadership, which is politically engaged against the Trump government, which is the government of the United States.

61. This does not make all members of such groups seditionists, insurrectionists, or traitors. However, once 2 or more Americans agree to take action against the interests of the United States, and one of the group performs an act in furtherance of their anti-American activities, they are part of a conspiracy to commit an insurrection, and they are guilty of a conspiracy to commit treason.

62. In this regard, there are numerous actors who may have never met or conferred with the architects of the insurrection against President Donald Trump, but who acted in concert for the same ends. These include the group of individuals who planned the events of J6 or participated in the planning and execution of the events, and the prosecution of the aftermath.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

63. When the police acted in concert against the J6ers, they were acting as conspirators to effect the foreign takeover of the United States by going along with the plan. In this regard, the FBI, placed 274 agents and informants on the grounds of the Capitol to cause protestors to enter the Capitol Building. Those events of J6, especially those who were inducing the J6ers to enter the building, went all the way to the top, including Attorney General Garland and Director of the FBI Wray, who were acting as co-conspirators against America, making them traitors to the United States.

64. The Assistant U.S. Attorneys who pursued the J6ers with a vengeance because the J6ers supported President Trump also were their own group of co-conspirators who committed treason.

65. The efforts of those who orchestrated the violence and the walking into the Capitol Building on January 6th was done so effectively that sensible law-abiding individuals, such as the chief judge of the District of Columbia, in Washington D.C. who laid down the way that J6ers' cases should proceed, was apparently convinced that the J6 Defendants in her courts were the insurrectionists who stormed the Capitol Building. It is difficult to blame her for her reactions to the events which were perpetrated to fool the whole of the American public. It fooled the judiciary, too.

66. As such, at best, the Federal District Court Judges and Magistrate Judges who went along with the wrongful conduct were playing into the hands of the true insurrectionists who had planned J6 well in advance of that date. There was no reason for the judges, at that point, to even imagine that someone had previously planned to break the windows of the Capitol Building, to enter the building, and to have 274 FBI agents and informants present to induce the crowd to proceed toward the Capitol Building and to enter it.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The Planning of Related Events Relating to the Rigged Election***

67. The covert infiltration into our election system would not have been complete without finding ways of curtailing those of the U.S. population who were expected to question the results of the Election and possibly generate an effective opposition to those who rigged the Election.

68. Part of the plan was to identify and limit the effectiveness of those who could upset the proverbial applecart of the devised election rigging. In that regard, plans were made to prosecute American citizens in authority and their attorneys who would possibly undermine the new government, the Biden government which was to be put into place. As a result, certain individuals, such as Tina Peters, Stefanie Lambert, Matthew DePerno, and others were prosecuted for alleged election related crimes where the prosecutors had to twist the law because no crimes were actually committed. Those victims of the conspiracy were attempting to preserve the evidence or maintain the truth of what had occurred. They were heroic American patriots, not criminals.

69. Moreover, the companies which manufactured and/or sold the corrupted election equipment would file lawsuits against anyone who criticized their machines. Ultimately, lawsuits were filed against patriots such as Michael Lindel, Patrick Byrne, Joseph Oltmann, the Trump Campaign, and many more.

70. Of utmost importance, all the rest of the opposition to the preposterous idea that Joe Biden emerged from his basement to be the victor with more votes than Barak Obama received needed to be nipped in the bud with slogans such as calling allegations of election fraud the "Big Lie," getting all lawsuits claiming election fraud dismissed before any evidence was presented.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

71. Some who were falsely put in trusted positions, but who were actually moles waiting to be utilized, such as William Barr, the Attorney General of the United States, suddenly took positions contrary to Donald Trump. William Barr, for instance, just prior to his appointment as Attorney General, had been a partner of the law firm Kirkland Ellis, which represented Staple Street, which had purchased Dominion. He made public pronouncements that he did not see any indications of election fraud. Unfortunately, this was trickery, as he gave the impression that the Department of Justice looked for such fraud and were not able to find any. In fact, he was being deceptive in that he failed to also advise that he never looked.

***J6 was a Psy-Op***

72. Of all the plans to take over the United States by infiltrating our election systems, one of the greatest was to commit a psychological operation, a "psy-op" against the protestors who the seditionists, insurrectionists, and traitors knew would be traveling to the Capitol Building in Washington, D.C. on January 6, 2021, the J6ers.

73. Although the foreign intervention in the election, itself, is not the subject of this Complaint, the conspiracy to wreak havoc at the U.S. Capitol on January 6th and use those events to cause an aftermath of harm to those patriots who attended at the U.S. Capitol on that fateful date was planned in advance and executed according to plan as part of the general scheme to take over America.

74. The Globalists knew that those true to Donald Trump would be traveling to the U.S. Capitol to attend a protest planned for January 6, 2021, as they were the ones who saw and understood that the Election had been rigged. They were the equivalent to the "Early Adopters" who are the first to buy products with new technologies. Without Early Adopters buying products with new technologies, they would not succeed, and likewise, without the protestors who were



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

early in accepting the truth of the rigged Election, the general public's opposition to the election rigging could not succeed. The psy-op was genius.

75. Long before January 6th , in fact, going back at least to September of 2020, active participants in what has been called the "Deep State" with various Non-Government Organizations ("NGO"), including Globalists, Patrick Young, Lisa Fithian, Maria Stephan, and Erica Chenoweth, along with hundreds of others actually knew January 6th was the date that the votes of the Electoral College would be counted and that Biden would be named as the winner of the election at the Capitol that day. These traitors conducted Zoom meetings to plan how the Globalists' were to turn a peaceful protest of the conservative J6ers into the peaceful events into the appearance of a riot.

76. Those seditionists, insurrectionists, and traitors, as early as August or September of 2020, long before the Election, itself, actually plotted to break some of the windows of the Capitol Building so that their compatriots and foreign participants would enter the Capitol Building to unlock and open the doors of the Capitol so that the anticipated protestors outside would be herded into the Capitol Building.

77. The plan was a trap to identify and destroy the tip of the spear of opposition to the election rigging. It was a psy-op designed to stifle public outcry of the rigging of the Election, itself.

78. Others were involved, such as Nancy Pelosi, who as Speaker of the House of Representatives was responsible for the safety of the membership. When offered 10,000 National Guard, she rejected any help. She later admitted her responsibility.

79. These Globalists borrowed from the gamebook of Adolf Hitler, who, 28 days after he was appointed Chancellor of Germany on January 30, 1933, had his storm-troopers burn down

the equivalent of Germany's capitol structure, the Reichstag. By doing so, he was able to take absolute power and became the Fuhrer within 60 days of his appointment of Chancellor.

***The Rigging of the Election Had Been Obvious to the J6ers***

80. After the Election, the Americans who supported Donald J. Trump could see that the Election had been rigged. To them it was obvious as no state in the country had ever stopped the counting of ballots after the counting began. Then, on election night of 2020. In 4 swing states in which Trump was ahead, the counting stopped (supposedly by coincidence), and in the morning, when the counting re-commenced, Biden was in the lead in each state, with a staggering percentage of the votes which came in after the counting was suspended. For instance, in Michigan, after the polls closed, instantaneously, Donald Trump received 5,968 votes while in that fraction of a second, Joe Biden received 141,258 votes.

81. In Arizona, 22,093 mail in ballots were received the day before they were supposedly mailed.

82. In Fulton County, Georgia, the J6ers saw the video from the camera which had been mounted on the ceiling of the ballot counting room.

83. In Pennsylvania, the commonwealth mailed out 1,823,148 ballots and received 1,462,302 back. Yet, it counted 2,589,242 mail in ballots, which were approximately 4:1 in favor of Joe Biden.

84. There is actually a wealth of evidence, at this point, but the point is that very early after the Election, people who favored Donald J. Trump began to file lawsuits, but they lacked standing. Approximately 60 lawsuits were dismissed without any judge examining any evidence.

***The Untoward Events Including Breaking of the Windows of the Capitol All were a Great Success for the Globalists and Foreign Interests***



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

85. All went according to plan. President Trump encouraged protestors to go to the Capitol. The trap was set in what would prove to be the greatest and largest conspiracy in the history of the United States.

86. Many American patriots, including the J6ers are citizens of different states who traveled to Washington, D.C. on or before January 6th in general support of President Donald Trump.[1]

87. At their own expense, they each traveled to Washington, D.C. and found accommodation, so that they could attended speeches and rallies and gather at the U.S. Capitol to attend additional speeches and to assemble, pray, sing, learn, and protest their grievance of witnessing what seemed to be the demise of our country.

88. With all of the trappings in place, the plans for January 6th were successful. The J6ers were cajoled, directed, and forced by GS gas and other insults to their bodies to enter the Capitol Building.

89. Many other incidents occurred, including the beating to death of Roseanne Boyland, the deaths of 2 J6ers as a result of concussion grenades being launched at them, and the horrendous death of Ashley Babbitt.

90. The circumstances of her death appear to have been pursuant to another more specific plan to make the "riot" there was a need for horrible things to occur. The film director and photographer John Sullivan just happened to be present with his crew to film the shooting, where supposed SWAT team members were present and who then apparently changed their clothing after their parts in the performance were concluded.

[1] Note that motivations varied widely, and some plaintiffs were motivated more by a need to raise awareness regarding various issues including public health overreach and/or election integrity generally.

91. The 274 FBI who were present in the crowds were successful in keeping hidden as to their true identity, and they succeeded in moving the crowds forward and into the Capitol Building, where they became susceptible to be charged with misdemeanors and potentially felony charges, as they later were.

92. The psy-op worked like a charm where the American people, including the judges in the D.C. federal courts were outraged by the conduct which they understood to have been started by the J6ers.

***Pipe Bomb Fairy Tale A "Gallows" Constructed with Government Permission, and A Scaffold Commander Urging Protestors to Move Forward .***

93. Upon arrival at the Capitol on January 6th, the J6ers found themselves in a confusing setting, with no signs regarding scheduled events and few visible law enforcement officers. A cheaply constructed "gallows" with a hanging noose had been erected by never-identified persons with apparent government permission.[2]

94. Although there were sections of minor fencing erected on the grounds early on J6, that fencing was mostly removed by afternoon, and the vast majority of the J6ers freely strode upon the Capitol Grounds without any obstructions or indications that they were not permitted to go there.

95. Capitol police officials in league with the general conspiracy to harm the protestors, later falsely testified at trials, at the direction of the Garland DOJ that the Capitol was ensconced in near-fortress-like security.

[2]Note that the gallows qualified as an installation and required a permit for placement on the Capitol Mall. The installation took more than an hour to set up, during morning hours before large crowds arrived.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

96. Within minutes of the beginning of Congress' scheduled electorate voting proceedings, government officials announced that "pipe-bombs" had been found at nearby Republican and Democratic-National Committee headquarters. It was the supposed finding of "pipe bombs," and not any conduct by any J6ers, that first caused proceedings at the Capitol to pause.[3] The story of pipe-bombs was constantly changing[4] and involved agents of the Capitol Police, President-Elect Kamala Harris, and the Secret Service. The pipe-bomb announcement triggered evacuations, closures, and shelter-in-place orders which ultimately culminated in a six-hour delay of Congress. All of this was later wrongfully blamed on the J6ers.

***The Afternoon Unfolded According to Plan***

97. Not only did the seditionists, insurrectionists, and traitors in the Deep State and certain NGOs plan to break the windows of the Capitol Building, to have agents go into the Capitol through the broken windows, and to open the doors of the Capitol so that protestors who would be on the Capitol grounds could be directed into the Capitol building, but the FBI infiltrated the crowds which surrounded the Capitol with a united plan to move the crowds forward and ultimately into the Capitol Building. They had 274 agents and others under their control in place to accomplish this.[5]

---

[3]From another J6er's statement of facts: At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters. United States v. Tommy Allan , Case 1:21- cr-00064-CKK Document 1-1 Filed 01/20/21 Page 4.

[4]Christopher Wray's FBI fabricated or doctored video and released fabricated slowed-down, deliberately-grainy footage of the "pipe bomber" to the public so as to prevent 'solving the crime' (while Wray's FBI purportedly offering a large reward for the supposedly-elusive 'bomber'). The "pipe bombs" themselves resembled stock dummy devices with less-than-one-hour kitchen timers. Private journalists later showed that Capitol Police bomb squad members knew precisely where to look for the "bombs"—obviously having foreknowledge. The FBI is known to have made several phone calls to The Blaze Media seeking to stop The Blaze' reporters from continuing their investigation.

[5]In furtherance of their plan, the FBI keep the fact that they had 274 agents and confidential informants at the Capitol until September of 2025.

98. Then, around 1:00 pm on January 6th, many the Plaintiffs witnessed undercover FBI agents and Cis, etc. shouting to "Go! Go! Go!" commanding and directing the crowds to move forward, toward the Capitol Building. One instigator nicknamed the "scaffold commander" positioned himself on a scaffold tower with a megaphone, shouting at the thousands of protestors to move closer and enter the Capitol. Another never-identified instigator, wearing a red "MAGA" cap with a price tag still affixed, broke and smashed the first window of the Capitol on the West side, to allow infiltrators to climb through the windows. That was according to the plan of the seditionists, insurrectionists, and traitors who rigged the 2020 Presidential Election and then participated in and planned the events of January 6th , as a psy-op to dissuade organized challenges to the rigged election.

99. The identity of the instigators has been well known to Wray's FBI for years; and those instigators have been under Wray's and Garland's protection.[6] Also, the paucity of law enforcement security on January 6th was deliberate.

100. As events unfolded on the Capitol's west side, Capitol police officers on the east side engaged in trickery with crowds of protestors, promising crowds (sometimes over megaphones) that police would try to help protestors approach more closely to the Capitol doors. When J6ers saw barriers removed on the east plaza, the protestors rushed forward, thinking officers had approved their advancement to the steps of the Capitol. Notwithstanding the obvious entrapment, the Plaintiffs were later charged with crimes for doing so.

[6] Another similar example involves a mysterious man wearing a gas mask who pushed J6er Will Pope into the Capitol at the east side's carriage doors. Just as with Scaffold Commander, MAGA-hat guy and the pipe bomber, Garland's DOJ prosecutors claimed they possessed no information about the man who pushed Pope inside the building (making Pope the first J6er to breach the east side). But after three years and much diligent research by Pope, DOJ admitted that the gas-mask wearing individual was known to the government and that the individual possessed a federal security clearance. See https://x.com/FreeStateWill/status/2006853257902305719 (accessed 1/2/2025).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

101. When Capitol Police on the Capitol's west side repeatedly used force and possibly lethal force[7] on the J6ers, the festive or pensive milieu quickly changed. Metropolitan Police bombarded the crowds of peaceful protestors who had been praying and singing songs like God Bless America were suddenly hit with percussion grenades, teargas, and rubber bullets, notwithstanding that they did nothing to provoke such an attack. Moreover, the Capitol Police caused bloody injuries to J6ers which further enraged the crowd and led to an escalation of violence in reaction and in self-defense.

102. During the events of that day, federal law-enforcement officers, including but not limited to officers of the Municipal Police Force and other federal agents, deployed chemical irritants (including pepper spray and tear gas), batons, flash-bang devices, and other less-lethal munitions against the Plaintiffs and the crowd without justification and in a manner that was excessive, unreasonable, and in violation of the Plaintiffs' rights.

103. Worse, at approximately 2:24 pm, the Metropolitan Police were low or out of their teargas and percussion grenades. They were down to a box of CS Gas canisters. CS Gas is so horrific in its effects, that it is a crime to use it in war. It causes severe inability to breathe, panic, high anxiety, and raw anger. A Metropolitan Police officer aimed a shot of a CS Gas cannister at scaffolding on which some J6ers had climbed, but the wind caught the cannister and took it to a line of Capitol Police, causing that line to break. Then the rest of the supply of CS Gas was shot into the crowds of protestors.

[7]Capitol and Metro police officers, including Shauni Kerkhoff and Anthony Campanele, used "less than lethal" weaponry such as pepper ball guns in a manner that was lethal under the law, rules and training.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

104. As a direct and proximate result of unlawful use of force, the Plaintiffs suffered injuries including chemical burns to eyes and respiratory systems, contusions, lacerations, and exacerbation of pre-existing conditions.

***The Largest General Search Warrants in American History***

105. Soon after January 6th , Attorney General Garland, U.S. Attorney Graves, and FBI Director Wray, in furtherance to the conspiracy to cause the protestors grave harm, and if furtherance of unseating the government of the United States with Donald J. Trump, President, violated Fourth Amendment limitations in their investigations of J6ers. These acts were all acts of sedition, insurrection, and treason. These federal officers crafted and used the largest and most general search warrants in history to identify every cell phone at the U.S. Capitol on January 6 th . The warrants were so general that they didn't even try to state suspicion that any individual committed any specific crime, as the U.S. Constitution requires. Rather, the warrants simply listed a menu of ten-to-twelve possible crimes (including crimes which never occurred such as murder) and alleged that possessors of cell phones were either perpetrators or witnesses of such crimes. These federal officers used these unlawful search warrants to find and identify the Plaintiffs, despite having no probable cause at the time of the issuance of the warrants.

***Government-Funded Vigilante Stalkers***

106. Wray's FBI also funded and provided illegal material support to a private vigilante group, "the Sedition Hunters," who worked to identify and investigate J6ers by both legal and illegal means. Among other things, Wray's FBI violated court orders by providing Sedition Hunters with court-protected discovery. J6ers such as Lyons and Williams, were identified by this secretly-government-funded vigilante group. J6er Allan was stalked by Sedition Hunters who



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

repeatedly tried to get Allan fired from his job. J6er Abual-Ragheb, was also stalked and harassed by Sedition Hunters, as were some of the Plaintiffs in this Complaint.

107. In support of the conspiracy to harm the J6ers, the FBI hid its support for Sedition Hunters for years, until after all J6er prosecutions ended and it was too late for J6ers to challenge illegal searches, stalking and harassment.[8]

***Savage, Militarized, Pre-Dawn SWAT-Style Tactical Arrests Over Misdemeanors, Even for Those Whose Lawyers Said They Would Self-Surrender.***

108. In most ways the J6 protest demonstrations were similar to hundreds of other rallies and protests at the Capitol over generations. Under well-settled state and federal law, demonstrators at capitols and legislative assemblies were to be allowed to speak freely and be given avenues for expressing and demanding redress.[9] Even if accused of trespassing or other misdemeanors, protestors must be given multiple warnings and opportunities to depart or comply with commands.[10]

109. FBI Director Christopher Wray, and Attorney General Merrik Garland, directed that FBI agents be diverted from serious, violent and sexual crime investigations to focus on misdemeanor January 6th investigations.[11] In many cases, J6ers were subjected to early morning

---

[8] See Ken Silva, "Online Sleuths who Hunted J6ers were FBI Informants," Headline USA, Jan. 21, 2026, https://headlineusa.com/online-sleuths-who-hunted-j6ers-were-fbi-informants-new-docs- reveal/

[9] See D.C. Law, Ch. 3A § 5–331.03. Policy on First Amendment assemblies. "It is the declared public policy of the District of Columbia that: (1) Persons and groups have a right to organize and participate in peaceful First Amendment assemblies . . . and to engage in First Amendment assembly near the object of their protest so they may be seen and heard. . ." (2) "MPD shall not engage in mass arrests of groups that include First Amendment assemblies or that began as a First Amendment assembly unless MPD: . . . (B) Has issued an order to disperse . . ." See also ACLU, Demonstrating in D.C.: Know Your Rights (2025); Metropolitan Police Department, First Amendment Demonstrations (2021).

[10] See, e.g., Adderley v. Florida , 385 U.S. 39 (1966) (upholding trespassing convictions for student protestors at a jail; but unanimously stating that such protesting at a legislative capitol would be a defense to trespassing charges); Edwards v. South Carolina , 372 U.S. 229 (1963) (ruling that the First Amendment forbade state government officials to force a crowd to disperse when they are otherwise legally marching in front of a state capitol).

[11] Note that such staffing decisions are administrative, rather than prosecutorial, decisions.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

paramilitary arrest-raids despite previously contacting FBI through attorneys to arrange peaceful meetings or surrenders.

110. Prior to January 6th , most FBI agents had never arrested anyone for misdemeanors (as such offenses are generally initiated by citations). However, in furtherance to the conspiracy to commit insurrection and sedition, Wray and Garland implemented the "shock and awe" program. They directed that armored FBI, and paramilitary SWAT-style tactical teams with military equipment descend on the homes of J6ers who were accused of being misdemeanants. Wray and Garland directed that the raids be conducted in a terrifying manner, with explosives and battering rams and teams of agents displaying masks, helmets, body armor, and semi-auto and automatic rifles.[12]

111. Wray's agents smashed and tore off the Plaintiffs' doors and gates, using flashbang grenades to traumatize the Plaintiffs. Wray's agents also commanded that local police assisting in the terror raids turn off their body cameras, often in direct violation of local police policies. That was done so that there would be no evidence of how they treated the J6ers.

***Overzealous Prosecution As "National Security"***

112. Garland, Graves, Wray and the other federal officials gave countless public statements describing the J6 demonstration in the course of their employment and accused the J6ers of attacking the Capitol, Congress, and even democracy, itself.[13] Those officials peppered their pleadings, complaints and arguments with national security justifications and false

---

[12]Upon information and belief, no accused J6er (out of more than 1,500) offered any violent resistance or obstruction during these arrests and abusive raids.

[13]Confirmation hearing, January 2021. When nominated, Mayorkas said if confirmed, he would do "everything I can" so that such an assault on the legislative branch and symbols of democracy would not happen again.

defamatory language.[14] In accordance with this "national security" artifice, these officials spent the next four years feverishly preventing J6ers from arguing or even invoking the protections of the 1 st Amendment.

113. Each J6 criminal prosecution began with government motions for protective orders, based on fake 'national security' grounds. The motions prevented J6ers and even judges from discovering the DOJ's concealed deceptions and fabrications, and it prevented the public from assisting J6ers. The DOJ falsely proclaimed that the locations of overhead cameras at the Capitol (which millions of people had seen while touring the Capitol) were so top secret that "national security" would be jeopardized if J6ers were able to share surveillance camera footage with the public.

114. The United States designated much of the discovery "sensitive" so that J6ers could only view it in the presence of their attorneys. This prevented many J6ers from putting on a defense because they lived at great distances from their attorneys.

115. The officials' true reason for demanding the protective orders was to keep the public from being able to identify undercover operators in the J6 crowds; which would have revealed the true scope of government entrapment and government distortion.)

***The "Capitol Siege" Section and The Application of Military Language And Techniques to J6 Investigations.***

116. The United States named the DOJ unit prosecuting the J6ers the "Capitol Siege Section," using terminology rooted in military strategy with no criminal-law meaning.[15] They

---

[14]See Luke Barr and Alexander Mallin, "AG Garland testifies Jan. 6 insurrection was 'most dangerous threat to our democracy," ABC News , May 12, 2021 ("Attorney General Merrick Garland told the Senate Appropriations Committee on Wednesday that he has not seen a more dangerous threat to democracy than the "invasion" of the Capitol on J6, which he called in written testimony a "heinous attack" and "intolerable assault.")

[15]A siege refers to a military operation in which armed forces surround a place, usually a fortified city or stronghold, with the goal of cutting off essential supplies and forcing the enemy to surrender.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

established a website for the "Siege" section.[16] That unit, which was operating to support the sedition, insurrection, and treason against the President of the United States, ironically loaded its charging documents with military language, ironically referring to the J6ers as the "insurrectionists" and focused on "breaches" of "perimeters," and "storming" the Capitol. DOJ pleadings constantly referred to the demonstration as "the attack" on the Capitol.

117. Pursuant to their plan against the government of the United States, Graves, Garland, and other federal officials turned J6 prosecutions into acts of partisan warfare. They invited DOJ lawyers who politically opposed Trump and MAGA conservatives to relocate to D.C. and "join this mission" because they "believed in the defense of democracy."[17] Those prosecutors viewed their investigations, not as justice inquiries into crimes, but as a "criminal inquiry into efforts to stop the peaceful transfer of power."[18] They were used by the true seditionists, insurrectionists, and traitors who rigged the election and then assisted in squelching any accountability in their effort to take over America.

***Involvement of the "National Security Division "[19] :***

118. Garland, Graves, and the other DOJ officials collaborated with the "National Security Division's Counterterrorism Section on many J6 prosecutions, treating the cases as

[16]https://www.justice.gov/usao-dc/capitol-breach-investigation-resource-page (now defunct).

[17]Ryan J. Reilly, "Jan 6 prosecutors describe 'shocking' 'gutteral' week after Trump's pardons," NBC News, Jan. 24, 2025, https://www.nbcnews.com/politics/justice-department/jan-6- prosecutors-describe-shocking-guttural-week-trumps-pardons-rcna188970 (accessed 10/1/2025).

[18]Ryan J. Reilly, "As Jan 6 probe expands, officials worry DOJ resources are at a breaking point," NBC News, July 29, 2022, https://www.nbcnews.com/politics/justice-department/jan-6-probe-expands-officials-worry-doj- resources-are-breaking-point-rcna40208 (accessed 10/1/2025).

[19]Note that the DOJ's "National Security Division" has a stated mission which strays markedly from a pure prosecutorial mission: "The mission of the National Security Division is to protect the United States from threats to our national security by pursuing justice through the law. The NSD's organizational structure is designed to ensure greater coordination and unity of purpose between prosecutors and law enforcement agencies, on the one hand, and intelligence attorneys and the Intelligence Community, on the other, thus strengthening the effectiveness of the federal government's national security efforts."



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

counterterrorism efforts.[20] Garland, Graves, and other officials explicitly proclaimed that J6 verdicts were obtained through the "National Security Division's Counterterrorism Section."[21] J6 convictions were described as " battlefield victories ." DOJ spokesmen proclaimed that the DOJ was bringing "accountability to [J6ers] who attacked our democracy on January 6." The United States' use of the Joint Terrorism Task Force invoked national security weaponry over matters that had nothing to do with terrorism.

***Selective Targeting and Prosecution of J6ers***

119. Over the years, similar or even greater intrusions by demonstrators at the Capitol had been punished with $25 or $50 fines, even for protestors who forcefully occupied Capitol spaces and refused and resisted orders to leave or remove them. However, the officials in this case selectively prosecuted the Plaintiffs herein with unique charges never applied in similar circumstances, vindictively escalated to life-crushing felonies for the vast majority who insisted on trials.

120. Similarly situated individuals, those who engaged in violence, property destruction, or disruption of government functions during 2020 protests, were not prosecuted with comparable vigor or at all. That selective enforcement was based on the Plaintiffs' political viewpoints and was orchestrated at the highest levels of the DOJ and FBI who participated in the sedition, the insurrection, and the treason to take over the United States.

[20]For example, in a January 6, 2025, press release on the San Diego U.S. Attorney's Office's role, GARLAND's DOJ stated: "These cases are being prosecuted through a collaboration led by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

[21]For example, GARLAND's November 7, 2023 press statement that "This case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

121. Even past demonstrators who had disrupted the precise, identical proceedings ,[22] on prior January 6th dates had been given $50 fines. Figure l. Three protestors arrested on Jan. 6th , 2017, got $50 fines for disrupting the identical certification ceremony. There were no claims of Secret-Service "restricted areas" for such demonstrators, despite the presence of VP Biden.

122. There were even demonstrators who committed the precise, identical conduct of picketing or parading at the Capitol alongside and surrounded by J6ers, who never feared arrest because they were anti-Trump, pro-Biden protestors. For example, a pro-government extremist demonstrator named Patricia Eguino was never arrested by the Biden DOJ because she was a Democrat, despite Ms. Eguino brazenly holding political pickets on January 6, 2021, on the upper east terrace of the Capitol. Figure 1Democrat, anti-Trump protestor Patricia Eguino taunting J6ers with a political banner. Those around Ms. Eguino were prosecuted; Ms. Eguino was not.

123. Even demonstrators at the Capitol who forcefully or violently disrupted official proceedings in years past were given $50 fines, if prosecuted at all. Several notorious pro-Democrat protestors have been detained many times each for obstructing congressional proceedings, but were never prosecuted for 20-year felonies

124. The officials herein turned a routine Capitol protest and 6-hour delay[23] of Congress into the largest and most expensive investigation in American history, with an overarching aim of chilling and suppressing the expression of particular viewpoints and grievances. The officials

---

[22] See Zoe Tillman, "Protesters Arrested As Congress Certifies Trump's Victory," Buzzfeed News, January 6, 2017 https://www.buzzfeednews.com/article/zoetillman/protesters-arrested-as- congress-certifies-trumps-victory (accessed 1/10/2026) (saying protestors Renaldo Pearson, Tania Maduro, and Ryan Clayton "were each charged with one count of disruption of Congress, a misdemeanor that carries a maximum penalty of six months in jail." "The protesters were released Friday evening after posting and then forfeiting $50, a process under District of Columbia law available for certain low-level misdemeanors that resolves the charges.")

[23] Note that other protests at the Capitol have shut down Congress for much longer periods. For example, the Kavanagh confirmation protests in 2018 stopped and disrupted proceedings for days. The May Day protests of 1970 also disrupted Congress for days. The Bonus Army occupation of the 1930 shut down congressional proceedings for many days.

fabricated evidence, concealed and withheld exculpatory evidence, made knowingly false statements in affidavits, pleadings,[24] and official proceedings related to the Plaintiffs' prosecutions, and exaggerated, concocted and manufactured threats and injuries, to secure wrongful charges, convictions and sentencings.

125. Note that the systematic targeting of a class of people due to affiliation with a politically unpopular or ousted ideology is administrative rather than prosecutorial conduct. Reno v. AADC , 525 U.S. 471 (1999). The participation of silencing dissent of the rigging of the Election was a carrying out of the aims of the conspiracy to commit sedition, insurrection, and treason by all involved.

126. Moreover, the conspiracy was committed by learned judges who were onboard to make sure that the sentences for J6ers were by far the harshest in U.S. history for political protesting, rioting, or demonstrating of any kind. Indeed, the longest prison sentences for J6ers were many times longer than those for any comparably-situated political demonstrator or rioter in history, and the 1st , 2nd , and 3rd highest individual misdemeanor fines in U.S. history were all imposed on J6ers.[25] Perhaps, some judges should be investigated and prosecuted for their horrendous conduct. No recommendation as to judges is being made, but treason is treason, and

[24] The Statement of Facts presented by the government in Tommy Allan's case is illustrative: "Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. . . At least one of the subjects carried a handgun with an extended magazine." Each of these statements is false. The most serious injury to any officer was a broken finger. The most common injury was "pain." No officers died as a result of injuries from J6. No member of Congress was ever in the same room as any demonstrator. No J6er was ever accused of entering the Capitol with a firearm. United States v. Tommy Allan , Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 Page 5-6 (emphasis added).

[25] J6er Rebecca Lavrenz now holds the all-time record with a $103,000 fine. The second heaviest fine in history for a misdemeanor was levied on another J6er, Brady Knowlton ($75,000). Third place seems to be a tie with criminal defendant named Robert J. Brenna Jr. (New York) who paid a $25,000 fine in 2003 for violating the Clean Water Act (the highest until January 6. J6er Paul Johnson's $25,000 fine apparently tied Brenna's 2003 fine for third place.)

donning black robes should not protect anyone from being charged with treason if it is a crime committed.

127. Wray's FBI illegally placed J6ers on Terrorist Watch Lists and "SSSS" flight restrictions which subjected them to extra security measures during air travel, including strip searches.

128. The United States de-banked and facilitated the debanking of J6ers so that J6ers were denied access to credit institutions. The United States also secretly directed and facilitated the deplatforming of J6ers from social media.

129. Acts such as spreading disinformation, imposing a program of shock-and-awe[26] pre-dawn paramilitary SWAT-style raids to terrify and traumatize arrestees (causing numerous suicides, attempted suicides and miscarriages), setting up a snitch line to maximize arrests and social division, staging deployments of explosives against accused misdemeanants,[27] certifying the world's most expansive general search warrants in history without probable cause,[28] materially supporting private vigilante groups to hunt down suspected J6 demonstrators, throwing out settled pretrial detention standards to keep nonviolent J6ers behind bars without convictions,[29] placing

[26]See Scott Pelley, "Inside the prosecution of the Capitol rioters," 60 Minutes, March 22, 2021 https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03- 21/ (accessed 5/19/2025) (Acting US Atty Michael Sherwin explained that "our office wanted to ensure that there was shock and awe …. And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, "If we go there, we're gonna get charged."; Jonathan Turley, "How Prosecutors Turned January 6 Rioters into Rioters," New York Post , Jan. 20, 2025, https://nypost.com/2025/01/20/opinion/how-prosecutors-turned-january-6- rioters-into-martyrs/ (accessed 5/18/2025) ("The Justice Department set out to send a chilling message to the nation. In an interview with CBS News a year later, Justice Department official Michael Sherwin indicated that they wanted to send a message with the harsh treatment of defendants.").

[27]See Burns v. Reed , 500 U.S. 478 (1991) (prosecutors do not have absolute immunity when giving legal advice to police regarding investigative stages of case, as such conduct is more administrative/investigative).

[28]See Kalina v. Fletcher , 522 U.S. 118 (1997) (certifying facts in an affidavit for probable cause was not entitled to absolute immunity—only qualified).

[29]In February 2021, the DOJ worked with Chief Judge Beryl Howell to create guidance for whether J6ers should be granted pretrial release. The "Chrestman 6" (or "Chrestman factors"). United States v. Chrestman (Case No. 21-mj-218). Howell granted the government's motion for review of a magistrate's pretrial release order, stayed the release, and ultimately ordered pretrial detention. The six factors were (1) felony or misdemeanor, (2) "the extent of the

Americans on watch lists, facilitating the de-banking of U.S. citizens, concealing and withholding the role and numbers of undercover government operatives and informants among demonstrators on January 6th, applying constrained 20-year-prison "obstruction-of-official-proceeding" charges to political demonstrators, punishing J6ers who refuse to plead guilty with retaliatory charges commanding 40-times-greater sentences, and threatening or arresting defense witnesses to prevent the J6ers from defending themselves are administrative, "national security," and investigatory conduct; not prosecutorial advocacy.

***Prosecutors***

130. Acting U.S. Attorney for D.C., Michael R. Sherwin, was responsible for organizing his Assistant U.S. Attorneys ("AUSAs") and pursuant to the plan to take over the United States, attempted to blame President Donald J. Trump for sedition, when he, himself, ironically, was actually the one who was guilty of the claim.

131. John Crabb Jr. was the Chief of the Criminal Division of the Office of the U.S. Attorney in D.C. and was the direct supervisor of Thomas Windom on the January 6th Detail. J.P. Cooney acted as Deputy Special Counsel to Jack Smith. These two commenced investigations against President Trump and "individuals within his orbit" regarding the leadup to J6, in their attempt to accuse Donald Trump of insurrection, and offered false testimony to the J6 Select Committee. One of the worst conspirators who conspired with Jack Smith as his deputy, was Molly

---

defendant's prior planning," (3) whether the defendant used or carried a weapon, (4) evidence of coordination with other protesters (5) whether the defendant played a leadership role, and (6) the defendant's words and movements during the riot. This framework helped keep nonviolent J6ers in jail indefinitely; J6ers needed to pled guilty or be held through trial. It was the first time an entire category of defendants were subject to special bail rules that didn't apply to others. And the Chrestman factors added factors for pretrial release beyond what the Bail Reform Act required. And the Bail Reform Act, 8 U.S.C. § 3142, enacted during the tough-on-crime Reagan presidency, was itself controversial for expanding pretrial detention. See United States v. Salerno , 481 U.S. 739 (1987).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Gaston, who took pride in announcing that a grand jury had returned a true bill in August of 2023 against President Donald J. Trump.

132. Gregory Rosen was the Chief of the Capitol Siege Section, Breach and Assault Unit in the office of the U.S. Attorney for D.C. It was his office working in conjunction with the above-named conspirators. He worked together with Prosecutors Carlos Valdivia and Samuel White who, in a Taranto sentencing memorandum which they field, they described J6 as "a mob of rioters," consistent with the needs of the seditionists, insurrectionists, and traitors to the United States. Their work was part and parcel of the destruction of the tip of the spear of objections to the election which had been rigged.

***Judges Joined the Prosecutors in Subjecting J6ers to Unprecedented Treatment.***

133. The most disappointing aspects of the takeover of the United States by foreign forces and Left Wing/Globalist extremists were the way that the vast majority, but not all, of the District Court Judges and Magistrate Court Judges were united between themselves in the District of Columbia to destroy the lives of the J6ers. All of their actions which were done beyond the bounds of reason and were unwittingly in furtherance of the purpose of sedition, insurrection, and treason against the United States of America. This was a demonstration of how effective the Globalists were in misleading the public and the judges. It is completely understandable that a judge who saw and watched and then saw accounts of what occurred on J6 would think that the J6er on trial was evil. Unfortunately, the judges were all fooled into believing the scenario which appeared to be real, but was not.

134. Of all of the judges, though, there was one who knew or should have known the truth, U.S. Magistrate Judge Moxila A. Upadhyaya who was one of the most extreme in her anti-J6er rhetoric and rulings. She was surely a fox in the henhouse who had her own goals and agenda.

Prior to her being appointed as a Magistrate Judge, she was an attorney who represented the one who was the key to exporting election equipment and its insidious programing designed to control the results of the Election, the President of Venezuela, himself, Maduro. Maduro was her client. Her conflict of interest was not only real. It was extreme. The J6ers were 100% opposed to the one responsible for rigging the Election and that was Magistrate Judge Upadhyaya' former most important client.

135. Not all, but almost all of the D.C. District Court judges and the Magistrate Judges willfully acted under the color of law to deprive j6ers of their rights including due process and their First Amendment rights.

136. The judges of the D.C. District and Circuit were witnesses to the events of J6, because the U.S. Prettyman Courthouse is adjacent to the Capitol Grounds and the judges had watched the events from their courthouse windows.[30] Normally such personal observation of supposed crimes would require recusal or transfer of venue. Nonetheless, the judges uniformly denied motions to disqualify them or to change venue.

137. Forcing J6ers to defend themselves in D.C. meant that the proceedings were tilted in favor of the prosecution. Polls showed that D.C. residents regarded themselves as victims of J6ers and prejudged J6ers to be guilty. Polls also showed that D.C. residents wanted J6ers punished by life imprisonment or the death penalty.

138. Moreover, the residents' local elected officials had all made points of singling out J6ers for abuse. DC city officials had even held townhall lectures and park presentations against J6ers. The DC mayor had issued parking bans and requests for businesses to shut down in advance

[30]During closing arguments in the biggest J6 trial, the Proud Boys trial of December 2022-April 2023, prosecutors finished by drawing jurors' attention to the proximity of the courthouse to the action of J6. This was intended to impress upon the jurors a sense of personal fear and attachment to the facts of the case.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

of J6. The DC mayor also ordered business to close early on the evening of J6. (Later, J6ers would be prosecuted under 18 U.S.C. §231 for adversely affecting commerce; and prosecutors even presented business managers as witnesses to the J6ers' supposed harm to the economy—bearing profit/loss data.)

139. The judges of the D.C. District also agreed with prosecutors that J6ers could never offer evidence regarding the improprieties of the 2020 presidential election. This was basic exculpatory evidence regarding innocent motive. But these judges' rulings did not stop the judges themselves from pronouncing, as supposed fact and law, that the 2020 election was properly won by Joe Biden as an aggravating factor at sentencings.

***The United States' Novel Theories of Law and Abuse of Statutes To Maximize Imprisonment of Plaintiffs.***

140. The United States, which had been taken over by foreign and domestic forces who continued the conspiracy of sedition, insurrection, and treason against the United States used novel theories of law[31] to target the Plaintiffs for false charges such as "obstruction of official proceedings" and "entering and remaining in a restricted area."

141. While there are federal trespassing statutes which explicitly apply to the U.S. Capitol,[32] such statutes provide only a petty offense and plainly exempt mere presence in public

[31] For example, many J6ers who merely walked or stood in places were convicted of "disorderly conduct" based on a theory (the "raindrop theory") that Jan. 6 protesters shared equal guilt for rioting, like raindrops that join to create a flood. See, e.g., United States v. Rivera , 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field."). The government also used "Seditious Conspiracy" charges against Oath Keeper and Proud Boy leaders based on a notion that U.S. citizens protesting the outcome of an election qualified as an attempt to "overthrow" the government.

[32] 40 U.S.C. § 5104(e) (2) Violent entry and disorderly conduct.--An individual or group of individuals may not willfully and knowingly-- (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House; (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House; (C) with the intent to disrupt the orderly conduct of official

areas where most J6ers walked and demonstrated. For Garland and Graves to act according to their plan, they chose to use an ill-fitting Secret-Service "restricted area" statute, 18 U.S.C. §1752I(B), to maximize penalties and imprisonments of the Plaintiffs. However, §1752 focuses on the authority of the Secret Service (SS) to create temporary restricted areas around certain federal protectees.

142. The use of the §1752 statute required constant deception and fabrication of claims and evidence by DOJ prosecutors. Knowing that the Secret Service had never formally "restricted" the Capitol on January 6th, and knowing that any designations or indications were insufficient, Garland and Graves' prosecutors retreated to a contrived argument that the Capitol Police had restricted the Capitol on January 6th on behalf of the Secret Service.[33]

143. While the D.C. Circuit later upheld this artifice,[34] at trials of J6ers, prosecutors presented a preposterously large, "restricted area" concept map around a single protectee (Vice President Mike Pence) (who was as far as a half-mile or more away from most J6ers at any given time).[35]

---

business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of-- (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress;

[33] At J6 criminal trials, GARLAND and GRAVES (DOJ) presented nothing but a memo announcing a construction closure on the west side and a series of emails announcing the scheduled movements of V.P. Pence as supposed evidence of the "restrictions."

[34] United States v. Neely , No. 23-3166 (D.C. Cir. Dec. 27, 2024) (affirming J6 the Defendant Darrell Neely's conviction under 18 U.S.C. § § 1752(a)(1) despite the fact that the restrictions had not been designated solely by the Secret Service).

[35] Note that for a year, the first J6 indictments falsely alleged there were TWO Secret-Service protectees at the Capitol: Kamala Harris and Mike Pence. But it was finally revealed that Kamala Harris had been at the DNC headquarters during the time and not at the Capitol. Upon information and belief, government officials had secretly staged a false flag operation involving Kamala Harris and government-placed "pipe bombs" at the DNC. But for reasons unknown, these government officials had canceled the scripted pipe bomb event or altered their intended storyline. Of course, this means that for an entire year, the United States presented false statements and fabricated evidence to grand juries regarding the location of V.P.-Elect Harris. Throughout 2022, the DOJ returned to the grand juries to obtain superseding indictments to correct this false information. The Secret Service deleted all text messages relating to these matters so as to obscure the truth.

144. Garland and Graves' use of §1752I(B) yielded absurd results. For despite the Garland DOJ's concocted claim that the Capitol Police were proxies for the Secret Service in "restricting" the Capitol on January 6th, the Garland DOJ simultaneously argued that the Capitol Police had no authority to 'unrestrict' any area of the Capitol, such as by opening doors, opening barricades, or inviting J6ers into the Capitol.

145. Certain unknown officers of the Secret Service were also part of the conspiracy to knowingly and deceptively delete all text messages relating to the matters of January 6th, to prevent the Plaintiffs and the public from knowing the truth and to assure that the evidence was not available to those charged for violations of law.

146. As a result, many innocent J6ers (including all of the Plaintiffs) were wrongly convicted through trickery as well as entrapment.

147. Thus, each J6 criminal prosecution was a collection of planned absurdities and fabrications. In J6 trials, prosecutors were also part of the conspiracy. They asserted that the mere presence of whiffs of smoke or pepper spray or sounds of alarms ringing, or even the sight of rolls of plastic fencing laying on grass nearby were proof of the mythical "restrictions."

148. There is no way that the prosecutors, under Graves' supervision, did not knowingly deceive jurors and judges by emphasizing signs which were not seen by individual J6ers, but which had been erected and then taken down hours before J6ers arrived, or were hundreds of yards away, or laying on the ground .

***They Were Out to Destroy J6ers***

149. This was all part of the plan to repress the J6ers and the other waves of concerned Americans who would have followed. The plan was to cause as much harm to all J6ers, including the Plaintiffs, as possible, to destroy their lives in every way possible. The point was that to make



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

examples of the J6ers and blame them for being rioters and insurrectionists, they would lose all credibility and their freedom to continue to protest. This was the leading edge of stemming opposition to the rigged election. Worse, the plan worked.

150. While the J6ers were on the grounds, Metropolitan Police used percussion grenades, rubber bullets, teargas, and ultimately CS Gas on the J6ers, and sprayed them in the face with pepper spray as they pushed them into the Capitol Building.

151. Then, months later, instead of making peaceful arrests, where J6ers would have surrendered themselves voluntarily, even where J6ers offered through counsel to be voluntarily arrested, the conspiracy dictated to do the most harm possible by smashing in their front doors of their homes in the early morning hours and then to pull them all out of their houses sometimes in frigid weather in their underwear and then hold them at gunpoint. Parents who had to stand were almost paralyzed for hours while their homes were ransacked as they stood watching the red dots from the laser sights of the guns and rifles on the chests of their children .

152. The misuse of the court system was to an extent where the District Court Judges and Magistrate Judges in Washington, D.C. became either wittingly or unwittingly part of the whole conspiracy.

153. For those who were imprisoned, in many circumstances, they were put in solitary confinement for extended periods because they were J6ers. In many circumstances, prison populations were falsely told that the J6ers were white superlists, and prison guards were falsely advised that the J6ers were responsible for the deaths of 5 police offices.

154. Every effort was made to destroy the lives of all J6ers possible and give them the harshest of all possible prison existences.

***The Government's Misuse of 18 USC §1512I(2)***

155. Merrick Garland's Department of Justice, also maliciously utilized a felony punishable by 20 years imprisonment, "obstruction of an official proceeding" under 18 U.S.C. §1512I(2) to punish J6ers who refused to immediately plead guilty to lesser charges, among other things.

156. From January 7, 2021, to January 20, 2025, Wray, Garland and Graves maliciously prosecuted the Plaintiffs with the bogus charge, "obstruction of an official proceeding" under 18 U.S.C. §1512I, without probable cause.

157. The statute was drafted by Congress as part of the Sarbanes-Oxley Act of 2002 following the accounting and auditing fraud revelations involving Enron and Arthur Andersen LLP. The legislative intent of the Act was that it was supposed to apply to evidence-destruction, bribery, or witness tampering associated with corruptly influencing official proceedings, resulting in erroneous outcomes.

158. Conspiracist Garland's prosecutors deployed the statute as an extremely punitive disorderly conduct law and a tool for compelling innocent J6ers to plead guilty to crimes they didn't commit. Prosecutors admitted that they used the same evidence for §1512 prosecutions as they did for misdemeanor disorderly conduct prosecutions. However, they used the threat of §1512 prosecutions to punish J6ers who defended themselves.[36] Moreover, the chilling shockwaves of

[36]A t least three dozen J6ers (at least 66 percent of all alleged misdemeanants who demanded trials) were charged with the bogus felony charges when they turned down misdemeanor plea offers. Tommy Frederick Allan; John D. Andries, Stephanie Baez, Richard Barnett were charged with misdemeanors; then superseded with felonies. (Sentenced to 45 mos.) Damon Michael Beckley, James Bonet, Larry Brock, Therese Borgerding, Dominic Box, Sara Carpenter, Jennifer Cudd started with two misdemeanors, which were quickly superseded with felony charges when Cudd indicated she would defend herself. David Davis, Derrick Evans, Simone Gold, Daniel Goodwyn, Derek Gunby, Brian Gunderson, Joseph Irwin, Leo Kelly, Deborah Lee, Larry Ligas, Kevin James Lyons, and Patrick Montgomery all had similar experiences. Darrell Neely was initially charged with 5 misdemeanors, then superseded with felony § 231 counts after declining plea offers (ultimately acquitted at trial of the felony § 231 count.). Michael Oliver as was charged with 4 standard misdemeanors on 12/8/21. A year later, after rejecting a plea, Oliveras was charged with a felony §111 assault charge, ultimately sentenced to 5 years. Nicholas Rodean was charged with misdemeanors on 01/29/21 and then indicted on March 19, 2021, with §1512 and felony destruction of property charges. Mark Sahady was charged with misdemeanors until rejecting a plea; then his misdemeanors were superseded with a §1512 charge.

these vindictive charging decisions reverberated throughout the J6er community, causing many innocent J6ers to falsely plead guilty to crimes they didn't commit.

159. The Supreme Court recognized the United States' improper use of §1512 on June 28, 2024, striking down the application of §1512I(2) except in cases where "the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in an official proceeding." Fischer v. United States , 603 U.S. __ (June 28, 2024).

***Garland's DOJ Weaponized the Use of Vindictive Superseding Indictments To Punish J6ers Who Insisted on Their Constitutional Rights.***

160. The vast majority of J6ers were initially prosecuted for misdemeanors. However, there were only 23 misdemeanor J6 trials. This is because (1) the vast majority (over 66%) of J6ers who insisted on misdemeanor trials were denied such trials. Rather, they were charged with bogus

Grayson Sherrill was charged with 4 standard misdemeanors on 04/06/21 which were then superseded on 12/15/21 with several felonies. Hatchet Speed was charged with 4 standard misdemeanors, then hit with §1512 charge after rejecting a petty misdemeanor plea offer. Christopher Spencer was charged with 4 standard misdemeanors on 02/23/21 which were superseded with a §1512 charge on 03/10/21. Yvonne St. Cyr was charged with two misdemeanors on Feb 12, 2021, offered a probation plea deal and hit with two felony §231 charges in May 2022 upon rejecting an offer. St. Cyr was convicted on all counts by jury in March of 2023 and sentenced to 30 months in prison. John Strand was charged with two misdemeanor and then with additional §1512 counts. He was offered a misdemeanor "entering and remaining" deal but rejected it. (Co-Defendant Simone Gold accepted and got 60- days). Strand got 32 months in prison. John George Todd III was charged with the four misdemeanors for two years and then, just nine days before trial after rejecting a plea offer, was charged with a 20-year-felony, 18 U.S.C. §111(b) assault causing bodily injury (officer cut his own finger inside the Capitol while tugging at Todd's tiny fiberglass flagpole). Later, prosecutors added a §1512 obstruction charge after Todd asserted privilege to testify before grand jury. Todd was ultimately sentenced to 5-year prison term. Anthony Robert Williams was charged on 3/24/21 with 4 misdemeanors; then superseded on 5/26/21 with §1512 and ultimately sentenced to 5 years imprisonment. After Fischer nullified Williams' conviction, DOJ vindictively superseded again with felony §231 charge on 12/18/24. There are also a handful (e.g., Nicholas DeCarlo, Nicholas Ochs, Robbie Norwood, and Williams (above)) who briefly overturned their felony convictions (due to the Supreme Court's Fischer decision) and then were poised for release or retrials on misdemeanors—only to be charged with other superseding felony charges. This list is substantially larger than the number of J6ers who were allowed to have misdemeanor trials (reported to be around 23). See Michael Kunzelman, "To plead or not to plead? That is the question for hundreds of Capitol riot the Defendants," AP News , Jan. 5, 2024, https://apnews.com/article/capitol-riot-anniversary-sentencing-data- c0a60a2ba68a70645bd5f9e5bcc45324 (accessed 10/25/2025).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

superseding felonies, and (2), other J6ers, aware of the DOJ's insidious practice, falsely pled guilty to crimes they did not commit in order to save their lives and careers.

161. J6 criminal defense lawyers frequently reported that their J6 clients were offered "petty" misdemeanor offers, meaning the J6ers were invited to plead guilty to offenses punishable by under 6 months' jail time. However, when the J6ers rejected such offers, as a matter of course, they were punished with 20-year-felony charges.[37]

162. No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered anything near a 40-to-1 ratio of vindictive charge escalation.[38] Even twice is abusive, least 40 times!

***A Machine for Generating Guilty Pleas***

163. Above all, the government's practice of steep charge escalation was a machine for generating guilty pleas, including false guilty pleas. It wasn't long before J6ers began to pronounce that they were being railroaded into pleading guilty to crimes they did not commit, being forced to submit to avoid the threatened lengthy prison sentences.

---

[37]See, e.g., Josh Gerstein & Kyle Cheney, "Two federal prosecutors were placed on leave hours after describing Jan. 6 as an attack by 'a mob of rioters.'" Politico , Oct. 30, 2025, https://www.politico.com/news/2025/10/30/sentencing-memo-january-6-attack-00631013 (accessed 11/21/2025) (saying "defense attorney Carmen Hernandez said Taranto was only facing charges over the 2023 incident because he turned down an offer last year to plead guilty to misdemeanor charges related to the J6 riot."). See also the September 2024 interview of Brian Korte on the Brian Lupo show "Inside J6 w/J6er Brian Korte," Inside J6 with Brian Lupo , Sept. 18, 2024 (https://rumble.com/v5fgsfp-inside-j6-w-j6er-brian-korte.html (accessed 11/24/2025) (saying J6er Brian Korte pled to 4 standard after being threatened with prosecution under §1512).

[38]Compare North Carolina v. Pearce , 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry , 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5-7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes , 434 U.S. 357 (1978)(defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); United States v. Goodwin , 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***Misuse Of 18 U.S.C. §231 and Brady Violations To Conceal Economic Prosperity Brought by J6ers***

164. Prosecutors also maliciously misused the federal rioting statute, 18 U.S.C. §231, which criminalizes resistance to authorities during "civil disorders" which "affect commerce." Congress obviously contemplated that the statute would apply to typical riots with property damage, looting and arson in mind. Yet in J6 prosecutions, Garland's Justice Department concealed and withheld evidence that J6ers had boosted the local D.C. economy, bringing profitability to the city's hotel and restaurant industries which hadn't been seen for months prior and after.

***A Systematic Program of Vindictive Prosecution***

165. Under conspirators Garland and Graves, vindictive prosecution became a science. There were 23 misdemeanor J6 trials. However, at least 35 accused J6er misdemeanants who demanded trials were punished with felony charges instead. This means that at least 66% were denied their constitutional right to trials.

***The Biggest Mass Brady Violation in Legal History***

166. Although prosecutors are under constitutional obligations to disclose exculpatory evidence, conspirators, Garland, Graves, and their underling prosecutors knowingly withheld the most basic exculpatory evidence from accused J6ers, including evidence that refuted central features of their false allegations; including:

a. Evidence that the DOJ had been carefully planning the J6 event since at least August 2020[39] and had planted hundreds of undercover government operatives and

[39] See John Solomon and Steven Richards, "FBI Secretly Prepared for Disputed Election and Political Violence in 2020, Bombshell J6 Memos Show," Just the News , Feb 9, 2026 (saying the FBI conducted a tabletop exercise in



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

agents amidst the crowds on January 6, 2021.[40] The United States concealed the information for years. Then FBI Director Wray, in furtherance of the conspiracy to take over America, lied and lectured congressmen for accusing the FBI of planting informants or agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicts multiple official sources, FBI Director Christopher Wray falsely testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6th. Those lies were finally revealed in September 2025 when facts showed there were 274 undercover FBI at the scene; after hundreds of J6ers had been misled into falsely pleading guilty to crimes they did not commit.

b. Evidence showing the United States' claims of "140 officer injuries" were bogus and exaggerated, and that the most serious injury suffered by any officer on J6 was a broken finger.

c. Evidence from pre-event and post-event meetings involved acknowledgement of exculpatory and material facts (including wrongdoing and excessive force by police which stoked J6 violence).

summer 2020 that led to development of strategies like undercover informants and mass prosecutions for minor crimes that it would later use with the Jan. 6 Capitol riot).

[40]Documents were declassified on September 25, 2025, which revealed that there were some 274 undercover plainclothes FBI agents among the crowds on January 6. This withheld evidence led criminal defendants (and defense attorneys) to falsely plead guilty or counsel J6ers to falsely plead guilty. In furtherance of their conspiracy to rig the 2020 Presidential Election and to take over the government of the United States, Former FBI Director WRAY lied and concealed this information for years and lectured House Republicans for accusing the FBI of planting informants/operatives/agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicted multiple official sources, FBI Director Christopher Wray testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6.

d. Evidence (including the presence of hundreds of armed, filming, recording , plainclothes agents on J6).[41]

e. Evidence from a team of undercover Capitol P.D. officers positioned above the west front lines, filming the action below. These officers would go into the Capitol, and at the end of the day they filmed curfew arrests. However, the government has not produced everything they recorded.

f. Evidence of officers committing police brutality against J6ers on a massive scale, which would have altered the United States' public J6 narratives.[42]

g. Evidence of the presence of large numbers of Antifa and Black Lives Matter rioters instigated aggressive and offensive conduct for which innocent Trump supporting J6ers were accused.

h. Text messages and other communications by U.S. Secret Service about the events of January 6th, including "pipe bomb" claims, the movements of Trump, Pence, and Harris, and the falsity of restricted areas at the Capitol.

167. The nondisclosed evidence that J6 prosecutions had been staged, set up, and pre-planned in advance in wargaming and tabletop exercises months in advance was also concealment

[41]As it turns out, , hundreds of plainclothes FBI agents filmed J6 events and recorded their and others' expressions, excited utterances and present-sense impressions which would have been exculpatory for many J6ers. Upon information and belief, these withheld recordings would have likely shown that the Capitol grounds were not as restricted as government trial testimony had claimed. Yet these many recordings were hidden and withheld from J6 defense counsels.

[42]One notorious example involves footage of officers kidney punching a J6er over a dozen times as the J6 cried in anguish. The officer hurt his hand. The full footage was initially posted on http://Evidence.com. Then on Christmas Night, Dec 25th, 2021, at 9pm, the footage was removed, and an edited version replaced it. The video abruptly ended before the beating. The notes by the investigator stated unambiguously that "The BWC was rattled, causing the Body Worn Camera to be shut off." Then, a NEW video popped up, where the beating had ended, but the BodyCam footage resumed. See also https://x.com/FreeStateWill/status/1693613732633460866 (accessed 6/3/2026) (showing he second gap in McAllister's footage occurred in the tunnel as he and Lt. Bagshaw were beating the defenseless Victoria White in the head. For both gaps, McAllister's camera did not beep (as normal) when the recording resumed less than a minute later (thus showing the footage was likely edited by prosecutors after obtaining the video from officers).



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

that the J6 prosecutions were a conspiracy, administratively planned, in advance rather than legitimate acts of court advocacy in response to crimes. Not only did this withheld evidence keep J6ers from proving entrapment; but the evidence showed planning to entrap J6ers, in advance, by the United States and its officers.

168. As a consequence of these the United States withholding this exculpatory evidence, many defense lawyers counseled J6ers to falsely plead guilty. Those J6ers who went to trial, including the Plaintiffs, became wrongly convicted of crimes they did not commit.

***DOJ's Pattern of Vindictive Escalation of Charges and Penalties For the Plaintiffs Who Tried to Defend Themselves***

169. As described above, some of the Plaintiffs, were initially charged with just misdemeanors. However, when they rejected petty-misdemeanor (i.e., up to 6 months' imprisonment) plea offers and exercised their right to trials, the Garland Justice Department punished them with felonies in retaliation and without probable cause. In most cases the Garland Justice Department charged alleged misdemeanants with 20-year felonies. This 40-to-1 ratio was the most extreme ratio of escalation ever registered in any case in the history of federal courts.[43]

170. Almost all J6ers who demanded trials received prison sentences. In fact, the majority of J6ers who were initially charged with misdemeanors found themselves facing additional, felony, charges when they exercised their constitutional right to trials. This occurred

[43]No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered a 40-to-1 ratio of vindictive charge escalation. Compare North Carolina v. Pearce , 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served 43 after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). Blackledge v. Perry , 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5-7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). Bordenkircher v. Hayes , 434 U.S. 357 (1978)(defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); 43 United States v. Goodwin , 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).

amongst a jury pool composed of more than 90% Democratic voters where the jury conviction rate for J6ers was 100 percent. Prison sentences for J6ers who demanded trials on felonies averaged two years longer than sentences of J6ers felons who pled guilty.

171. This landscape of steep charge escalation and punishment led many J6ers to denounce the prosecutions and publicly proclaim they were wrongly convicted. In response, the DOJ threatened further retaliation against them.

172. Judges such as Chief Judge Beryl Howell explicitly agreed with the government's retaliatory charging of J6ers who turned down plea offers. Chief Judge Howell even excoriated a federal prosecutor who failed to add felony charges against a J6er who insisted on a misdemeanor trial.[44]

***The Government Turned J6 Sentencing Hearings Into Pageants of Exaggeration, Fabrication, and Blood Lust***

173. The Government demanded seizure of every penny crowdfunded for legal defense, as punitive fines. J6ers had difficulty finding public defenders who would zealously defend them. Moreover, in every case where J6ers sought to raise funds for their defense, the prosecutors demanded that every penny raised for legal defense be seized and turned over to the government.

**The DOJ Monitored Social Media, Seeking to Silence and Punish Attempts by the Plaintiffs and Their Attorneys To Alert the Public Regarding These Injustices.**

174. Under the Constitution, an accused has a 1st, 5th (due process) and 6th Amendment (fair trial/counsel/defense/confrontation) right to alert the public regarding injustices in the federal courts. Accused persons also have a constitutional right to plead for help in defense. The public

---

[44] In the case of United States v. Todd , Chief Judge Howell scolded a prosecutor for making her have a trial on misdemeanors. When the federal prosecutor responded that the DOJ had searched for felony charges to bring against Mr. Todd, Chief Judge warned the prosecutor that he was "running out of time."

also have 1st and 6th Amendment rights to be informed of injustices and to donate funds to fight injustice. However, Garland's Department of Justice scoured through J6ers' social media posts to identify memes, statements, podcasts, or interviews by each J6er regarding the prosecutions. Prosecutors filed pleadings to punish those J6ers who tried to alert the public regarding their treatment. Federal prosecutors even filed documents to sanction criminal defense lawyers who alerted the public about the unjust prosecutions.

175. The rigging of the 2020 Presidential Election which was followed by DOJ prosecutors imprisoning J6ers and attempting to keep the wrongful arrests, fines, and imprisonment secret from the public was in furtherance to the true insurrection which had rigged the election.

***Fabricated Sentencing Enhancements to Increase J6er Sentences***

176. In almost every trial where any J6er testified in his own defense (often because the J6er was forced to, because the DOJ systematically intimidated defense witnesses or precluded J6ers from presenting defense arguments unless the J6ers took the witness stand), the Government claimed the J6er lied during the testimony—invariably pointing at some subjective question—and then demanded a two-point sentencing enhancement for 'committing perjury.'

***Property Returned Damaged, Broken and Missing.***

177. Upon their release from the malicious charges, the Plaintiffs sought the return of property which had been seized by the FBI during their cases. The FBI returned their property damaged, missing and/or broken. The FBI returned cell phones and computers to J6ers with hard drives and files destroyed or missing.

178. The hard drives and SIM cards were missing probably because the Government withheld, hid, or destroyed them. Those drives and SIM cards contained images and videos taken

on January 6th which refuted and debunked the Government' bogus narratives. Thus, these acts of damage and theft constituted Brady violations as well as takings and/or negligence.

179. All of these items were fully functional and in good condition prior to the FBI's seizures.

***The AUSA Prosecutors Who Were Part of the Conspiracy To Commit and Cover-up the Insurrection and Treason***

180. The following are some of the prosecutors who conspired to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Merrick Garland, the U.S. Attorney General who supervised, guided and directed the grave national injustice herein described.

b. Matthew Graves (U.S. Attorney for D.C.), who implemented and imposed these abuses in the District of Columbia.

c. Greg Rosen, Chief of the Capitol Siege Section who oversaw the Capitol Siege Section, supervising hundreds of abusive prosecutors and J6 investigations. He supervised more than 1,000 prosecutions, trained and managed over 200 prosecutors and staff, and coordinated the abusive investigation and litigation from grand juries through trials and appeals.

d. Jeffrey Nestler, an Associate Deputy Attorney General at the U.S. Department of Justice, used blatant perjury in his rigged J6 trial of Oath Keepers. Mr. Nestler also concealed and withheld the evidence that would have exposed government perjury during the trial.[45]

---

[45]Blaze Media's October 2023 investigation found that witness David Lazarus's trial testimony was contradicted by extensive Capitol CCTV footage. Although Lazerus claimsed to witness a hostile encounter between Officer Dunn and Oath Keepers, analysis showed Lazarus was in a Senate office building when the encounter began and did not arrive at the scene until three and a half minutes after the last Oath Keepers had left the area. Officer Dunn's testimony



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

e. Jocelyn Ballentine supervised numerous abusive and malicious J6 prosecutions. Ms. Ballentine and Assistant US Attorney Jason McCullough approached Proud Boy leader Enrique Tarrio with a cooperation deal around October 2022 in which the government promised Mr. Tarrio's immediate release if Tarrio would falsely say that Donald Trump had directed the Proud Boys on J6. Ms. Ballentine is presently pursuing wrongful prosecution against an innocent black man to cover up the role of the government in the government's "pipe bomb" affair.

f. Brendan Ballou, an Assistant US Attorney (AUSA) who prosecuted several J6ers with sadistic zeal. Mr. Ballou fought for jury instructions that said there were no First Amendment rights at the U.S Capitol.

g. Ashley Akers prosecuted dozens of January 6th defendants, with a focus on exaggerated claims of "assault" on law enforcement officers. She perfected the art of vindictively prosecuting accused misdemeanants with felonies when they demanded trials. She presided over the Chris Quaglin investigation, where agents told a J6er he would never see his family again unless he testified against fellow J6ers.

h. Kyle M. McWaters was a leading orchestrator of escalated 20-year-felony charges against J6ers who turned down misdemeanor plea offers. Mr. McWaters refused to dismiss a false § 1512 conviction of J6er Hatchet Speed even after the Supreme Court struck down the use of the statute as a disorderly-conduct substitute. i. Michael Gordon, an AUSA who used his status to abuse J6ers. In at least one case Mr Gordon argued that J6ers who carried flags were committing assault with a deadly weapon because a plastic flagpole

also appears to have been inconsistent. Initially, he claimed Oath Keepers had de-escalated the situation, but his later accounts portrayed them as aggressors.

might poke someone's eye out. j. Sean Murphy, a particularly cruel prosecutor who vindictively and relentlessly prosecuted such J6ers as Stephanie Baez with a bogus §1512 charge when Baez insisted on her right to a trial. Even after the Fischer decision, Mr. Murphy refused to drop the false charge against Baez. Ms. Baez was hospitalized from stress and suffered several miscarriages during the ordeal. Ms. Baez was finally acquitted of the vindictive bogus charge at trial. k. Sam White vindictively charged J6ers such as Derek Gunby with false "obstruction of official proceeding" charges when they wouldn't plead guilty to misdemeanors. l. Alexis Loeb , like others in the conspiracy, used her position to vindictively increase charges against J6ers who wouldn't plead guilty. As former Deputy Chief of the Capitol Siege Section, Ms. Loeb played a senior leadership role in coordinating the section's abusive and malicious prosecutions. m. Lisa Monaco, deputy Attorney General from April 2021 to January 2025, publicly framed January 6th as an "attack on our democracy." Ms Monaco emphasized the heavy use of inapplicable felonies like 18 U.S.C. § 1512I(2) ("obstruction of an official proceeding") for many non-violent entrants. Under Ms. Monaco's direction, J6 prosecutions peaked before the 2022 and 2024 elections. Ms. Monaco also tried to pressure J6er James Giannakos into falsely saying the Proud Boys had followed Donald Trump's directions on January 6th. n. Barry Disney vindictively and maliciously added two 20-year felony charges (§1512 and §111(b) "assaulting an officer, causing bodily injury") against a J6er when the J6er testified before the grand jury in his defense. (The bogus "assault" charge was fabricated upon an officer's finger cut when the officer pulled on the J6er's fiberglass flagpole on J6.) o. Samantha Miller used Brady violations and false police testimony to obtain convictions against a



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

J6er. p. Francisco Valentini stalked social media accounts of J6ers and their lawyers to punish those who criticized the unjust prosecutions.

181. These prosecutors overcharged many participants in the J6 protest and weaponized the Justice Department by holding defendants in pretrial detention, lengthy delays, and denying due process and exculpatory evidence to J6ers.

***The District Court Judges Who Participated***

182. The following are some of the District Court judges who participated to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Judge Beryl Howell was the chief judge of the District of DC until mid-2023. Judge Howell worked hand in hand with federal prosecutors in the escalation of misdemeanor cases into felony cases when J6ers demanded trials. Judge Howell also aided federal prosecutors in concocting diminished rights to pre-trial release for J6ers in plain contradiction of settled appellate precedent. In fact, she inserted herself to overrule all decisions from Magistrate Judges in at least 17 different courts to overrule decisions where Magistrate Judges followed the law to release J6ers who were charged with J6 offenses based on criteria of law which did not apply. This included cases involving, but not limited to Tom Ballard, Richard Barnett, Jeffrey Scott Brown, Lisa Eisenhart, Eric Munchel, Scott Fairlamb, Doug Jensen, Cody Mattice, Timothy Hale-Cusanelli, Ronald McAbee, Brian Mock, Ethan Nordean, Christopher Quaglin, Zachary Rehl, Thomas Sibick, Jack Whitton, and Christopher Worrell. Judge Howell was the main protagonist who lead the judges of the District Court of the District of Columbia, and knowingly and intentionally was intent on removing Donald J. Trump from office by concealing the rigging of the Election. Her

conduct and that of the judges who follow in this section need to be examined by the Department of Justice and if applicable, they should be prosecuted for their complicity in the conspiracy to commit treason.

b. Judge Emmet Sullivan who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

c. Judge Trevor McFadden who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

d. Judge Rudolph Contreras who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

e. Judge Reggie Walton was particularly cruel in imposing supposed "COVID"-related mask and vaccine restrictions on J6ers. Judge Walton knew that prospective jurors who disdain mask and COVID vaccine rules tended to be skeptical jurors who might also be skeptical of the bogus J6 prosecutions. So Judge Walton prohibited unvaxxed jurors, in order to tilt trials in favor of the prosecution.

f. Judge Amit P. Mehta presided over numerous J6 prosecutions and ruled for the government on most pretrial and post-trial motions. Judge Mehta also pronounced that J6er motivations were lies because the 2020 election was "clearly" not stolen.

g. Judge Royce C. Lamberth claimed that "no evidence ever emerged" supporting Donald Trump's election criticism—despite ruling repeatedly that J6ers could never present such evidence.

h. Judge Amy Berman Jackson referred to J6ers' election integrity motivations as "the lie that the [2020] election was stolen" despite repeatedly denying J6ers the opportunity to show their good faith regarding the issue. i. Judge Tanya Chutkan, who



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

handled Trump's federal election case and many J6 sentencings, described the protest as a riot fueled by "baseless claims of a stolen election" despite Judge Chutkan's denial of every attempt to support the stolen-election claims with evidence. Because the issue of "corrupt intent" was an element required for conviction under 18 U.S.C. §1512 obstruction, this denial of opportunity to present evidence was a fundamental due process violation. Moreover, the government's withholding of such evidence was not just a discovery violation but a Brady violation. j. Judge Timothy Kelly helped the government conceal evidence of FBI misconduct, including evidence that Agent Nicole Miller and her team destroyed evidence, unlawfully recorded attorney/client communications and sought to break up the marriage of J6er Zachary Rehl. k. Judge Thomas F. Hogan made it public that the J6ers committed an "insurrection that was probably the worst thing that's happened to our democratic way of life in our history." He continued ruthlessly with his bias.

***The Magistrate Judges Who Participated***

183. The following are some of the Magistrate Judges who conspired to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a. Magistrate Judge Moxila A. Upadhyaya processed many J6 cases while applying the tilted rules of the other judges of the District (e.g., protective orders to prevent public awareness, pretrial rulings precluding the 1 st amendment and entrapment defenses, evidentiary rulings allowing prosecutors to show evidence of violence throughout the Capitol while narrowing J6ers' evidence to things immediately seen). Magistrate Judge Upadhyaya presided over J6 cases despite having previously represented clients who were



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

deposed or were major players in Dominion Voting machine litigation cases involving the 2020 presidential election.

b. In fact, it is on information and belief that she personally represented the president of Venezuela who was the one who perpetrated the scheme of rigged election equipment on the United States. She had been asked to disqualify herself, and she always refused. Judge Upadhyaya had been the personal attorney for the head of the snake selling computer election results in America. She stayed on cases knowing full well that she was deeply conflicted out and was one of the harshest and worst judges of all. She also stays as Magistrate Judge on the matter of Dominion Machines v. Byrne, and she is so totally conflicted, it leads to a conclusion that she is aware and intentionally acting wrongfully. Her position lead to a conclusion that she is acting in furtherance of the wrongful rigging of the Election, making her probably guilty of participating in a conspiracy to commit sedition, insurrection, and treason.

c. Magistrate Judge Zia M. Faruqui presided over numerous J6er arraignments. At one misdemeanor J6 trial, Magistrate Judge Faruqui instructed a jury that all of the statutes involved were constitutional and that there were no First Amendment rights at the U.S. Capitol. Judge Faruqui imposed the heaviest fine in U.S. history for a misdemeanor, $103,000, upon a J6er who strode through open doors into the Capitol and walked around for under 10 minutes.

***Other Damages***

184. As a direct and proximate result of the Government's tortious conduct, each of the Plaintiffs suffered and continues to suffer losses in excess of $1 million, including but not limited

to medical expenses, lost wages and income, pain and suffering, severe emotional distress, loss of liberty, reputational harm, and other consequential damages.

185. The Plaintiffs also suffered loss of consortium with their spouses. Husbands and wives abandoned them during these malicious prosecutions.

186. At least six J6ers committed suicide due to the trauma,[46] and many others attempted suicide during the ordeal.

**The Atrocities Which Occurred In Prison**

187. When J6ers were incarcerated in jails and prisons they were subjected to additional abuse. J6ers were forced to surrender DNA samples, even if held on mere nonviolent misdemeanors. J6ers who refused to submit to experimental COVID-19 vaccine injections were denied attorney visits and held in solitary confinement for extended periods. They were also denied haircuts and shaving privileges.

188. J6ers were also denied access to their discovery to prepare for trials. In some cases, defense attorneys who came to the jails in D.C. or Alexandria to show or provide digital discovery or video files to J6ers were turned away by jail authorities multiple times. And in some cases, incarcerated J6ers were never allowed to see their discovery—the evidence against them—until they were in trial.

189. J6ers were denied medical care and treatment throughout the federal prison and jail system. J6ers such as Bart Shively and Christopher Worrell were denied cancer treatment, causing their cancers to grow out of control. Mr. Shively died shortly after his release from prison.

---

[46] J6ers Mark Aungst, Chris Stanton, Jord Meachum, David Kennedy Homol, and Matthew Perna took their own lives during the prosecutions.

190. The FBI also monitored attorney-client communications of J6ers and used information gathered in such illicit surveillance to strengthen their prosecutions against J6ers.

**A Case In Point**

191. For purposes of explanation, one J6er has been chosen to explain what happened to innocent people on J6 and thereafter. Ryan Zink was a campaign photographer for his father, a candidate for Congress.

192. The Zinks made their way around the Capitol to the east side, following massive crowds. Shortly after 2 pm, the Zinks heard a megaphone interaction between Capitol Police officers and protestors wherein a Capitol Policeman promised to see if he could get approval for the crowd to move forward to the steps of the building. Minutes later the barricades were removed and the Zinks saw exuberant crowds rush forward to the east Capitol steps. Ryan saw a police officer literally waving people forward.

193. Ryan livestreamed as he and his father joined the crowd moving forward. Ryan hyped up the drama for his livestream audience, saying into his phone, "We're storming the Capitol!" When the Zinks got to the upper east balcony they witnessed a young man kicking at windows. Ryan loudly shouted at the crowd to let police do their jobs and arrest the man. Seeing that the Zinks were protecting them, the officers asked Ryan to help give them space and record the incident. Moments later, the officers abandoned the arrest of the window kicker and moved away toward the main door. The Zinks eventually followed after the officers to photograph and livestream the scene at the door. When Ryan saw violence near the Capitol entrance, he and his father quickly made their way down the steps and back to their hotel.

194. Just days later, Ryan was awakened by flash bang grenades at his home in Amarillo, Texas. A large tactical team of counterterrorism officers kicked in his door and raided his rented



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

property. He was charged with a 20-year felony, "obstruction of an official proceeding," and two misdemeanors. Although a local magistrate judge ordered Ryan released on pre-trial conditions, prosecutors and judges in D.C. teamed against him to appeal the ruling.

195. Ryan spent the next month in various jails, poisoned with rotten food and losing forty pounds from illness and distress.

196. As Ryan prepared for trial, he noticed that the DOJ deprived him of important discovery including the photos and video he had taken with his campaign camera. The DOJ provided only his Facebook livestream images, in which Ryan had dramatized the J6 events with hyperbolic "We're storming the Capitol!" statements.

197. At trial, the officer who thanked Ryan and asked Ryan to record the event lied on the stand and said Ryan had gotten in his way on the balcony on J6. The officer who waved crowds forward to the Capitol testified that he was waving only at another officer.

198. Oddly, prosecutors provided a couple images from Ryan's campaign camera in discovery. However, prosecutors withheld hundreds of other photographs. During trial when Zink's attorney asked Judge Boasberg to order the prosecution to provide the seized camera footage, Judge Boasberg would not issue the order, saying Zink should have asked earlier, which he had. When Zink's counsel brought a flash drive to prosecutors for prosecutors to transfer the nondisclosed camera files, he untruthfully advised that the files had been deleted.

199. Later, at closing argument, a federal prosecutor told jurors that Zink had lied on the witness stand about being a campaign photographer on J6 and even told the jury that the (missing) camera images did not substantiate Ryan's defense.

200. Upon cross-examination, government witnesses admitted that no one inside the Capitol building could have possibly heard anything Ryan Zink had said to his livestream audience

on his cellphone. Jeff Zink testified that even he could not hear what Ryan was saying to his livestream audience amid the roar of the crowd. Nonetheless, Mr. Zink was convicted of "obstructing an official proceeding" of Congress for making a few hyperbolic remarks into his cell phone while outside the Capitol.

201. Prior to sentencing, the Supreme Court invalidated the use of the §1512I(2) "obstruction of an official proceeding" statute as a punishment for political demonstrators. Thus Ryan faced sentencing for only two misdemeanors by the time of sentencing. Nonetheless, prosecutors requested maximum, consecutive sentences for the misdemeanors. Chief Judge Boasberg sentenced Mr. Zink to 90 days in jail, an outrageous sentence for a first-time offender who merely livestreamed his experience outside the Capitol and helped officers on J6.

202. Ryan Zink continues to suffer long-term injuries from the ordeal and his wife suffered several miscarriages due to emotional distress.

**Specific Allegations As To Each Plaintiff**

203. In each of the Plaintiffs' cases, the J6 criminal proceedings terminated in the Plaintiffs' favor, either by dismissal with prejudice, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

204. The prosecutions were initiated and pursued without probable cause, with actual malice, and for the improper purpose of politically persecuting the Plaintiffs because of their support for President Donald J. Trump and their exercise of constitutional rights. The following summarizes each the Plaintiff's prosecution and its termination in their favor:

**Craig Michael Bingert**

205. The Plaintiff Craig Michael Bingert traveled alone from Pennsylvania to Washington, D.C. on January 5, 2021 to protest the improprieties of the 2020 Election, and

attended the rally the following morning. He was twenty-nine years old, held a degree in criminal justice, and was considering enlistment in the United States Army. He carried an American flag.

206. When Mr. Bingert reached the Capitol grounds by way of the Reflecting Pool, the route was open and unobstructed. He observed a severely understaffed police line using bicycles and bicycle racks as a barrier, and he watched a supervising officer touch another officer's shoulder and gesture that the officers would fall back. The officers then withdrew up the stairs and the crowd followed them. Mr. Bingert also observed a man address the police line, several officers shake their heads while listening, and one officer appear to take or shake the man's hand.

207. A man standing next to Mr. Bingert—a stranger to him, who would later be charged as his co-defendant—used a megaphone to count "one, two, three, push." The crowd surged and the bicycle-rack barrier rose. Mr. Bingert placed one hand on the rising rack to keep it from falling on him while holding his American flag in the other. Officers then drove the metal rack down the stairs, and Mr. Bingert was forced to walk backwards down the steps under the weight of the rack and the crowd, at one point pinned between the rack and another person. He stepped on someone who had gone down in the crush and helped that person back up. The officers pushed the barrier to the bottom, went back to the top of the steps and re-formed their line, and Mr. Bingert went back up the steps along with everyone else.

208. Police deployed smoke-producing devices while clearing the upper level. An officer on the upper level aimed what Mr. Bingert understood to be a pepper-ball launcher directly at him, causing him to turn his back to the officer. Mr. Bingert was exposed to smoke and to airborne and residual chemical agents, which caused coughing, burning and watering eyes, and difficulty breathing that he described as unbearable. As daylight faded, officers used shields to push him and others off the Capitol lawn. He never entered the Capitol building.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

209. After hearing the government announce that it would find everyone who had gone to the Capitol, Mr. Bingert found his own photograph on the FBI's wanted webpage. He immediately retained counsel so that he could surrender voluntarily before agents came for him. His attorney coordinated the surrender with the FBI's Philadelphia office, and his parents drove him there in January 2021.

210. Agents took Mr. Bingert's cellular telephone and told him they would gain access to it either way, after which he supplied the passcode. The FBI retained the telephone for an extended period. Mr. Bingert later received notice from his cellular provider that his records had been requested and released to the government. He surrendered his United States passport to his pretrial officer shortly after his arrest, and it has never been returned to him. His father was required to remove a firearm from the parents' household and to sign a form confirming the firearm was gone.

211. While Mr. Bingert was handcuffed in an FBI elevator, a building guard struck the elevator button unusually hard in what Mr. Bingert perceived as an effort to intimidate him. He was handcuffed to a table in an interview room while two agents questioned him. One of them talked football with him and he experienced the other as hostile, and he wondered at the time whether they were working a good-agent, bad-agent routine on him. While fingerprinting him—before any adjudication of guilt whatsoever—an FBI agent remarked that the prints were being taken in case "Craig commits a crime again." He was then transferred to the United States Marshals and restrained in both handcuffs and leg shackles.

212. Roughly one week after the initial charging stage, the government added further offenses against Mr. Bingert. He rejected the government's plea offers because he intended to



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

contest the case, and he believes that his insistence on his constitutional right to trial thereafter shaped the government's treatment of him.

213. Mr. Bingert personally identified officer badge numbers and preserved videos and emails that he wanted his defense to investigate, including material he believed showed undercover government activity at the Capitol. He delivered the material to his appointed lawyer on a flash drive and asked in writing that the identified persons be called as witnesses. Counsel's face reddened and counsel told him they were not going to spend all day examining videos. Counsel reviewed at most one or two of the videos. In opening statement, counsel announced that Mr. Bingert had witnesses he wanted called—and then called none of them, saying he might obtain what he needed from the prosecution's case instead. During the proceedings, counsel sat typing on a laptop on matters Mr. Bingert believed concerned other clients.

214. The defense encountered a Brady-related discovery dispute and a late production of evidence, and when the defense asked for additional time to review the material, the court denied the request. Mr. Bingert observed the presiding judge, the Honorable Royce C. Lamberth, nodding off during the proceedings. He was barred from presenting the videos and witnesses concerning the persons he believed to be undercover participants.

215. At trial the prosecutor displayed a photograph of Mr. Bingert looking toward the Washington Monument and attempted to characterize him as looking downward toward the tunnel, in order to associate him with conduct at the tunnel in which he took no part. At sentencing, the prosecutor opposed a downward variance by invoking Mr. Bingert's COVID-19 vaccination status and telling the court that he was asking it to care more about his health than he did.

216. Mr. Bingert was convicted after a bench trial on seven of the eight counts against him—Counts One through Six and Count Eight—and, on September 26, 2023, was sentenced to

96 months' imprisonment—eight years—together with 36 months' supervised release and $2,000 restitution. A co-defendant whom Mr. Bingert regarded as the far more aggressive participant received approximately 72 months. Mr. Bingert believes he was punished for testifying and for speaking his mind.

217. Before his imprisonment, Mr. Bingert's landlord learned of his January 6th case and moved to remove him, leaving him temporarily displaced and forced to find housing through a stranger advertising on Craigslist. The replacement landlord told him he had received what he deserved because of January 6th. Mr. Bingert had already paid a private Philadelphia attorney approximately $7,000, and could not pay the approximately $32,000 more that counsel required to continue, which is how he came to be represented by appointed counsel at trial.

218. Mr. Bingert self-surrendered to FCI Yazoo City in November 2023 and served approximately 441 days—roughly fourteen months—before clemency, in addition to a day of pretrial custody. He entered prison expecting to remain there for eight years. He suppressed his own emotions at the prison gate while his mother cried and his father choked up, because the family expected an eight-year separation.

219. Shortly after his arrival at FCI Yazoo City, Mr. Bingert discovered a homemade weapon hidden in the cell assigned to him. Prison racial groups immediately classified him, had outside associates check his background, and expected him to affiliate for protection. A racial-group leader later ordered prisoners to participate in an assault on another inmate and threatened that Mr. Bingert himself would be beaten when he refused to take part. He slept in his boots and remained on constant alert after a prison fight because he feared the other inmate would return for revenge. During a storm and complete power outage, with the cameras apparently down and prisoners unruly, he believed he could be stabbed without anyone ever knowing who had done it.

220. Mr. Bingert was strip-searched after approximately three prison visits. After a yard fight between two other prisoners, a response team ordered all prisoners to the ground and an officer waved a less-lethal weapon over them while Mr. Bingert lay face-down in the dirt; he was then locked in his cell for approximately a week with showers about once every three days. The institution imposed repeated facility-wide lockdowns and closed the recreation yard for as long as two months. Staffing fell to approximately one officer for a pod of sixty-seven prisoners, and at times no officer was present in the pod at all.

221. Mr. Bingert was given intake injections at the Philadelphia jail and again at prison intake after staff told him they were required, over his stated objection. He developed a tooth infection in prison, could not obtain timely dental treatment, and has incurred post-release dental costs for extractions and replacement teeth. He endured extremely cold air conditioning and a mattress so thin that his body pressed against the metal bunk through the night; visible mold on the shower walls and feces on shower surfaces; laundry returned still dirty; and food that was poor, sometimes expired, and supplemented only when commissary access was permitted—which was denied for weeks at a time.

222. Mr. Bingert's case was resolved by the President's pardon proclamation of January 20, 2025. As he and the other January 6th prisoners awaited release, staff locked them in their cells and then abruptly told them to pack. An officer escorting him out of custody remarked, "You see what politics gets you."

223. The pardon did not restore the approximately 441 days of earnings Mr. Bingert lost, the family time, the job opportunities, the relationships, or the peace of mind taken from him. A sister stopped communicating with him and withdrew from the family. Other relatives treat him and his family differently, and those relationships remain permanently diminished. He could not



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

visit his parents after they moved to Florida because of pretrial travel limits and lack of funds. Local television and newspapers used his name and image. Coworkers argued with him and made hostile and sarcastic remarks. He received an anonymous letter telling him he was going to prison for many years. His criminal-justice degree, and the student-loan debt that came with it, have been rendered substantially less useful because the prosecution impairs the very career for which he trained.

**Jared Paul Cantrell**

224. The Plaintiff Jared Paul Cantrell is a crane operator who lives in Indianapolis, Indiana with his wife Nancy. Before January 6th he owned and operated AeroShot, a drone-based three-dimensional cell-tower modeling business he had built since 2017, specialized work that required him to travel across the country, sometimes for weeks or months at a time. He drove to Washington, D.C. with two cousins for the opportunity to see the capital and a sitting President speak, and the three agreed in advance that they would not break barriers or do anything they believed was prohibited.

225. Mr. Cantrell's navigation application stopped working as he drove into Washington and displayed no route into the city, and cellular coverage failed in and near the Capitol and returned only after he moved away. He walked across the West grounds and entered the building through a door that was already standing open, while officers stood nearby without stopping anyone who went in and one officer appeared to direct a person inside toward the Rotunda. He understood those circumstances as permission to enter. He crossed no barrier, no scaffolding, no restricted-area sign, and no closed door on his route. He was inside for approximately ten minutes, took photographs of the artwork and sculptures, could not find his cousins, and left. He damaged nothing, took nothing, and confronted no one.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

226. Because Mr. Cantrell did not believe he had committed any crime, he made no effort to conceal the trip. He sent a friend a sarcastic private message saying that they had "stormed" the Capitol—a remark the government later placed before the court stripped of its context.

227. An FBI agent came to Mr. Cantrell's home while he was away traveling for his business and left contact information stating that agents wished to question him. He retained counsel and, on counsel's advice, declined an interview. Approximately twelve months then passed between that first contact and his arrest, a year in which he did not know whether or how the government would proceed against him.

228. On March 10, 2022, in the dark of a winter morning, federal authorities arrested Mr. Cantrell at his Indianapolis home using a Joint Terrorism Task Force that included FBI, state, and local personnel. The operation employed two armored vehicles, drones overhead, officers in full tactical equipment, and rifles trained on him. Agents broke through his front door approximately fifteen seconds after knocking and deployed a flash-bang device on entry that left him disoriented. They handcuffed him and took him outside wearing only shorts, barefoot and shirtless, and kept him shivering in the winter cold for the entire duration of the search. The street was shut down, and the neighbors gathered to watch. All of it was for four misdemeanor charges, after which Mr. Cantrell was released on his own recognizance.

229. Agents destroyed the front door, its molding, and its frame, leaving the door hanging by a single hinge. They ransacked the house and threw framed pictures to the floor, some of which bore footprints on their backs. They left rifles, shotguns, and handguns strewn immediately inside the broken and unsecured entrance, creating a serious risk of theft and of injury until Mr. Cantrell's wife returned home. They took his telephone, his electronic drives, the clothing

he had worn on January 6th, and his backpack, depriving him of all of it until the items were eventually returned. The door, frame, and molding cost approximately $2,000 to reframe and replace, and the remaining damage approximately $1,000 more.

230. Mr. Cantrell was held alone for hours before he was brought before a judge, and was offered no food and no water during that time. Booking included fingerprinting and the collection of his DNA.

231. Although Mr. Cantrell was released on his own recognizance, the court confined him to the Southern District of Indiana and required advance permission for him to leave it, a restriction that struck directly at work built on nationwide travel. He was subjected to drug testing during the pretrial period and again after prison, to regular reporting by telephone and in person, and to a restriction on travel to Washington, D.C. He was barred from any contact with his co-defendant cousins for the duration of the case, cutting him off from his own family. He was required to transfer his firearms to a third party who would formally hold them.

232. The travel restriction and the publicity together ran AeroShot into the ground. Mr. Cantrell's clients learned of the case and withdrew, his principal business contacts disappeared, and the commercial goodwill he had spent years accumulating evaporated. Uber would not approve him because of the charge, Airbnb deactivated his account during the same period, and he lost access to other applications and services. The occupants of the adjoining half of his duplex moved out within days of the raid, costing him that rental income. He was audited by the Internal Revenue Service for approximately two years. He eventually took a job at Waffle House.

233. Mr. Cantrell was charged in United States v. Cantrell, et al., No. 1:22-cr-00121-TNM (D.D.C.), before Judge Trevor N. McFadden, jointly with his cousins, on four misdemeanor counts. He felt pressure to plead guilty and refused, because he did not believe that a brief entry



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

through an open door beside officers who did not stop him was a crime. He experienced substantial delay in receiving discovery. He initially retained private counsel but ultimately proceeded with appointed counsel, who failed to return his emails and whom he believed to be biased against the defendants he represented.

234. Mr. Cantrell went to a bench trial. On April 4, 2023, the court found him guilty on Counts One, Two, and Four and acquitted him on Count Three. The government's case rested in material part on testimony from an officer who had not been at Mr. Cantrell's location and had never interacted with him; on photographs of barriers and bicycle racks that had nothing to do with the route he actually walked; on an exit-only sign that was mounted on the reverse side of the already-open door and was invisible to anyone entering through it; and on his sarcastic private message about having "stormed" the Capitol.

235. Mr. Cantrell declined to express remorse for conduct he did not believe was criminal, because he regarded an apology he did not mean as a lie. He believes the court punished him for that refusal. On June 26, 2023, he was sentenced to six months' imprisonment, twelve months of supervised release including four months of home incarceration, 100 hours of community service, an $8,000 fine, $500 in restitution, and a $60 assessment—for approximately ten minutes inside a building he entered through an open door.

236. Mr. Cantrell self-surrendered to the Metropolitan Correctional Center in Chicago, a facility holding a mixed population of pretrial detainees and prisoners in transit under conditions he understood to be comparable to maximum-security custody. He was strip-searched at intake. His housing unit held roughly ninety to one hundred people—more than twice its capacity—with three toilets, inadequate sanitation, and unsuitable restroom access. He was housed on a gang block with approximately one correctional officer for every hundred inmates, and general neglect was

the normal operating condition. He was assaulted and drawn into physical altercations. He was subjected to tuberculosis testing. He served approximately eighty-five percent of the six-month term—five months and some additional time—and spent Thanksgiving and Christmas in prison.

237. Mr. Cantrell then served four months of home incarceration on an ankle monitor, which prevented him from leaving the house even to look for work or to perform it, while his ordinary bills and his child-support obligations continued to accrue. He completed approximately seventy-five of his one hundred community-service hours with the fire department before the pardon.

238. Mr. Cantrell's former wife used the case to restrict his access to his three daughters and portrayed him to them in a manner he believes was false, inflicting lasting damage on those relationships. His incarceration separated him from his daughters and disrupted those relationships. While imprisoned he attempted to maintain contact by writing to them, but his former wife intercepted those letters and frequently did not deliver them, further limiting his ability to communicate with his daughters and preserve the parental bond. He spent substantial time and money with lawyers simply to preserve access to his own children.

239. The neighbors who watched the tactical operation on their street largely stopped speaking to Mr. Cantrell, and he still lives in the same house where it happened. He lost many friends and associates. Unknown social-media accounts harassed him. Indianapolis Star coverage concerning him remains publicly available. Several people reported him to the FBI through its hotline because his attendance at the rally was widely known among his acquaintances. He is reasonably certain that his driver's license was flagged with a terrorism-related designation.

240. Mr. Cantrell learned at trial that the government had obtained location data associated with him or his device, and the government searched, copied, seized, or reviewed digital



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

material associated with his device, his accounts, his telephone records, his messages, his photographs, his videos, and his social media.

241. Mr. Cantrell remains hypervigilant. He describes a lasting "new normal" and a substantial loss of quality of life, drinks more than he did before the case, and avoids air travel altogether because he expects burdensome government screening if he flies. His familial, professional, and social relationships were damaged beyond repair.

242. Mr. Cantrell received a full pardon under the proclamation of January 20, 2025, though he never received a certificate or any written documentation acknowledging it. The pardon ended his remaining supervision and his outstanding financial obligations. It did not return AeroShot, its clients, or its goodwill, none of which could be recreated, and it did not restore the family, professional, and social relationships he lost. He paid thousands of dollars out of pocket to train for an entirely new career as a crane operator, because the specialized business he had spent years building no longer existed to return to.

**Holly Dionne Christensen**

243. The Plaintiff Holly Dionne Christensen is a funeral attendant and substitute paraeducator who lives in Puyallup, Washington with her husband, the Plaintiff Scott Ray L. Christensen, and their daughters. The trip to Washington, D.C. was a Christmas present from her husband and a once-in-a-lifetime opportunity to hear the Ellipse speech, and the couple spent the preceding days sightseeing in the capital. She was charged in the same federal case as her husband, and her individual conduct and her individual injuries are separately alleged here.

244. At the Capitol, airborne chemical-agent residue burned Mrs. Christensen's face and eyes and forced her to wash her face. The crowd carried her through the East doors and then compressed her from every side inside the Rotunda, where officers were directing the crowd into

an increasingly concentrated mass. She feared she would be trampled if anyone fell, could not identify a safe path out, and suffered a panic attack. She waved her arms to obtain an officer's attention. While she was pinned in the crowd, several officers immediately behind her touched, pushed, and hit her. Cellular service was unavailable to her inside the building.

245. One Capitol Police officer removed Mrs. Christensen from the compressed crowd and directed her to a bench so that she could regain control of herself. A second officer then yelled and screamed at her to leave the bench and rejoin the crowd, although the first officer had authorized her to remain there and defended that authorization. Mrs. Christensen begged an officer to take her out through another exit because she could no longer tolerate the crowd, and he escorted her through a back exit. The Rotunda episode remains etched in her memory years later.

246. On the morning of December 7, 2022, Mrs. Christensen was eating breakfast in her pajamas and slippers when the FBI arrived at the family home. She saw numerous officers in head-to-toe tactical equipment with rifles, helmets, and shields, and armed agents walked past her kitchen windows pointing rifles through the glass at her. Shaking, she telephoned her husband to tell him the FBI had come. Loud banging began at the front door while additional personnel and vehicles surrounded the residence. When she opened the door, three or four armed men pointed firearms directly at her. The operation included shields, battering equipment, and firearms directed through multiple windows, at an intensity she could compare only to a film depiction of an operation against a drug cartel or a mass murderer.

247. All of it occurred on a heavily traveled public street directly across from a junior high school, during the principal morning period, while students, buses, neighbors, and other members of the public watched. Agents refused Mrs. Christensen's request to put on a bra and required her to leave her home in her pajamas. They handcuffed her and placed her in ankle



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

shackles outside the house, with her wrist restraints connected to her ankle restraints, and walked her to an unmarked vehicle. She sat restrained in that vehicle outside her own home while the search and the disturbance to her family continued, and was then transported to the federal courthouse in Tacoma, where she waited near a rear alley before processing.

248. The Christensens' fifteen-year-old daughter was home sick that morning. She came out of her bedroom into the banging and saw multiple armed agents pointing firearms through the windows of her house. Fearing the agents would shoot the family dogs, she shut the animals in a bathroom. She stood beside her mother when the front door was opened and watched agents take her mother away in restraints, and Mrs. Christensen saw the terror on her daughter's face and tried to reassure her from the government vehicle. Agents made the girl go outside barefoot in her sister's slippers, holding her by the shoulders until she yelled at them to stop touching her and preventing her from retrieving her own shoes. They kept her standing outside in the freezing cold of December 7th for approximately forty-five minutes and denied her access to her telephone for approximately an hour after both of her parents had been taken. When they brought her back into the house they required her at gunpoint to change her clothes in front of the agents, a female agent refusing her request for privacy and remaining in the room while she changed.

249. Agents searched the residence without presenting a search warrant to Mrs. Christensen before the search and left the household in disarray. They broke the closet door used by her youngest daughter and damaged the lock on an outdoor shed containing ordinary lawn equipment. They seized cellular telephones, a laptop, flags, clothing, and the jacket and hat Mrs. Christensen had worn on January 6th. Her iPhone was returned unusable, displaying an unfamiliar screen, with its SIM card removed and signs of repeated attempts to access it; her father, a computer scientist, could not restore it. The loss of the family's telephones forced the household



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

to obtain temporary phones and then replacement devices so that family members could communicate.

250. United States Marshals fingerprinted and photographed Mrs. Christensen and collected a DNA swab. She was placed alone in a courthouse holding cell for several hours while still restrained, in a cell whose toilet area was exposed to cameras and a large mirror and afforded her no meaningful privacy. Marshals openly expressed disbelief that someone like her was being arrested on the identified charges. After the court proceeding, she waited outside a Starbucks in the same pajamas the agents had made her leave home in.

251. Mrs. Christensen's release conditions placed her under pretrial supervision and required her to surrender her passport, to transfer the household firearms to a third party, and to obtain advance permission to travel outside a limited portion of western Washington, supplying destinations, addresses, airline information, and family verification each time. She was subjected to repeated urine testing throughout supervision, and on one occasion was required to produce a urine sample while a male officer remained in the room. She and her husband attended approximately two or three court proceedings while the prosecution repeatedly asked the court for additional time, and they relied on appointed counsel because they could not afford private defense attorneys.

252. Mrs. Christensen's attorney repeatedly warned her that going to trial would expose her to imprisonment. She was terrified that both parents would be imprisoned and that her daughters would be left without either of them. She cried through numerous telephone calls with her attorney because she believed she would have to admit conduct she disputed, and she believed counsel understood she faced a lose-lose decision but did not meaningfully fight for her individual account. She felt grouped together with violent actors and portrayed as a terrorist-type offender



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

rather than treated as an individual. She accepted a plea she regarded as untruthful in order to protect her family from the risk of imprisonment, and she experienced that plea as morally humiliating and as a compromise of her beliefs, her faith, and her sense of who she was.

253. The prosecution characterized Mrs. Christensen as defiant and unremorseful because she maintained that the crowd had carried her into the building, and the court characterized the couple as unremorseful as well, prompting them to submit letters to the court addressing that characterization. They paid approximately $102 for court transcripts that they found difficult to obtain from the Department of Justice.

254. Mrs. Christensen was charged in United States v. Christensen, No. 1:23-cr-00203-DLF (D.D.C.), before Judge Dabney L. Friedrich, on four counts. She pleaded guilty to Count Four, parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G), and Counts One through Three were dismissed under the plea disposition. On December 18, 2023, she was sentenced to 36 months' probation, 30 days of home confinement, 60 hours of community service, $500 in "restitution" for property damage she maintains she did not cause, and a $10 assessment. No custodial sentence was imposed.

255. Home confinement did not begin until January 2024 because of the delay in installing the monitor, and Mrs. Christensen wore an ankle monitor throughout the thirty-day term. Every movement had to be scheduled in advance, and she had only narrow windows in which to travel to and from work. A curfew of approximately 9:00 p.m. applied, and she was confined to the house for the remainder of each day once her morning work ended. The monitor's boundaries kept her out of portions of her own garage, backyard, and surrounding property. She was limited to a single two-hour grocery-shopping period each week and was required to keep and produce receipts for authorized activities. She bought special clothing to conceal the monitor at the gym



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

where she worked and gave up her own workouts entirely, because exposing the device was humiliating and risked drawing unwanted attention to the business that employed her.

256. Mrs. Christensen, her husband, and at least one of their daughters were subjected to enhanced airport screening, which she and her husband understood to be "SSSS" or Quiet Skies treatment. The scrutiny recurred over time and varied by airport and by personnel. She was taken into a separate room during some screenings, commonly spent approximately three hours in airport processing before she could board, and was subjected to repeated pat-downs, chemical swabs, and baggage searches—sometimes searched several times during a single trip rather than screened once. She describes the repeated treatment as humiliating.

257. Mrs. Christensen lost her process-serving assignments for the Tacoma public defender's office because the individual who assigned that work was no longer comfortable continuing the relationship after January 6th. The loss eliminated those wages entirely and forced her to find different work, and it impaired her earnings, her earning capacity, her employability, and her ability to obtain comparable work. She did not return after the pardon to ask for the assignments back, because the earlier rejection had made her feel unwanted. At the same time, the family's need to shut down and restrict its social-media activity cost the household substantial real-estate income, because her husband depended on social media to generate clients. The combined loss of her income and his placed the household in continuing financial difficulty and generated lasting credit and debt strain.

258. Local media identified Mrs. Christensen by name many times and identified the city where she lived, taking material out of context and portraying the couple as among the worst January 6th actors. Fake or anonymous profiles posted articles about her and her husband in a Glassybaby collectors' group with thousands of Seattle-area members, causing numerous

members to hate her on the basis of what they believed about her and deterring people from interacting with her or buying items from her sales listings. Hostile users entered her personal comment spaces, posted hostile material, and wished harm upon her family, forcing her to block users and lock down her profiles and depriving the family of ordinary online participation. Strangers appeared outside the family home and photographed it. A former local police officer repeatedly taunted and yelled at her in public, including remarks about the couple's supposed status as insurrectionists. Certain relatives changed how they treated her. People stared at and talked about her daughters at school, impairing the girls' well-being to the point that school staff offered them excused absences when the attention became overwhelming. Mrs. Christensen could not defend herself publicly or accept media opportunities during the prosecution, because she feared the consequences for her children and for her family's standing in the community.

259. The prosecution left Mrs. Christensen with intense fear, crying, shaking, and an inability to sleep, and with anxiety and depression she had not had before. She wakes suddenly from dreams and traumatic memories and cannot return to sleep because her mind will not stop. She describes the year before sentencing as horrific because of the uncertainty, and she withdrew from other people because she no longer trusted them and had lost her capacity for joy. She and her husband had to take turns being the strong one while both were living through the same ordeal. Her outlook became substantially more dismal for years, she stopped decorating her home for patriotic holidays and did not put out red, white, and blue again until 2026, and she feels deeply betrayed by the United States government and has lost her faith in governmental institutions. She calls the stigma a permanent "Scarlet Letter," and says the case has touched every aspect of her life and damaged her ability to trust.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

260. Mrs. Christensen received a full pardon under the proclamation of January 20, 2025, and the pardon restored very little. A search of her name, her husband's name, or both still returns January 6th material as the leading result, and much of that material remains untrue or misleading. The online attacks and the public taunting continued for years after the underlying events. The process-serving work has not been restored. The financial instability caused by the lost household income continues. After the pardon, a church-planting assessment panel printed the couple's January 6th records and questioned whether their conduct was a sin requiring repentance, forcing Mrs. Christensen to defend herself yet again years later. She has considered leaving Washington altogether, because she believes relocation may be the only practical way to escape the local stigma and begin again.

**Scott Ray L. Christensen**

261. The Plaintiff Scott Ray L. Christensen is a church planter and real-estate professional from Puyallup, Washington, where he grew up, attended school and college, planted a church, coached youth soccer, and built a public business and long-standing community ties. He arranged the trip to Washington, D.C. as a Christmas present to his wife Holly—a once-in-a-lifetime opportunity to hear the Ellipse speech—and the couple spent the preceding days sightseeing.

262. On the way to the Capitol, Mr. Christensen approached officers who were putting on riot gear and asked about conditions ahead. The officers did not answer him. He then heard repeated booms and saw a man who appeared to have been gassed. He saw approximately twenty to thirty Capitol Police officers rush past his position shortly before a body-armored group surged in the officers' direction. He also saw two officers walk away after speaking with a man who then



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

moved fencing toward the Capitol terrace, and he saw people using walkie-talkies and cellphones in apparent communication with persons positioned on the stairs.

263. Crowd pressure carried Mr. Christensen progressively higher on the East stairs. The large iron East doors then opened outward from inside, and the crowd surged and carried him bodily through the doorway. He was frightened and unable to move against the mass of people. Inside, the atmosphere appeared calm enough that he saw officers and participants embracing and saw a crying officer being held by a participant.

264. The officers' demeanor changed abruptly after Mr. Christensen believed the reported shooting of Ashli Babbitt had occurred. Officers began directing everyone out, and he and Holly were separated. Capitol Police directed the crowd through the Columbus/East doors while pepper balls were fired above that doorway, creating a logjam as others tried to enter. When Mr. Christensen asked for another route, an officer required him to use that exit. Of the roughly forty-eight minutes Mr. Christensen spent inside the building, approximately thirty were spent waiting in the congested exit line the police themselves had created. He was exposed to airborne pepper spray or mace that burned around his eyes, was pushed by officers, and tripped and fell on his hip while trying to leave, before a police motorcycle officer helped him up.

265. Approximately one week after January 6th, two FBI agents came to the Christensen home and spoke first with his oldest daughter while Mr. Christensen was at work and his wife was in the shower. He had already consulted a Tacoma attorney and prepared a written instruction directing any approaching agents to counsel.

266. What followed was years of surveillance. Discovery later revealed surveillance of the family's Washington and Florida homes, including cameras outside the residences, involvement of the Miami field office, and monitoring of vehicles, workplaces, the children, school

travel, soccer activities, neighbors, and even a family carpool. Agents accused Mr. Christensen of counter-surveillance because he changed from shorts into sweatpants in a Chicago airport bathroom. Investigators treated his use of a post-office box as suspicious, though his Florida church had advised him to use it because of neighborhood crime. Investigators told him his phone was "too clean" and treated the absence of expected content as itself suspicious. Authorities obtained and used location data associated with his device and account and searched, copied, seized, or reviewed his telephone, email, photographic, video, and social-media information.

267. Mr. Christensen was placed in the Quiet Skies program and subjected to "SSSS" screening. Enhanced airport treatment began on a return flight from Florida to Washington when his mobile check-in failed despite TSA PreCheck, he waited one to two hours, and officers subjected him to a full-body pat-down; approximately ten TSA personnel were then positioned at his boarding area. The same screening occurred on the return trip and on approximately three trips between Florida and Washington. On a later trip to Arizona for a youth soccer tournament, Mr. Christensen, his wife, and their daughter were all put through the SSSS process. On one occasion he watched TSA personnel conduct an intrusive pat-down of his daughter at the same moment an officer's hand was inside his own pants.

268. On December 7, 2022, after Holly called him home, approximately three agents pulled Mr. Christensen from his car, took his phone, and positioned him against the garage door. They questioned him while he tried to remain silent, read him his rights at the garage, frisked him, removed the shoelaces from his boots, and placed him in both handcuffs and ankle restraints. The agents then displayed him in restraints before a crowd of neighbors, teachers, students, and school buses during the principal morning traffic period for the junior high school directly across from his home.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

269. The FBI held the Christensens' fifteen-year-old daughter at the home with armed agents after both parents were taken away. Mr. Christensen had to telephone a real-estate colleague from the arrest scene and ask the colleague to retrieve her. The government forced the girl to stand outside in the freezing cold of December 7th for approximately forty-five minutes, brought her back into the house, and at gunpoint required her to change clothes in front of the agents. She suffers nightmares, severe anxiety, and post-traumatic stress to this day.

270. Agents searched the home for a United States national-team scarf and jersey Mr. Christensen wore on January 6th, walkie-talkies, Holly's jacket and hat, flags, phones, and his laptop. In the course of the search they destroyed his daughter's closet doors and damaged the exterior shed door. The iPhone the government seized could not be turned on when returned, a loss of approximately $1,200; the MacBook Pro never functioned properly again and had to be replaced at a cost of approximately $2,400.

271. Mr. Christensen was photographed and fingerprinted and then held alone in a cell for approximately six hours before meeting a temporary public defender, after which he was returned to the cell for approximately another hour. He and Holly were then placed together in a small holding cell, kept in handcuffs and ankle restraints, and required to wear masks before the magistrate—the only people he remembers being masked. Authorities collected photographs, fingerprints, palm prints, and a cotton-swab DNA sample. After release on bond, the loss of their cellphones left the couple with no way to call for transportation until a probation officer allowed them to call their children from a Starbucks.

272. Mr. Christensen was required to surrender his passport, transfer the household firearms to a neutral custodian, submit to urine testing, and comply with pretrial supervision. He



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

went home from his arrest terrorized and scared, put on his coaching clothes, and led soccer practice that same night because he was trying to continue functioning.

273. Mr. Christensen was charged in United States v. Christensen, No. 1:23-cr-00203-DLF (D.D.C.), before Judge Dabney L. Friedrich, on four counts. His appointed attorney told him that conduct ordinarily treated as ticketing, parading, or demonstrating would normally draw an approximately $60 citation by mail. Prosecutors nonetheless described him in proposed plea materials as participating in a riot, requiring him and his counsel to object to the characterization.

274. At a hearing the judge questioned the prosecutor about what “picketing,” “parading,” and “demonstrating” actually meant, and appeared to Mr. Christensen to doubt that his conduct fit those terms—yet his own attorney warned him that the judge’s skepticism could send the case to trial and expose him to prison. Mr. Christensen accepted a plea to the lowest count on September 25, 2023, after assessing the risk of a District of Columbia jury and imprisonment. Protecting his children and his family was the controlling reason. He was then required to tell the court that his plea was voluntary even though he felt forced by the threatened alternative. He and Holly felt compelled to apologize and “fall on their sword” at sentencing because their attorneys believed imprisonment remained possible.

275. On December 18, 2023, Mr. Christensen was sentenced to 36 months’ probation, 30 days’ home detention with an ankle monitor, 60 hours of community service, $500 in “restitution,” and a $10 assessment. Probation confined him to a specified territory in Western Washington and required advance permission and detailed itineraries for travel outside it; a family visit to Holly’s parents in Modesto required signed forms, address verification, location information, and airline details. He was required to pay the cost of his own ankle-monitor supervision, which came to approximately $450 out of pocket. Although sixty hours of community



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

service were required, he performed approximately eighty or more hours for his soccer club and lost a month of his usual club pay while doing so. He paid approximately $102 for court transcripts he believed necessary to preserve the record of the plea proceedings.

276. On January 6, 2025—the fourth anniversary of the protest—probation officers searched Mr. Christensen's home and asked whether he planned to attend political events, treating a man who had complied fully with supervision as though he were a hardened criminal.

277. The economic destruction was comprehensive. Mr. Christensen and Holly were doing well financially before the Washington trip. After a disagreement with his church-planting organization over the Election and President Trump, he resigned and lost that income. Within days of his return, an unidentified person telephoned his Keller Williams broker and accused him of participating in a riot. Media and social-media contacts reached all of his employees. He suspended his real-estate business after the arrest and publicity and took work as an activities director at a senior living center. His online presence largely disappeared for approximately two years, and he could not publicly defend himself or answer online accusations for fear prosecutors would use any response against him. He has applied for jobs at Christian schools and been refused because the schools knew his identity and did not want the controversy. A school-district background process required him to disclose the arrest and left him uncertain what the reviewer saw in his FBI record.

278. Mr. Christensen paid approximately $125 and submitted fingerprints to obtain a post-pardon FBI background report, which labels the matter "Capitol riot" rather than the petty offense to which he pleaded and contains disposition entries he believes inaccurately describe how the other counts were dismissed. He has since received an FBI response estimating that production on a records request could take approximately 2,010 working days—about 7.7 years—leaving the investigative records concerning his own case unavailable to him for that entire projected period.

279. Mr. Christensen remains estranged from nieces, nephews, sisters, and brothers who place him among the worst people in history because of the January 6th label. A former local police officer publicly called him an "insurrectionist," refused his invitation to discuss the matter, and continues to make remarks when they meet in the neighborhood. A Reddit post falsely attributed another person's recorded profanity to him and could not be removed. He saw strangers outside his home taking photographs, and learned that his name appeared on Washington political lists used to identify conservatives. He describes the January 6th label as a permanent "Scarlet Letter." He continually looks over his shoulder, anticipating the next hostile comment or damaging story that will land on his family, and he remains uncomfortable even shopping at a Walmart because he does not know what strangers think they know about him. His case was terminated by the President's pardon proclamation of January 20, 2025.

**Chad Allen Heathcote**

280. The Plaintiff Chad Allen Heathcote is a software engineer, business owner, and veteran of nearly ten years of honorable service to the United States. He held a commercial helicopter certificate, an instrument rating, and advanced ground-instructor credentials, and had previously held a security clearance. He lives in Adel, Iowa, with his wife and young son. He traveled to Washington, D.C. with a friend to attend events on January 5, 2021, and the rally at the Ellipse the following morning. After the Ellipse rally he walked toward the Capitol because an advertised website and printed materials had led him to expect another stage and additional speakers there for the remainder of the afternoon.

281. When Mr. Heathcote arrived, the route onto the Capitol grounds was open and unobstructed, allowing him and his companion to walk through a parking area directly onto the terrace. At a north-side door an officer first described the door as an exit but then told him, "okay,

go ahead," after another person held the door open. Shortly after he entered, another officer raised his hands as if asking him to pause, spoke briefly to the person beside him, lowered his hands, turned, and walked farther inside. Mr. Heathcote followed that officer.

282. A police line then formed in front of Mr. Heathcote while additional people entered behind him, leaving him trapped between the officers and the incoming crowd. A younger officer discharged pepper balls toward the ceiling, causing the irritant to rain down onto the confined crowd. Larger officers then advanced and pushed the crowd while people behind pushed forward, creating pressure from both directions. Mr. Heathcote was knocked down and trampled, fell hard on his right elbow, and was pinned while an officer fell on top of him. While pinned on the floor, Mr. Heathcote held that fallen officer up to protect him from the crowd's weight, fearing that both of them would be suffocated. Video evidence later showed a percussion grenade detonating immediately beside him—an event he could not even recall amid the sensory overload.

283. As officers cleared the terrace in a formation Mr. Heathcote estimated to be seventeen officers deep, people fell beneath the advancing line and officers continued over them without allowing them to rise. Mr. Heathcote feared someone would be killed. When other individuals proposed using construction material to obstruct the officers, Mr. Heathcote and his companion moved the material away, because he believed the obstruction would get people hurt. An unidentified uniformed person in camouflage, whose affiliation he could not determine, stood nearby with what appeared to be a real rifle and stared at his group, causing him to fear he would be shot where he stood. His right elbow was markedly swollen, bruised, painful, and difficult to move for many months afterward.

284. In February 2022, two FBI agents came to Mr. Heathcote's home. After he declined an interview without counsel, agents went to his business partner and then-employer, displayed a



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

photograph, and asked the partner to identify him. Agents also questioned a longtime friend—an Egyptian-born pilot—about what the two men had discussed; questioned an old roommate for approximately four hours at an airport, including whether Mr. Heathcote was a white supremacist; and approached people at his former church. For months Mr. Heathcote awoke each morning in fear of an arrest raid, an experience he describes as psychological torture.

285. On May 4, 2022, immediately after Mr. Heathcote returned from taking his young son to school, approximately eight to ten vehicles converged on his property and an agent ordered him to raise his hands. Agents told him they had sought to avoid arresting him while his son was present—which told Mr. Heathcote they had been monitoring his family's daily routine. He estimated more than twenty agents in tactical gear participated in the arrest and search of a home whose occupant faced four misdemeanors. Agents handcuffed him outside his home and held him in the back seat of an agent's personal pickup truck between two agents while the search proceeded. They photographed virtually everything in the house, searched for the jacket he had worn on January 6th, and seized his telephone and boots, retaining the telephone for approximately two months.

286. United States Marshals restrained Mr. Heathcote's hands at his waist, shackled his ankles, swabbed the inside of his cheek for DNA, and placed his eyes before a large imaging device he understood to be a retinal scanner. He was given no food during the hours between his approximately 9:00 a.m. arrest and the conclusion of his hearing at approximately 3:30 p.m.

287. The government issued Mr. Heathcote a letter stating that he posed a risk of air piracy and terrorism and requiring him to relinquish his commercial helicopter, instrument, and advanced ground-instructor credentials—years of education and training erased by administrative fiat. Those credentials were unavailable from approximately 2022 until he was informed, at some

point in 2023 or 2024, that he was no longer considered a threat. An administrative watchlist appeal took months and ultimately produced an agency response stating that he was not meant to be in the program at all. He had already been subjected to SSSS screening on an April business trip, when an airport kiosk would not issue his ticket and airline personnel spent an hour making calls before releasing it, with additional screening at each layover and gate. On a return flight from Las Vegas in early 2023, multiple TSA employees surrounded him in layers, a manager stood beside him, and the team escorted him through the airport. The Polk County sheriff directed him to surrender his concealed-carry permit because government records misclassified his misdemeanor charges as felonies, and the felony misclassification persisted after his attorney alerted prosecutors to the error and propagated into news coverage about him.

288. Mr. Heathcote was charged in United States v. Heathcote, No. 1:22-cr-00232-CJN (D.D.C.), with four misdemeanors. When he rejected the government's initial plea offer, prosecutors reacted angrily, asked his attorney whether he had a mental condition or disability, and required him at the next hearing to address under oath his competency and the voluntariness of his refusal to plead guilty. After more than a year of investigation, prosecutors announced—immediately after he maintained his rejection—that they would file unspecified superseding charges, and then refused to identify what those charges would be. The threat raised Mr. Heathcote's stress so severely that he stopped eating.

289. Mr. Heathcote accepted a plea to a single misdemeanor on November 4, 2022, because he believed the threatened superseding charges and a District of Columbia trial exposed him to years in prison and jeopardized his ability to care for his wife and young son. He conditioned the plea on avoiding an FBI debrief because he feared investigators would use it against his travel



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

companion. When his defense sought to depose the officers shown in the evidence, the government responded—approximately two years after the event—that it could not identify its own officers.

290. Mr. Heathcote accepted the plea after his attorney assured him he could tell the judge his side, but he was later directed to use his allocution only to apologize. The government submitted a YouTube video for sentencing without its audio, and the silent presentation prevented the court from hearing a conversation Mr. Heathcote believes may have included an officer's authorization to enter. The prosecutor told the sentencing court that Mr. Heathcote led the breach, incited others to enter, and ignored repeated police instructions. Mr. Heathcote disputes each of those characterizations. He recalls the court remarking several times that his individual conduct did not warrant the severity of the punishment being imposed, and understood the prosecutor's presentation to have driven the sentence upward; he has never been able to obtain the sentencing transcript, and his account of what was said is his recollection. Every hearing began with generalized descriptions of the January 6th "riot" and terrorism, so that Mr. Heathcote was judged through a national narrative rather than on his individual conduct.

291. On February 13, 2023, Mr. Heathcote was sentenced to 36 months' probation, fifteen days of intermittent confinement to be served on weekends, $500 restitution, and a $10 special assessment. The fifteen days were divided among recurring Friday-to-Sunday commitments; repeatedly restarting custody proved far more punishing than a single continuous term. He spent approximately the first thirty hours of every weekend in a Polk County, Iowa holding cell known as the "fishbowl," roughly eight by sixteen feet, sometimes holding fourteen men, with hard concrete benches on which most men could not fit, a single exposed toilet and sink behind an arm-length partition, and only a very thin blanket. Detainees ate, slept, urinated, and defecated in the same confined space. He was exposed to vomit, urine, feces, and toilet overflows,

with cleanup delayed. He was not permitted to bring in his written telephone contacts or a printed book of the Bible. On his second weekend, two inmates confronted and taunted him, asking whether he was the man who "stormed the Capitol," after which he concealed the reason for his detention.

292. Pretrial release confined Mr. Heathcote to the Southern District of Iowa—restricting travel within his own state—and required prior approval for travel outside it. For approximately six to eight months he called a color-selection line daily and, when selected, drove nearly an hour each way to provide a urine sample; he built a software application simply to record each day's color and preserve proof of compliance. Agents required his wife to transfer his firearms to a friend before he was released from his initial appearance, leaving the family without them. He surrendered his passport, later had to report it lost and complete a replacement process, and could not travel internationally. His probation officer expressed surprise at the nature of the supervision, telling him it was the officer's first probation matter of that kind involving a misdemeanor.

293. Mr. Heathcote had suicidal thoughts every day for a prolonged period after his arrest and sometimes believed his family would be better able to move forward if he were gone. His young son is the reason he remained alive during that period. He lived in terror, came to believe that every person he met knew of his case and regarded him as disgusting, obtained counseling and neurofeedback therapy for anxiety and depression despite a lifelong reluctance to ask for help, became reclusive, avoided crowds, and used alcohol to numb his distress. He continues to suffer anxiety and depression and does not know whether he will recover fully.

294. Mr. Heathcote received online comments demanding his death, execution, or lifelong imprisonment, and hostile posts were placed on his wife's catering-business pages. Local and national outlets repeatedly displayed an image of a different person wearing a gas mask, even

though the charging document itself identified that person as someone other than Mr. Heathcote. A neighbor serving full-time in the National Guard told him the military had briefed the neighbor at Camp Dodge about him as though a terrorism suspect lived next door. Neighbors treated his family differently and their children treated his young son less politely. He lost friendships because people feared the FBI would follow them merely for associating with him. He and his wife shielded their son from knowledge of the arrest, prosecution, weekend jail terms, and probation until after the pardon.

295. In approximately 2019 or 2020 an older tax debt of Mr. Heathcote's had been placed in noncollectible status, and the IRS confirmed that status in approximately 2022. In 2023, abruptly, the IRS removed the status and demanded approximately $150,000, rejected an offer in compromise, and forced Mr. Heathcote and his wife to raise that sum through borrowing secured by his wife's business and a second mortgage on their home. Mr. Heathcote is now the chief executive and an owner of a software startup seeking capital, government contracts, FedRAMP certification, and government-grant opportunities, and he reasonably fears that his January 6th record, watchlist history, and banking flags will cause investors, financial institutions, and government customers to reject the company in due diligence. A woman working in high-level bank-compliance functions recognized his name and told him it had circulated through banking systems as a terrorist or security risk.

296. Mr. Heathcote received clemency dated January 20, 2025. The pardon did not restore his good name. He continues to fear being stopped, restrained, questioned, or barred from entry during domestic and international travel, and he expects that fear to last the rest of his life. He remains uncertain whether government and commercial databases ever corrected the erroneous felony classification and the terrorism flags placed against him.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

**Joseph Lee Howe**

297. The Plaintiff Joseph Lee Howe lives in Magnolia, Kentucky with his wife and children. He and several coworkers drove through the night from Kentucky to Washington, D.C. to hear the President speak, parked in a garage, and got no closer to the Ellipse than about fifty yards from the Washington Monument because of the size of the crowd. When the speech ended they walked toward the Capitol. They crossed no fence and passed no sign marking the area closed. They were able to walk up and put a hand on the building.

298. At the West Terrace steps Mr. Howe was exposed to CS gas and to concussion devices that detonated at head level, leaving his ears ringing and his hearing diminished. Officers fired projectiles from elevated positions down into the crowd. He saw a man struck in the cheek by a rubber round that lodged in the man's face. The wind was blowing toward the Capitol, so the gas the officers fired into the crowd came back onto the officers, and the crowd's reaction and the officers' escalated together. Mr. Howe understood that a riot declaration was never announced three times over a loudspeaker system as the applicable use-of-force policy required, and that the policy also forbade firing those projectiles at the head or torso.

299. Benjamin Philips was down on the ground near Mr. Howe with a woman performing chest compressions on him. No one would come for him. Mr. Howe dragged a bicycle rack off the sidewalk, and with the help of several other men lifted Mr. Philips onto it while the woman stayed astride him continuing compressions. They carried him off the grounds to an ambulance that was parked on Constitution Avenue with its lights off and that would not come to them. The crew took Mr. Philips from them. Mr. Philips died that day. For moving the bicycle rack he used to carry a dying man to an ambulance, the government charged Mr. Howe with destruction of government property.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

300. Mr. Howe carried a painter's mask that day. He had been in Washington, D.C. for an event the preceding December, and he and a companion had been attacked in the streets that night; he expected counter-demonstrators using bear spray to be present again and wanted to be able to protect himself. The government used the mask against him as evidence of premeditation.

301. Mr. Howe went looking for a friend he had lost in the crowd. The crowd had by then moved up into the scaffolding, and officers who had been firing from ground level were now positioned above the crowd firing down into it. With the force of thousands of people moving in one direction, he could not turn around and go back. Then the police were simply gone.

302. Somehow the magnetic doors began opening. Mr. Howe saw people going through a broken window and did not follow them, because he did not want to be cut on the glass; he went through an open door on the Senate wing. The officers inside the building were not behaving as the officers outside had been. Immediately inside, a camera crew was already in position filming the people coming in. They wore no visible credentials, and Mr. Howe could not understand how they had gotten there ahead of everyone.

303. Mr. Howe turned left and walked roughly a hundred feet down a corridor past that camera crew. It was dark and nearly silent in that direction, and lit to the right, so he turned around and went the way everyone else had gone, which led to the Crypt. His discovery never showed him turning left. He believes the footage was withheld because the Capitol camera that covered that direction would also have recorded the camera crew.

304. The Crypt was packed. Officers of the Metropolitan Police Department stood in a hallway adjoining it with a number of fire extinguishers stacked in front of them. A surge came through the archway and trampled people. Mr. Howe sprayed one of the extinguishers at the ground to push the crowd back far enough for him to get out. The video the government later used



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

cut from him walking toward the officers directly to him discharging the extinguisher, omitting the surge that preceded it. A gunshot sounded. He tried to circle the edge of the Crypt to leave by the door he had come in, saw five men dressed entirely in black carrying rifles turn and go up a staircase, and went back out the way he had entered. On the steps outside he picked up a Capitol Police officer's hat that was lying there, intending to hand it to the next officer he saw.

305. The Federal Bureau of Investigation met with Mr. Howe twice, voluntarily, at a restaurant near his workplace. The third time agents came to his work and held him in a conference room while they executed a search warrant. His wife worked at the same place. Agents required her to leave work and drive ahead of them to the family home to open the gate across the driveway. Mr. Howe asked the agent in charge only that they not tear his house apart, and was given the agent's word that they would not.

306. Eight or nine armed agents entered the house. Every security camera they encountered they manually turned upward to face the ceiling or the sky. They did not find the camera in the room where Mr. Howe's children play, and that camera recorded them damaging furniture and throwing an end table across the room. When an agent finally noticed it, he walked into the kitchen and told a colleague who was working at a computer, and the feed went black. They photographed his hard copy of the Constitution, which they took down off his bookshelf. They searched his gun safe. He was not given the search warrant until after the agents had left, and it authorized the seizure of an article of clothing whose location he had already told them.

307. A person at Mr. Howe's workplace reported him to the Federal Bureau of Investigation through its tip line. The government failed to redact that person's name from a document it produced to Mr. Howe in discovery.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

308. On October 28, 2022, Mr. Howe telephoned the government and arranged to surrender himself. He asked only that they not come to his workplace, because he was trying to keep his job. His wife drove him to a Kentucky State Police post, and he left his wallet and his belongings with her. Agents arrived fully equipped with rifles pointed at him. They fastened a leather belt around his waist, handcuffed his hands to the belt, placed him in leg irons, ran a chain from his wrists down to his ankles, put him in a truck, and chained him to the floor of the truck. They performed a retina scan, took his fingerprints, and swabbed him for DNA in the vehicle. He does not remember anyone reading him his rights. He was transported to a federal holding facility in Oldham County, Kentucky. The telephone the government eventually returned to him came back without its SIM card.

309. Mr. Howe's release conditions confined him to the Western District of Kentucky, roughly eighteen counties, so that he could not take his children out of that area, while the same conditions permitted him to fly to Washington, D.C. for court. He was required to surrender all of his firearms, although no firearm had any part in the events charged.

310. Mr. Howe first retained a Kentucky and Tennessee attorney who was never able to obtain the District of Columbia sponsorship required to appear in his case, and the quotes he received from District of Columbia counsel were beyond anything he could pay. He proceeded with an appointed federal defender. During a meeting before a court appearance he saw her turning through photographs in a binder that he had never been shown, including a photograph of his open gun safe taken during the search of his home. She would not let him look at them, telling him there was material she could not share with him. He does not believe the discovery he received was complete.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

311. The government told Mr. Howe that if he did not accept its offer it would add further felony charges, and he understood his exposure on the charges then threatened to be approximately eighty years. He did not believe that a man from rural Kentucky could obtain an impartial jury in the District of Columbia, and he could not fund a trial without putting his family into debt for the same result he watched others receive. On August 1, 2023 he pleaded guilty to obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) and to assaulting, resisting, or impeding officers under 18 U.S.C. § 111. He does not dispute that he discharged the fire extinguisher; he maintains that he sprayed it at the ground to clear a path out of the Crypt and that he never struck anyone. At the change-of-plea hearing he was required to sign a document attesting that he had not been coerced, which he questioned with his attorney at the time. He received a three-level enhancement for obstruction of justice.

312. Before sentencing, Mr. Howe discovered that the conditions proposed for him required him to register as a sex offender and to attend domestic violence classes. On October 11, 2023, he wrote to his appointed counsel asking why on earth such conditions would appear on a document bearing his name, calling it a serious clerical error that would cause him enormous problems later, and asking that it be addressed. Counsel replied that conditions six and seven "should have been omitted," that such conditions are mandatory only on sex or domestic violence offenses and were "not applicable here," and that although the probation officer's recommendation and the presentence report would continue to carry them, she would see that they were kept out of the judgment. Mr. Howe refused to sign anything until the conditions were removed. He was nine days from sentencing, and he was afraid that paperwork identifying him as a person required to register as a sex offender would follow him into a federal prison.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

313. On October 20, 2023, Judge Timothy J. Kelly sentenced Mr. Howe to 50 months' imprisonment, 12 months of supervised release, and $2,000 in restitution to the Architect of the Capitol.

314. Mr. Howe had no criminal history to speak of and his Bureau of Prisons classification score qualified him for a camp. The Bureau nonetheless applied a "greatest severity" public safety factor to him, as he was told it had applied to the other January 6th prisoners at the institution. A counselor explained to him that the designation placed him in the same classification as sex offenders, and it barred him from the outside-the-fence maintenance and groundskeeping work he had asked for — a job paying roughly thirty dollars a month that he wanted in order to keep his sanity.

315. Because of that designation Mr. Howe was not permitted to seal his own outgoing mail, so that letters home to his wife went into a shared drop box open for anyone to read or take. Legal mail sent to him by his own attorney arrived already opened, accompanied by a Bureau notice asserting that the address was not sufficient for legal correspondence. His electronic messages were flagged, so that where another prisoner could send a message in the morning and have a reply within ten minutes, Mr. Howe would be fortunate to receive his wife's answer the same day.

316. Mr. Howe was placed in solitary confinement on the stated ground that he was under investigation. He lost his telephone privileges, so that on his visitation day he could see his wife only by video and could not speak with her. He was released the following day. While he was in segregation his property was stolen, including legal paperwork concerning his own case that he has never recovered.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

317. Mr. Howe had already served more than eight months in federal prison by the time his co-defendant was sentenced in August 2024, two and a half years after that co-defendant's arrest and more than a year and a half after his own.

318. Much of Mr. Howe's paperwork remains unaccounted for. He has asked his former appointed counsel to send him whatever remains of his file, and he has filed requests under the Freedom of Information Act with the Federal Bureau of Investigation and with the Bureau of Prisons, in an effort to obtain the records of his own case and the basis of the classification imposed on him. He has been told production could take years.

319. Mr. Howe's conviction was terminated by the President's pardon proclamation of January 20, 2025. The pardon did not return the months he spent in a federal prison under a classification reserved for the most dangerous, the letters his wife wrote him that he could not seal or receive in private, the legal papers taken from his cell, or the years in which his family lived under the threat of eighty years.

**Micaiah Philip Joseph**

320. The Plaintiff Micaiah Philip Joseph lives in Fredericksburg, Virginia with his wife Maria and their young son. Before January 6, 2021, he worked in corporate-governance program management and earned a six-figure salary. He is now unemployed.

321. At the Capitol on January 6, 2021, police officers struck Mr. Joseph with batons. He was exposed to chemical crowd-control agents that made it hard to breathe and set his eyes and skin burning; he could not tell what chemical was used. He was caught in severe crowd pressure and could not control his own movement. He became exhausted and was frightened that he would fall while trying to help someone who was already down. An officer then pushed him down a flight of stairs, and he twisted his ankle and struck his wrist. His skin burned as though it were on fire



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and turned pink; his eyes burned for approximately two days and his throat was sore for approximately as long. The chemical saturated everything he had on, leaving an orange residue that kept burning his skin after it dried, and the clothing and equipment he wore that day were a total loss.

322. The government's case placed Mr. Joseph at the Lower West Terrace tunnel for approximately thirteen minutes, from about 3:00 to 3:13 p.m., and described him pushing toward the police line and using doors for leverage. He does not dispute that he was there. His account is that he followed the crowd from the rally, first encountered police at the tunnel, was trying to obtain directions, and was attempting to stop violence being done to officers—to keep weapons and shields from reaching them—and that the video, viewed whole, supports him. He disputes the government's interpretation of that footage, and a jury rejected his account.

323. Mr. Joseph was identified to the government by the private group that calls itself Sedition Hunters, which supplied the tip, mapped him to the identifier "AFO 221," and attached the label "#tricorntraitor" to him. His name and photograph appeared in federal identification materials and in online reporting. The charging complaint described the use of facial-recognition software. The government obtained his telephone call logs before it ever seized his telephone. He saw government or police vehicles near his home and following him, which he understood to be surveillance by the United States Capitol Police.

324. Before Mr. Joseph was arrested, FBI agents went to his employer—who was his own brother. After speaking with the agents, his brother told him he understood that Mr. Joseph was facing a charge of accessory to murder and that he could not keep him on the payroll in those circumstances. No such charge was ever brought. Mr. Joseph lost that position in November 2022



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and was unemployed until April 2023. It paid approximately $100,000 a year, and it was the first interruption of a career he had spent years building.

325. At approximately 6:00 a.m. on January 18, 2023, an armed tactical team entered the family's home in Triangle, Virginia. Mr. Joseph recalls an armored vehicle, at least twelve tactical personnel, and another five to ten besides. The entry broke the exterior door. Agents held Mr. Joseph at gunpoint and restrained him. They took his wife outside, handcuffed her, and held her at gunpoint. Their infant son was inside the house, and he was held at gunpoint too. A surveillance drone was flown through the interior of the home.

326. Mr. Joseph was taken outside into the January cold in his underwear, in view of the neighborhood, and was brought back in to dress while agents watched him. His wife was given no privacy to breastfeed their infant with agents in the house. Agents searched the private rooms and left the home in disarray. His handcuffs were tight enough that he complained of them. A DNA swab was taken from him in the arrest vehicle, before they had even left his home, and his fingerprints were taken later at the jail. His telephone was seized; he had to buy another while it was gone, and although the original was eventually returned he has never trusted it since.

327. Mr. Joseph was transported to Washington, D.C., held in restraints through processing and his court appearance, and spent part of the day alone in a cell that smelled. He was released the same day and got home at four or five in the afternoon.

328. Mr. Joseph's release conditions required him to surrender his passport and give up access to his firearms, which agents inventoried and had his brother collect. He reported by telephone every Monday. Travel outside his state required advance permission, including an ordinary trip across a state line, and he needed separate permission to enter the District of Columbia. Those conditions ran for the length of the prosecution.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

329. Mr. Joseph opposed further delay in his case and pressed to go to trial. At or near the deadline on the government's plea offer, a superseding indictment added a charge of assaulting an officer. He understood the added felony, the sentencing exposure it carried, and the cost of defending it as pressure to plead. He declined to admit conduct he disputed.

330. Mr. Joseph asked for a separate proceeding and wanted a bench trial. Severance was denied, and he represented himself at a joint jury trial with standby counsel. He had difficulty obtaining and reviewing the evidence he needed. When he finally saw the full video he believed it showed conduct that the government's presentation had omitted or mischaracterized, and his efforts to obtain other officers' recordings and testimony failed. The officer whose body-camera recording was central to the case had died before trial, so Mr. Joseph could never examine him. He asked for headphones so the jury could actually hear the audio he considered essential to his defense, and that request was denied. He recalls the judge describing his account as a "Mr. Magoo defense" and calling him a liar.

331. On June 10, 2024, a jury convicted Mr. Joseph on all six counts tried: civil disorder under 18 U.S.C. § 231(a)(3); assaulting, resisting, or impeding officers and aiding and abetting under 18 U.S.C. §§ 111(a)(1) and 2; entering or remaining in a restricted building or grounds, disorderly or disruptive conduct in a restricted building or grounds, and engaging in physical violence in a restricted building or grounds under 18 U.S.C. §§ 1752(a)(1), (a)(2) and (a)(4); and impeding passage through the Capitol grounds or buildings under 40 U.S.C. § 5104(e)(2)(E). He was prosecuted in United States v. Tryon-Castro and Joseph, No. 1:23-cr-00035-RC (D.D.C.), before Judge Rudolph Contreras, jointly with the Plaintiff Casey Jane Tryon-Castro.

332. After the verdict Mr. Joseph lost the insurance-company position he had found in the interim. On November 12, 2024, he was sentenced to 37 months' imprisonment, 36 months of



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

supervised release, $2,000 in restitution, and $285 in assessments—a sentence that put a separation of years between him and his wife and his small son.

333. Mr. Joseph self-surrendered to FCI Fort Dix in New Jersey in early January 2025 and served approximately two weeks before the pardon of January 20, 2025, brought him home. He was strip-searched on admission and required to bend over and cough. The ceilings of his housing area were moldy; there were holes in them, water leaked through, and the building was in substantial disrepair. There were cockroaches. The food was poor, and other prisoners warned him away from the drinking fountains, so he bought water instead.

334. Because Mr. Joseph had only a paper identification document at first, staff made him wait until everyone else had eaten before he could go in for a meal. Depending on when his building was called he stood outside in the January cold for as long as an hour or two, and if he stepped into another building to get warm he risked losing his chance to eat. He missed a meal that way. For his first several days he was given no clean change of clothing, and his own became foul enough that other prisoners gave him clothes and supplies. Fort Dix was far enough from home to make it hard for his wife to visit him at all.

335. After the pardon Mr. Joseph kept trying to get back to work. In January 2026 he accepted a six-figure consulting offer supporting a large United States bank. The employer ran an FBI fingerprint background report, which still showed his January 6th case without the disposition information he expected it to carry, and the offer was withdrawn. He contacted the FBI and got the record corrected, but by then the offer was gone. That was the third position this case has cost him, and it came a year after he was pardoned.

336. Mr. Joseph contemplated suicide during the course of this experience. He reports post-traumatic stress, depression, anxiety, hypervigilance, paranoia, and a temper he did not have

before. He has nightmares about prison and weeps when he encounters depictions of confinement. He is clear about what did the damage: being locked up at all, rather than the particular conditions he found once he was inside. A reporter came to his house. Coverage of him ran on a video commentator's channel, in New York and Virginia outlets, and across the private websites that track January 6th defendants. The case strained his relationships with his father and his sister, which have since improved, and cost him acquaintances; his wife, his immediate family, and his close friends have stood by him.

**Michael Andrew Mackrell**

337. The Plaintiff Michael Andrew Mackrell is a medically retired United States Marine who lives in Wellington, Ohio with his wife Margaret and a blended family of six children. He served from 2001 to 2006, including service in Iraq in chemical-defense and convoy-security duties. He injured his back loading equipment overseas, and the resulting back and nerve problems ended his working life: he managed a towing company and then retired before January 6, 2021, relying on disability benefits. He walks with a cane, wears a foot-drop brace, and has an implanted spinal-cord stimulator. He traveled to Washington with his nineteen-year-old son Clifford, who would later be charged as his co-defendant.

338. Mr. Mackrell heard explosions and saw officers at an elevated position firing what he understood to be less-lethal munitions into the crowd before the police line collapsed. Sirens, alarms, and megaphone announcements came from more than one direction, but the crowd noise and the explosions made the words unintelligible. He walked into a cloud of chemical agent while still approaching the police line and was then sprayed repeatedly at close range. He watched six to eight officers surround a man on the ground, deliver full-swing punches, and appear to kick him.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

339. A sudden surge from behind pinned Mr. Mackrell at the front against a metal bicycle-rack barrier and forced him forward as the police line gave way. He suffered painful impacts to his abdomen and right side, and later found two small rubber balls—one in a jacket pocket, one in a pants pocket—which told him he had been struck by crowd-control projectiles. A person advancing with a bicycle-rack barricade struck him from behind and knocked him into a pile of officers and protesters, where his impaired right leg and poor balance left him struggling to rise. While he was on his hands and knees, someone pulled him backward by his collar or backpack and he fell onto his back.

340. Mr. Mackrell then saw his nineteen-year-old son trapped between the crowd and the officers while an officer struck the boy repeatedly on the head with a baton. He moved toward the officers to draw their attention away from his son, and officers threw him to the ground. Officers reached through and beneath their shields and struck him in the stomach, the side, and below the belt while he was trying to hold open space between the crowd and the police line. After a brief lull, an officer pushed through the line and struck him in the stomach and ribs with a baton—reigniting, as Mr. Mackrell saw it, a confrontation that had begun to subside. He was knocked down again while officers were retreating, and as he rose, he and another man faced the crowd with their arms extended and shouted for the fighting to stop while officers behind him continued to strike and kick him.

341. What Mr. Mackrell did next is what the United States chose to prosecute him for. Near an upright sheet of plywood roughly eight feet tall, he saw an officer strike his nineteen-year-old son in the head with a baton or a shield, and he stepped forward and pushed that officer back toward the police line to put separation between the officer, his son, and the people around them. Over the course of several interactions he used his hands to push officers, making physical contact



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

with approximately five of them. He did not punch or strike anyone. He believes he may have pushed one female officer to the ground, which he describes as accidental. He was shouting at the officers to get out of there, because he believed that officers who became separated from their line were the ones who ended up hurt, and he was afraid for them as well as for his son. He worked to create space between the crowd and the retreating officers, urged the officers to leave, walked the last of them toward a doorway, and helped close the door behind them. The entire sequence the government later charged as his officer encounters lasted approximately seven minutes. Video footage depicting these interactions existed, and Mr. Mackrell was not given access to it for use in his defense.

342. Mr. Mackrell lost his cane and his GoPro camera in the confrontation. He searched beneath plywood and around the police line and could not find them, and used a PVC flagpole as a substitute cane to get himself out. Chemical residue transferred from his contaminated clothing into his eyes when he removed his mask, and he could not see well enough to leave without his son guiding him; another person gave him water to rinse his eyes, and the burning and visual impairment lasted another twenty to thirty minutes. The exposed skin of his neck burned, and burned again when water touched the residue. His ears rang from the blasts. Once the adrenaline subsided he could barely move, and needed a third dose of prescribed pain medication he ordinarily avoided, together with additional medication over the counter. On the drive away he saw lumps on his son's head and heard the boy complain of severe head pain; he has since come to believe his son suffered a concussion, and regrets to this day that he did not take him to an emergency room. He had seen bleeding head wounds in the crowd, and had helped a woman whose pants were gone and whose side was extensively bruised and bleeding obtain a covering and reach an

ambulance. He and his son abandoned the father-and-son fishing and camping trip they had planned and drove home.

343. Within one to two months, unfamiliar minivans and other vehicles began appearing on the lightly traveled rural road where Mr. Mackrell lives, including vehicles stopped in the roadway near a blind hill. He began recording makes, models, and license plates, and noticed that the vehicles changed after appearing several times. Vehicles followed him through deliberate extra turns, and on one occasion a pickup truck followed him through a U-turn while he was driving to collect his son. This continued for approximately two years before his arrest, while he was largely homebound and while the government already knew his habits.

344. After seeing his son's photograph on an FBI webpage, Mr. Mackrell moved his firearms to relatives, because he feared they would be seized without compensation and wanted his family to be able to sell them if money became necessary.

345. The government sent three separate teams to arrest Clifford Mackrell—one to the son's apartment, one to his former wife's residence, and one to Mr. Mackrell's home. A local detective had already calmly handcuffed the son when six to eight additional vehicles came into the yard and numerous agents emerged with firearms pointed at Mr. Mackrell and at his handcuffed son. Agents ordered Mr. Mackrell to his knees and handcuffed him at his own home while simultaneously telling him he was not under arrest, and continued questioning him after he repeatedly said he did not wish to make a statement. His wife was kept away from him and had to push closer to relay an attorney's instruction that entry into the house required a warrant. Agents described a limited search of the basement and garage but presented a consent form Mr. Mackrell understood to authorize a search of the whole house, and he refused consent after consulting



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

counsel. An agent promised to return with his son's prescribed medication if the son were held overnight; the son was transported from Cleveland to Youngstown and back and never received it.

346. News media arrived at Mr. Mackrell's residence and at his former wife's residence and filmed from angles that prominently displayed each street address—one camera position, he believes, required standing in a flower bed to capture his. News personnel were present near his home before officers approached, and at the second address as well. Threatening mail directed at his son began within days. Unfamiliar people drove past and into the family driveway, and local police warned at least one of them not to return. Mr. Mackrell's then-seventeen-year-old daughter ran to answer forceful pounding at her mother's house, fell on the stairs, injured her ankle, went to an emergency room, and used crutches for weeks; agents questioned her rapidly while she was injured and crying, and pushed into the residence asking whom her brother had accompanied to Washington.

347. At approximately 7:00 or 8:00 a.m. on March 9, 2023, Mr. Mackrell was awakened by a telephone call from the FBI in which the caller shouted that the house was surrounded and rapidly demanded information about its occupants and pets. He accidentally disconnected the call while dressing, and immediately feared that agents would read the disconnection as resistance and shoot him. Several officers shouted different commands at him as he emerged with both hands raised, until one gave him a single clear set of directions. From his driveway to the roadway he saw a semicircle of armed personnel, a SWAT team behind his garage, numerous vehicles, and rifles trained on him throughout his surrender. He estimates more than fifty personnel took part, and later learned the operation involved two federal SWAT teams and one local SWAT team. Officers blocked the rural road for hundreds of feet in each direction for most of the day. This was



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

for a man the government had already met during his son's arrest, whose home supervision personnel had already inspected for weapons, and who could not walk without a cane.

348. Agents flew a drone through Mr. Mackrell's front door and over his kitchen table, where its prop wash scattered papers, until his cat struck it and knocked it down; an agent then angrily accused him of lying about the household pets. Agents taped over his Ring doorbell camera so that it could not record the operation, and kept his wife from approaching closely enough to see what was carried out of the house. He asked for shoes before transport and was told he could have them, and was then driven away in socks, his foot-drop brace useless without the shoe that went with it. He walked over gravel, parking areas, and government buildings in socks, dragging his impaired foot, until marshals eventually found him a used pair. Agents repeatedly demanded the combination to a safe that held no firearms—it contained his wife's jewelry and sentimental family property, including their son's baby blanket. After he supplied the combination, a local detective told him that agents would otherwise have dragged the safe outside and cut it open.

349. The search left boxes and stored property from the crawlspace, basement, and garage opened and displaced. Agents seized two laptops, every external hard drive they could find—including one used with a child's video game console—approximately four headlamps, and other electronics. Recovering the property took what Mr. Mackrell describes as a "weird battle," and the items came back only shortly before September 2026, more than three years later. One laptop's casing had been pried open and was not in the condition in which it was taken. He was driven first to the Cleveland FBI building for fingerprints, DNA collection, and retinal scans, and then to the United States Marshals facility for leg restraints and holding before his appearance.

350. Mr. Mackrell was prosecuted in United States v. Mackrell, No. 1:21-cr-00276-CKK (D.D.C.), before Judge Colleen Kollar-Kotelly. His release conditions imposed geographic

reporting requirements, firearm and ammunition restrictions, and mandatory continuing treatment, and a temporary no-contact order barred him from communicating with his own son once their cases were joined. He was required to waive or extend his speedy-trial period because discovery remained outstanding past the ordinary time, leaving him to choose between an unprepared proceeding and further delay, while the government received repeated extensions of its own.

351. The first judge to handle the case expressly ordered production of all evidence, including exculpatory material. Mr. Mackrell could nonetheless review discovery only at his attorney's office in Toledo, roughly two hours from his home, and made that round trip on four consecutive days despite chronic back and leg pain. He was forbidden to keep copies, and as to the online evidence repository he was forbidden even to operate the computer himself while his attorney searched. The material was jumbled, repetitive, and difficult to search. What he was shown were short, poor-quality video snippets rather than continuous recordings, and they repeatedly ended just before the images that would have shown him restraining the crowd or helping officers. Meaningful review of the repository would have required counsel to search an estimated forty thousand hours of footage while controlling the computer. Mr. Mackrell could not locate continuous body-worn-camera footage for the officers he interacted with. After his release he found a Sedition Hunters video on Facebook that shows him clearly—far more clearly than anything the government produced to his defense.

352. The court preserved a late-December trial date, including after Mr. Mackrell's attorney disclosed a preexisting family trip, while the prosecution withheld its plea proposal until shortly before the deadline to elect plea or trial. When a prosecutor wrote to defense counsel that she would tell the judge the government had missed the plea-delivery deadline, a different prosecutor appeared at the hearing; the court briefly admonished the substitute and directed that



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the offer be delivered, and nothing further came of it. The offer, when it came, was take-it-or-leave-it, with a warning that any later proposal would be materially worse.

353. On October 20, 2023, Mr. Mackrell pleaded guilty to a single count under 18 U.S.C. § 111(a)(1); the remaining charges were dismissed. The plea narrative used terms and a chronology he considered materially inaccurate and more violent than what happened, reordering separate encounters so that they appeared continuous and omitting the intervals and the intervening conduct—yet he was required to affirm that wording under oath to avoid the sentencing exposure of a trial. The number of alleged officer encounters shifted from five to seven by the time of sentencing, unexplained. The government at one point treated the officer he was said to have thrown as unidentified, then used a feminine pronoun for that officer at sentencing, and that officer's body-camera evidence was never available. At sentencing the government presented a person previously unassociated with the alleged encounters in place of the named officers.

354. On March 18, 2024, Mr. Mackrell was sentenced to 27 months' imprisonment, 12 months of supervised release, $2,000 in restitution, and a $100 assessment. He attempted to pay the restitution in full on the day of sentencing and completed payment approximately a month later, before reporting to prison. He served approximately nine months at FMC Lexington, roughly four and a half hours from his home, before the President's pardon proclamation of January 20, 2025; staff delayed processing his release, placed the group in a holding cell, suggested that transportation might hold things up, and finally released him between 2:30 and 3:00 a.m. after a friend arranged a ride.

355. The medical treatment of a disabled veteran in the custody of the United States was as follows. Mr. Mackrell went through his arrest and booking day without his ordinary prescribed medication and grew progressively ill. At FMC Lexington he was given contradictory directions

about whether he could bring his prescriptions in, and was left at intake with no instruction about when or where to obtain them; he spent his first days in custody without them until another inmate noticed his heavy sweating and physical decline and directed him to the pill line. A regimen of roughly ten prescriptions was cut to about three at minimum dosages. Several were stopped outright, without tapering. His repeated requests for his usual treatment were refused, and he took quantities of over-the-counter analgesics large enough that he worried about his liver. The institution withheld the remote control needed to adjust his implanted spinal-cord stimulator, rendering the device unusable, because changing position without adjusting it produces painful shocks; an outside physician in Lexington recommended both medication and access to the remote, and the institution refused even an arrangement under which a guard would hold the remote and provide it as needed. He could not use his foot-drop brace for approximately his first week because the issued footwear would not accommodate it, and he was assigned to second- and third-floor housing after requesting the first floor, so that he negotiated stairs with a cane, a dropped foot, and missing sections of handrail. He lost approximately forty pounds.

356. The conditions at FMC Lexington were as follows. Cockroaches, rats or mice, and wasps and other insects entering through unscreened windows. Showers too dirty to use. Black mold, and roof or vent leaks bad enough that rain fell on Mr. Mackrell while he slept and containers were set out to catch the water. Cracked tiles, crumbling plaster, peeling paint, and holes in the ceilings of occupied areas, with orientation staff advising inmates that asbestos was present and safe so long as it remained encapsulated. Extreme summer heat with no air conditioning and a large old fan whose noise and airflow hurt his ears. A winter stretch with the steam heat off while outside temperatures sat near fifteen degrees. A dormitory light left on through the sleep period. Bagged lockdown food approximately a month past date. A laundry closure of approximately one

week, posted only the day before, which he did not see, leaving him to wear dirty clothing for its duration. Pillows prohibited and confiscated, from a man with chronic back and nerve injuries. Inspections routed through the better-maintained first floor while the upper floors stayed as they were.

357. Mr. Mackrell was strip-searched and subjected to compelled visual body examinations around prison visits. He witnessed fights and threatened violence. Six or seven inmates threatened to beat or kill him because he had sought staff help for a young inmate who was vomiting, shaking, and clutching his chest. Prison personnel rejected multiple photographs his wife mailed him. For approximately four months he asked to write to his incarcerated son and was told an unexplained computer restriction prevented it; the same unexplained classification blocked him from an institutional job, and staff became unwilling to discuss the designation once they had looked at it.

358. January 6th and what followed made substantially worse a condition that had been improving before it. Mr. Mackrell's hypervigilance is now worse than when he first sought treatment after his service, particularly because he watched vehicles follow him for two years. His prescriptions changed afterward, including one he strongly dislikes. Walking through his own front doorway brings back the armed agents and the drone, and he expects it always will. He suffers nightmares, fear, and continuing anxiety from the armed arrest at his home, and emotional distress, humiliation, and trauma from the prosecution. During the period encompassing his arrest, prosecution, and imprisonment he contemplated self-harm. His preexisting avoidance of crowds worsened to the point that it interferes with entering buildings and attending his son's activities; he remains largely homebound and has not flown since his release. He has lost faith in the courts,

the prosecutors, law enforcement, and the government, and he fears that his retained DNA, fingerprints, and retinal scans will one day be used against him.

359. The financial damage runs through every part of Mr. Mackrell's household. Under the Department of Veterans Affairs' own rules governing incarcerated beneficiaries, Mr. Mackrell's benefit was to have been reduced beginning on the sixty-first day of his incarceration. The VA did not reduce it. It kept paying him in full and did not stop until January 2025, at the very end of his imprisonment. Before he surrendered, Mr. Mackrell and his wife had prepared a request that the VA pay some or all of his pension to his wife and children while he was away; the request could not be submitted until he was actually in custody, and it was sent within a day or two of his surrender. After his release the VA wrote denying the apportionment for his wife and children, on the ground that it had checked his account and seen that he was receiving full payment. Approximately one week later it wrote again, this time to tell him that he should not have been paid while he was in prison and that it had overpaid him by six months. The agency thus refused his family on the ground that he was being paid, and then declared that same payment improper and demanded it back—its own failure to reduce the benefit serving first as the reason to deny his wife and children and then as the basis of a debt against him. He asked the VA to waive the six-month debt it asserted. The decision took a year, and for that entire year he was paid approximately ten percent of his ordinary monthly benefit, while he and his wife accumulated substantial credit-card debt to live. The VA then granted the waiver, which meant it owed him the ninety percent it had withheld. It paid only a fraction of that. When he asked about the remainder he was told his account would have to be audited, and when he pressed again in September 2026 he was told that the debt the VA had waived had first been taken out of the back pay it owed him, and that he had been paid whatever was left over. The Social Security Administration reinstated his benefits and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

issued approximately $14,000 in back pay after a representative told him the pardon supported payment—then demanded repayment and cut his monthly benefit by more than half. While he was still incarcerated, and roughly three weeks to a month after the November 2024 election, he was told on the day of a scheduled hearing that the agency had opened a possible fraud review; he had never received the underlying letters and the video connection did not work. The law firm that had handled his earlier disability matter dropped the fraud-review case within days, telling him he would be found liable before it had seen his evidence or the agency's, and he proceeded without counsel. He spent months assembling records to answer the agency's expert, and learned at the second hearing that both experts had been replaced. The replacement specialist supported his treating physician and he received a fully favorable decision; the repayment and payment disputes continue regardless.

360. After his release Medicare denied Mr. Mackrell's treatment claims over an unresolved Part B premium issue, and TRICARE denied the same bills because Medicare was treated as the primary payer. He has attended roughly two appointments every three months since returning home in January 2025 with neither program paying. He asked his congressman for help and got a response that resolved nothing. His wife lived on credit cards during his imprisonment, and he has since withdrawn money from investments to pay household bills and those balances. Before his arrest he and his wife restructured and protected what they had, including the home and money set aside for the children, because they expected him to be taken and the income to stop. He settled a preexisting VA reimbursement dispute arising from a medical-malpractice claim faster and on materially worse terms because his son had been arrested and he expected his own arrest to end the negotiation. He paid airfare, lodging, and transportation for proceedings in Washington, repeated travel for discovery review, and fuel and lodging for prison visits.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

361. Mr. Mackrell received the "SSSS" designation every time he flew for his proceedings, with pat-downs, swabs, electronics and baggage scrutiny, and secondary searches. On one occasion screening delayed the aircraft and the same personnel escorted him some two hundred feet from the checkpoint to the gate and searched him again immediately before boarding. His wife and his best friend were selected for additional screening when they traveled with him, and screening personnel challenged his mother's inoperable tablet before letting the group proceed.

362. Mr. Mackrell's wife was hospitalized during his imprisonment and was out of work for three to four months. A marriage he describes as exceptionally close was strained by the imprisonment, the money, and disagreement over how much the case consumed him. He lost approximately nine months of daily parenting while his youngest son was about thirteen. Firearm and ammunition restrictions cost him his youngest son's entire first year of trapshooting and sometimes required him to stay indoors while his children shot elsewhere on the property. He missed family milestones he cannot recover. His oldest daughter withdrew from him after his release and called him a racist. His children began questioning his judgment and his advice. An aunt and other relatives on both sides of the family stopped speaking to him. People drive past the house and make obscene gestures at it. He has heard the government and the news media call January 6 participants, including himself and his son, terrorists—a word he finds particularly insulting, having volunteered for the Marine Corps and served in Iraq.

**Ronald Thomas Mele**

363. The Plaintiff Ronald Thomas Mele lives in Bulverde, Texas with his wife. He lived in Southern California at the time of the events alleged here and worked for more than twenty years in a career he can no longer return to. He had two cervical spinal fusion surgeries behind him and had recently had shoulder surgery.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

364. On January 6, 2021, Mr. Mele went to the Ellipse. When the crowd began walking toward the Capitol he walked with it and spent time on the lawn. As the crowd moved closer and grew louder, flash-bang devices and tear gas canisters were fired into it. He watched a line of police officers turn around and walk away. He went up the west terrace stairwell, took photographs and video, reached the top of the stairs and walked around, then climbed down from the scaffolding to the ground and left. He was there approximately fifteen minutes. He returned directly to the place he was staying ahead of the curfew and photographed himself there to establish that he had complied with it.

365. Before traveling, Mr. Mele had joined a group messaging channel that was organized to coordinate travel and lodging. He replied to it no more than twice and had no time to follow it. People who said things he objected to were removed from the channel by its organizers. That channel, and an affiliation he believes was inferred from it, became the basis on which the government charged him with a conspiracy.

366. The government tracked Mr. Mele's location through his telephone.

367. Before 6:00 a.m. on June 10, 2021, a flash-bang device detonated outside Mr. Mele's bedroom window. He and his wife woke to floodlights on the glass. Agents ordered him to put his palms against the window, and he looked down to find approximately fifteen red laser points on his chest. They ordered his wife downstairs, then him. Drones flew inside the house. A robot with a light on it sat at the bottom of the stairs. An officer in tactical gear put the muzzle of a rifle in his face. The front door stood open and agents were breaking down the doors into and inside the garage. Twenty to thirty agents entered the home. Helicopters were overhead and white canopy tents had been set up in the road. Mr. Mele and his wife were handcuffed, masks were put



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

over their faces, and they were held outside in the cold until the house was cleared. A photograph of his wife taken during the raid was published.

368. Agents told Mr. Mele they were searching his house for blueprints of the Capitol and for rockets. They found none, because there were none. They destroyed two doors and their frames — the exterior entry into the garage and the interior garage door — and pulled a closet organizer out of an upstairs bedroom wall, damage he puts at approximately $1,500. They photographed every item in the house associated with the President or the Vice President, and an item about the Constitution. An agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives asked about a particular pistol registered to him, which he had lawfully sold to a neighbor. Agents asked for the combination to his gun safe. He opened it. They looked at a collection that was lawful in every respect, complimented him on it, closed the safe, and told him they were satisfied — leaving the firearms and the ammunition for him to put away. A highly collectible knife taken from the house was never returned.

369. Mr. Mele talked with the agents for approximately four hours. He was swabbed for DNA. He was released on a $25,000 bond, subjected to conditions of release, and drug tested.

370. Mr. Mele was charged with conspiracy to obstruct an official proceeding under 18 U.S.C. § 1512(k); obstruction of an official proceeding and aiding and abetting under 18 U.S.C. §§ 1512(c)(2) and 2; entering and remaining in a restricted building or grounds; and disorderly and disruptive conduct in a restricted building or grounds. At his arraignment on June 14, 2021, he pleaded not guilty to every count. He never entered into a plea agreement. He was presented with a plea offer he understood as a threat and he refused it. He went to trial.

371. On November 7, 2023, a jury convicted Mr. Mele. On April 19, 2024, Judge Royce C. Lamberth sentenced him to 33 months' imprisonment, 36 months of supervised release, $2,000



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

in restitution, and a $250 special assessment. He was remanded into custody from the courtroom and was not permitted to surrender himself.

372. Mr. Mele's convictions under 18 U.S.C. § 1512 — the conspiracy count and the substantive obstruction count, the two felonies that drove his sentence — were subsequently vacated. He holds the order and the mandate. Rather than release him, the government responded by threatening to add another felony charge in order to keep him in prison.

373. Mr. Mele was held in solitary confinement at a county jail and did not leave the cell. He was then put on a bus and transported to Philadelphia, where he was held for approximately a month and a half and classified as a high-level prisoner. In Oklahoma he was housed in a structure he describes as a horse stable in which the temperature was approximately fifty-two degrees. He was placed in solitary confinement again for nine days. He was called a domestic terrorist repeatedly by staff, and was told that this was where they put all the domestic terrorists.

374. Mr. Mele's two cervical spinal fusions required a particular pillow and a particular sleeping position to keep pressure off the discs that remained in his neck. He was denied a pillow and was harassed for asking for one. He was assigned an upper bunk, which he had to reach by climbing onto a desk and climbing back down, with a fused neck and a recently operated shoulder. The medical staff took a single X-ray of his neck — an imaging study that could not show the condition he was describing, which requires magnetic resonance imaging — told him there was nothing wrong, and gave him no further treatment. He has had constant numbness and tingling through his upper body ever since, and it has not stopped.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

375. Because Mr. Mele's employer terminated him over this prosecution, he lost the medical insurance that would have paid for the care he still needs. He has been unable to obtain the imaging or the treatment for an injury the government caused and then refused to treat.

376. Mr. Mele was employed by a food-manufacturing company that terminated him after his indictment, asserting that he had acted against company guidelines. He has been refused employment elsewhere once prospective employers learned he was a January 6th defendant. He is unable to find work paying anything near what he earned for more than twenty years, and his tax records show the drop. As he puts it, a single search of his name has cost him one opportunity after another.

377. Mr. Mele's California license to carry was revoked, and so was his Utah license to carry.

378. Mr. Mele was identified and targeted by media organizations and by the private websites that assembled and published identifications of January 6th attendees, to the point that cease-and-desist letters had to be sent on his behalf. He received hate mail, including a letter threatening sexual violence against his family. He filed a police report and a complaint about it. He was subjected to "SSSS" screening when he flew.

379. Mr. Mele's convictions were terminated by the President's pardon proclamation of January 20, 2025. The pardon did not restore his career, his income, his licenses, his health insurance, or the feeling in his right side.

**Michael Steven Perkins**

380. The Plaintiff Michael Steven Perkins is an electrician from Plant City, Florida who founded a family electrical business in 2018. He traveled to Washington, D.C. with his wife, his fourteen-year-old daughter, and friends from his church.

381. Explosions and chemical agents suddenly entered the crowd on the West Terrace. The crowd began pushing in every direction, Mr. Perkins became separated from his wife and daughter, and the scene became chaotic. Capitol Police pepper-sprayed and gassed the Perkins' fourteen-year-old daughter, causing her to cry hysterically, vomit, gasp for breath, and struggle to escape the chemical odor. Mrs. Perkins saw officers pepper-spray a pregnant woman. Crowd and police movement forced Mr. Perkins to the ground, where people stepped on him and fell on him. Mr. Perkins recalls that while he was looking away and bending to retrieve his flag, an approaching officer made contact with the flagpole and punched him at the same moment, leaving a swollen black eye that he photographed. He denies intentionally striking any officer; the criminal court nevertheless found him guilty of offenses including assaulting officers with a dangerous weapon, as set out below. He extended a hand to help a fallen officer; the officer refused it, and another officer sprayed him. He suffered acute eye burning, impaired vision, breathing difficulty, and disorientation, and the chemical agent discolored and damaged his clothing. The family returned to their hotel in shock, only to watch news coverage characterize the people who had been present as instigators and terrorists.

382. In the months that followed, the Perkins family believed they were under surveillance. They remained on guard for approximately six weeks; their daughter slept in her parents' room because she was afraid; and family members slept on the couch fearing what might happen. They saw unfamiliar vehicles near their home, watched several vehicles repeat Mrs. Perkins's interstate maneuvers, and observed multiple plainclothes individuals disperse near their church. Mr. Perkins observed recurrent low-altitude aircraft circling over his work locations and home and preserved video of the flights. The family reported the suspected following to the state attorney's office and asked whether an investigation was open.

383. At approximately 5:45 a.m. on or about June 29 or 30, 2021, the government executed a predawn assault on the Perkins home involving what the family estimated to be dozens of SWAT personnel followed by approximately twenty FBI agents. Percussion devices shook the residence and knocked pictures off the walls; neighbors believed the family had been killed. The family saw firearm laser sights trained on family members ordered from the home, including their fourteen-year-old daughter. Officers ordered the Perkins' son outside in his underwear, kept him there, and questioned him. Smoke obscured Mr. Perkins's view as officers shouted commands, leaving him unable to determine where to walk; his own property looked to him like a war zone.

384. Two FBI agents separated the Perkins' fourteen-year-old daughter from her parents and questioned her without a parent present, displaying an envelope of photographs of her at the rally, telling her they knew she had been there, and asking her to identify who had accompanied her and how she had traveled. The agents apologized and left only after Mrs. Perkins confronted them about interrogating a fourteen-year-old child without a parent.

385. Officers sent a robot into the house and questioned Mrs. Perkins about purported booby traps before personnel entered. Law-enforcement vehicles drove through and smashed the family's gate. Devices deployed during the operation left large black burn marks on the carpet. Officers used claw hammers to beat the exterior surveillance cameras off the home, repeatedly missing and leaving holes in the siding—and conveniently limiting how much of the operation the camera system recorded. The search left every cabinet emptied and flour scattered across the floor and couch. Agents seized three family cellphones, additional old phones, Mr. Perkins's shoes and hoodie, a Nikon camera, memory cards, and the family photographs stored on those cards, and retained them for approximately two years. Two of the Perkins' church friends' homes were raided at approximately the same time.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

386. Agents drove Mr. Perkins away from his home, stopped on the side of the road, began questioning him, and read him his Miranda rights only after he said he would not speak with them. He was fully strip-searched during initial processing and subjected to fingerprinting and an oral DNA swab. After the first court appearance, the two church friends who had traveled with him were released while Mr. Perkins was detained for approximately fourteen days as a purported danger to the community. Marshals handling him during both the initial case and his later self-surrender openly questioned why he was being incarcerated in connection with January 6th at all.

387. Mr. Perkins was placed on pretrial home confinement with GPS monitoring for approximately sixteen months, initially confined to his home except for precisely scheduled work and church activities. His ankle monitor alarmed if he stepped onto his own porch. He received monitoring calls almost nightly at approximately 1:00 or 2:00 a.m., disrupting his sleep before work, sometimes falsely accusing him of being five miles from his approved location; he and his wife kept time-stamped cameras trained on their doors so they could document that he had remained at home and answer an inaccurate alert or an alleged violation. Monitoring personnel called during an approved beach trip, accused him of a violation, acknowledged that his file reflected approval, and laughed in the background. He was subject to random drug screens, had to check a color system daily, and lost work time and nearly two hours of travel from job sites for same-day testing. His conditions prevented him from helping family members, including his own father next door when the father's air conditioning failed. His release order barred contact with co-defendants even when they attended his church. He was required to produce approximately four years of tax, business, and payment records.

388. When Mr. Perkins refused the government's plea offer and exercised his right to trial, additional charges and enhancements followed. He proceeded by bench trial on appointed



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

counsel's advice that a District of Columbia jury pool would be biased. He was never given access to the complete discovery; appointed counsel told him he could not have it, and met with him in person for approximately one hour on a single occasion. The government presented a shortened video segment that portrayed him as kicking an officer, while the defense located a longer segment showing him pulling and kicking another person who was on top of the officer. Mr. Perkins sent counsel video clips showing police use of force; counsel declined to use them, told him he would be found guilty, and focused instead on obtaining a lower sentence. At the outset of trial the court announced it would limit evidence or argument concerning alleged government involvement, which the court called "conspiracy theories." The lead FBI case agent sat with the prosecution throughout trial, took notes, and then testified as the prosecution's final witness—while defense witnesses were barred from the courtroom before testifying.

389. Mr. Perkins was found guilty on all six counts in United States v. Pollock, et al., No. 1:21-cr-00447-CJN (D.D.C.). Counsel advised him to apologize at sentencing or receive a harsher outcome, and his apology for any unintended harm made him appear to admit conduct he has always disputed. The sentencing judge expressly invoked deterrence, which Mr. Perkins and his pastor understood to mean the outcome had been predetermined. On August 17, 2023, he was sentenced to 48 months' imprisonment, 36 months' supervised release, $2,000 restitution, and $510 in assessments; the government had asked for 90 months. He was allowed approximately twenty-one days at home before reporting to custody, in which he had to wind down the family business he ran with his son and his uncle and put his affairs in order.

390. Mr. Perkins served approximately 550 days and was moved through eight different jails and prisons in roughly one year—destabilizing "diesel therapy" that he often learned of only when officials moved him in the middle of the night without telling him where he was going.

Transport personnel applied shackles tightly enough to leave significant indentations in his wrists and ignored his complaints.

391. At the Pinellas County Jail an officer repeatedly called Mr. Perkins a "cop beater" and an "insurrectionist," mockingly recoiled as if Mr. Perkins might strike him, searched his bunk, dumped his belongings on the floor, and moved away an inmate with whom he had become friendly; he slept with bugs crawling on him. At Grady County Jail he was given a foul-smelling mattress without intact plastic covering and a bunk directly beneath a leak, forcing him to sleep on one side and borrow a bowl to catch rainwater; food was inadequate; he received no outdoor time and no Bible; and staff dismissed his reported illness as not an emergency. A Northern Neck intake officer questioned why he had been sent there and said the facility was not supposed to receive more January 6th detainees because of scrutiny over their treatment; flushing the open toilet there caused toilet water to run around his bunk, which inmates had to mop themselves; he received no outdoor time and had to purchase footwear before using a cold, unclean shower. As he left Northern Neck an officer told him that people in the D.C. jail especially liked "white boys" and "insurrectionists."

392. At the District of Columbia jail Mr. Perkins was placed directly into a filthy intake cell amid food debris and held alone for approximately four days without toilet paper, cleaning supplies, or a shower, forcing him to use pieces of his sheet for hygiene. The cell lacked adequate air conditioning and became so hot that he remained nearly naked. Pepper spray deployed against a neighboring detainee entered his unventilated cell, caused him to gasp for breath, and triggered a recurrence of his January 6th trauma while staff ignored his requests for help. His cell was infested with mice and its toilet leaked across the floor; staff refused cleaning supplies and a Bible. An officer repeatedly struck his cell door at night, shone a flashlight into his eyes, and turned off



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the pod's fan before going elsewhere to sleep. He spent approximately two months under conditions resembling solitary confinement, was denied a razor or haircut for months, and repeatedly found pubic hair in his food while guards laughed and accused the inmates of putting it there themselves.

393. At the Federal Detention Center in Philadelphia, Mr. Perkins witnessed stabbings and observed delayed officer responses, observed widespread drug use, was given no pillow or shower shoes, was initially denied a Bible, was frequently isolated, and was served portions so small that his financially strained wife had to send money so he could eat. At Petersburg he was served discolored, foul-smelling, moldy bologna and other food bearing expiration dates as much as a year past, and suffered severe gastrointestinal illness, stomach pain, and diarrhea as a result. When he pressed the emergency button because he was acutely ill, an officer threatened to enter and knock his "white-boy ass" out if he pressed it again, leaving him afraid to seek medical help. He received the same old bologna sandwich for Thanksgiving while isolated. A chaplain declined his request for a Bible but offered him a Quran. He wore the same clothing for approximately two to two-and-a-half weeks because staff provided no change of clothes. At Atlanta he was given one thin sheet and a bunk beside a drafty window and shivered nightly in early December, and could not shower for approximately three days because no towel, washcloth, or shower shoes were provided and the shower was clogged, flooded, and cold. At Coleman the shower ceiling was covered in black mold and portions of drywall fell on him while he showered; he obtained video and a physical drywall sample to document it. Officers there repeatedly searched his room and opened, crushed, and threw on the floor the commissary food his wife had purchased. Coleman repeatedly cancelled visits without meaningful notice, including after telling Mrs. Perkins by telephone that visitation would occur and after she had driven an hour and a half on Christmas



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Day. Letters from multiple people never reached him and electronic messages from supporters were delayed three or four weeks; a guard told him messages to January 6th inmates were personally reviewed.

394. Mr. Perkins reported back pain while using jail bedding and staff declined an assessment or accommodation because he could not produce proof of a prior surgery. He suffered severe dental pain at Coleman, delayed attention, extraction rather than repair of the affected tooth, and excruciating pain afterward. While housed in cold conditions with visible black mold at Coleman, he became so ill that he could not get out of bed for approximately three to four weeks. His weight fell from approximately 205 pounds at self-surrender to approximately 168 pounds by the time he reached Coleman—a loss of nearly forty pounds. He suffered chronic sleep deprivation across every facility.

395. Mr. Perkins's case was resolved by the President's pardon proclamation of January 20, 2025. Even then, Coleman personnel removed him from the television room, placed the pod on lockdown, and did not release him until approximately 2:00 a.m., after his wife went to the facility with the order and prison personnel called the local police on her.

396. The family electrical business Mr. Perkins founded could not continue without him. His uncle retired from it and his son took different work. Mrs. Perkins's part-time church income could not cover the bills; the couple's son paid most household expenses and their daughter worked to help support the household. The family delayed payments on multiple obligations, and commissary and telephone expenses were substantial, with account balances not following Mr. Perkins between facilities.

397. Mrs. Perkins received vulgar telephone calls wishing the family dead, threatening to hang them as traitors, threatening sexual violence against her while her husband was imprisoned,

and expressing hope that Mr. Perkins would be raped in custody. The family's address and telephone number became publicly accessible. Mrs. Perkins deleted her social-media accounts because posts repeatedly characterized the family as traitors and insurrectionists and included vile statements about their children. An article identified the Perkins' then-sixteen-year-old daughter, leaving her afraid that her coworkers would learn of the case. One published report used Mr. Perkins's photograph and name but attributed to him a co-defendant's conduct and occupation. Extended relatives stopped calling and avoided the family for fear of becoming subjects of surveillance themselves; Mrs. Perkins's grandfather barred the family from their lifelong Christmas breakfast because he feared officials were watching them. Mr. Perkins missed his daughter's graduation and last day of school after having taken her to her first day, and missed the funerals of an uncle and members of his church family. He now has difficulty sleeping in darkness because custodial facilities kept the lights on, suffers nightmares, and sometimes stops in the middle of ordinary construction work, breaks down, and cries.

**Kenneth Bruce Rader, II**

398. The Plaintiff Kenneth Bruce Rader II is a published author from Sioux City, Iowa. His book Psychotic Monkey was published on June 25, 2021, and by December 2021 he was in its active marketing phase, with a recent book signing, a radio interview, a television appearance, an entertainment-magazine feature, and a feature in the Sioux City Journal.

399. Approximately two-thirds of the way through the rally speech, Mr. Rader began hearing booms and was told that the sounds were concussion grenades and that the Capitol was being taken. He moved toward the Capitol with the crowd. Firing had already begun when he arrived. From near the scaffolding he saw approximately twelve police officers surrounding and



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

clubbing a man who was bleeding, and he shouted at them to stop—conduct the government later characterized in charging materials as interference with police.

400. Mr. Rader was directly gassed and sprayed and was exposed to tear gas, pepper spray, mace, and black smoke. He was exposed to flash-bang devices, concussion grenades, and very loud blasts, including one that detonated immediately next to him and left ringing and humming in his ears well into the following day. Something deployed near him burned holes in the sweatshirt he was wearing. He was exposed to rubber bullets and to officers' batons and shields and saw others beaten with batons and shields. The crowd was so packed and chaotic that he was pushed, crushed, pinned, and carried forward against his own will. He saw an unconscious person, a death, and a cardiac-arrest event. His eyes burned until the end of the night and he suffered scrapes.

401. Mr. Rader's own brother contacted the FBI about him on January 8, 2021—but the government did not arrest him until approximately January 20, 2022, more than a year later. In approximately September 2021, two plainclothes FBI agents approached him at his home, asked whether he planned to attend another Washington rally, and questioned him about January 6th. On January 6, 2022, an agent returned to his home, asked whether anyone had interfered with his recent book signing, displayed a badge, gave him a card, and told him the FBI was available if anyone bothered him. Mr. Rader understood the unsolicited visit for exactly what it was: notice that he was being watched.

402. During a South Dakota traffic stop Mr. Rader heard dispatch refer to the FBI, and during a separate Iowa roadside encounter he heard dispatch associate him with an FBI investigation and a domestic-terrorist group. He was stopped by police four times within eight days, after which he sold his car—and has been without a vehicle ever since. After his January 6th



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

arrest he was removed from the fine-payment program through which he had been paying older fines, which prevented him from restoring his driver's license and left him without practical transportation from his father's rural residence. He saw government or police vehicles near his residence constantly, and drones that followed him from his house, remained for hours, followed him home, and hovered over his house.

403. The arrest came at approximately 7:00 a.m. and involved the FBI, the Sioux City police, and the Woodbury County Sheriff's Office, with eight to twelve vehicles and an FBI tactical truck with tactical equipment visible. Mr. Rader opened his front door and found the arrest team there; an agent was opening the screen door at the same moment, and he was handcuffed on the porch. Officers awakened his stepfather, his stepfather's wife, and her two adult sons—Mr. Rader's stepbrothers—and removed them from the home into very cold weather in robes and slippers while the search proceeded; officers remained present while the wife, who has serious health problems, dressed. The search left the residence in a substantial mess, and officers seized three cell phones.

404. Arrest-day processing included handcuffing, fingerprinting, palm printing, and a strip search requiring him to bend over and cough. He was held approximately five hours in a cell that smelled of urine, contained discarded food containers, and had a toilet in public view under a camera; he was given neither food nor water and personnel rarely came by.

405. The three seized telephones were returned only after service on the pay-by-the-month devices had lapsed, and Mr. Rader had to buy a replacement. He learned through counsel and legal paperwork that location information associated with his device and account had been obtained and reviewed with no advance or provider notice. Investigators obtained selected material from his Facebook account, and Facebook then deleted the account, depriving him of access to the

very material he needed to place the selected posts in context. He lost access to his Facebook, TikTok, and X accounts. Prime Bank, Security National, and Great Southern each closed or removed his account without explanation; he was, in his words, "debanked" three times.

406. Mr. Rader was charged in United States v. Rader, No. 1:22-cr-00057-RCL (D.D.C.) with four misdemeanors—two disorderly-conduct counts, one unlawful-entry count, and one parading, demonstrating, or picketing count. His charging materials labeled him a QAnon adherent, associated that label with domestic terrorism, and used the characterization against him in court. The materials used his private messages and other social-media content, and authorities repeatedly referenced the December Sioux City Journal feature published while he was promoting his book. A gag restriction prevented him from publicly explaining his position or answering reporters during extensive local coverage.

407. At his first federal appearance, an attorney was already seated at counsel table and told Mr. Rader that he had petitioned to represent him before the two had ever discussed representation. Mr. Rader and counsel argued at their first meeting. He accepted a plea to the parading count without seriously considering trial because he feared a drawn-out case, longer supervised release, and a harsher result if he exercised the right to trial.

408. On September 29, 2022, Mr. Rader was sentenced to 90 days' incarceration, 36 months' probation, $500 in "restitution," and a $10 assessment for a petty misdemeanor. When he asked to appeal the combined custody-and-probation sentence, counsel discouraged him, told him another defendant had already challenged the issue, and advised against "poking the bear."

409. Mr. Rader spent approximately six days in an Iowa federal holding facility and was then transferred to the United States Penitentiary at Leavenworth, a medium-security institution, for the remaining seventy-odd days of a ninety-day misdemeanor sentence. He identifies that



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

placement as one of the two most serious harms done to him: it made him feel his life was endangered and kept him constantly on edge. Leavenworth personnel collected a DNA swab at intake. After he declined an attempted COVID-19 vaccination, staff swabbed him and placed him in quarantine for approximately five days, with movement and processing extending the experience to roughly ten; during quarantine, shower rotations repeatedly ended before reaching him, leaving him able to shower only once every three or four days. He was strip-searched repeatedly when transferred among Woodbury County, Orange City, and Leavenworth, including bend-and-cough searches even where a body scanner was also used.

410. At Leavenworth Mr. Rader was exposed to gang threats with generally inadequate inmate protection, an uncontrolled K2 drug problem, and numerous fights; he heard a correctional officer tell two other inmates that their transfer would be delayed because someone had been stabbed in the receiving unit. Drinking water was available only through the fixture built together with the toilet in his cell. The first shower room he used had no lights and stood in ankle-deep water. He endured roaches, mice, mold in the showers, and extreme cold. Outdoor recreation was offered for one hour early on winter mornings without issuance of a coat, so he used it once. His communications were restricted to a single telephone number—his father's—and a single email address, restricting contact with family and counsel; he was told the restriction concerned alleged QAnon activity. He entered custody with a preexisting empty eye socket, repeatedly requested a clear prosthetic insert, and was refused for his entire incarceration; staff also confiscated the protective eye shield he had brought with him.

411. Mr. Rader's father suffered a heart attack approximately two weeks after he entered federal custody, remained hospitalized throughout his confinement, and died the following February. Mr. Rader could not be with him. He went directly from release to the hospital, and

describes that separation as the hardest part of the prison experience. He spent both Thanksgiving and Christmas in custody. His older sister was too frightened of harassment to pick him up from prison.

412. Mr. Rader's supervision included approximately fifteen months of probation with officer reporting, urine testing, officer visits, a prohibition on travel to Washington, restrictions on contact with other January 6th defendants, and a restriction against viewing QAnon-related material. He was required to remove swords and a BB gun from the residence. His supervision officer refused a proposed overnight stay with a friend when Mr. Rader needed transportation to a court hearing thirty to forty miles away, telling him that all he knew were criminals and drug addicts. The District of Columbia probation office retained jurisdiction while an Iowa officer performed local supervision, and the Iowa officer told him directives came from Washington.

413. After an appellate ruling Mr. Rader understood to invalidate the probation structure, he moved to terminate his probation. The court denied the request—and a violation proceeding followed approximately two days later. The violation allegations concerned drug use that preceded voluntary treatment he had himself requested, scheduled over a college break, and completed successfully before returning to school. The District of Columbia probation officer who addressed the revocation court had never met him, and his actual Iowa supervising officer was absent from the hearing. He was sentenced to 135 days with credit for the original 90, serving approximately 45 additional days.

414. Mr. Rader lived in a concealed safe room for approximately two months because he feared being taken into custody, stopped reporting to his probation officer temporarily, considered remaining hidden until a change in presidential administration, and then resurfaced voluntarily the day before court. He feared that authorities would kill January 6th defendants or

hold them indefinitely as political prisoners. He suffers humiliation, trauma, significant social isolation, and what he describes as "maybe a little PTSD"—interpreting later loud noises as another explosive device.

415. The phones the government seized held Mr. Rader's writing and the materials he was using to promote Psychotic Monkey, and the seizure brought that work to a substantial halt while news of his arrest displaced the book's publicity and a gag order prevented him from answering reporters. Sedition Hunters identified him by name but initially paired his identity with another person's address and state. Public sources called him racist and asserted that he had been charged with or pleaded guilty to insurrection. A YouTube video used his image and disclosed personal information about him and remained publicly accessible. A podcast reviewed his criminal history, attacked his character, and discussed his book. Community members called for a boycott of his participation in a West High School fundraiser, and organizers removed his donated books and memorabilia from an ongoing auction under public pressure. He lost friends and became estranged from the brother who reported him and from an aunt. He encountered people in grocery stores who appeared ready to become violent with him. He enrolled in college for media and film and earned all A grades in seven classes at midterm—only to be forced to withdraw when the probation violation returned him to custody. A former classmate later interviewed him for local media after the pardon, forcing him to confront where his own career might have gone. Mr. Rader received a presidential pardon in January 2025.

**Kenneth John Reda**

416. The Plaintiff Kenneth John Reda was a public-school teacher and coach in Florida, certified in English, business, and physical education, and had been married for thirty-three years.

He traveled to Washington, D.C. to hear the President speak and to protest the improprieties of the 2020 Election.

417. When Mr. Reda reached the Capitol, some of the exterior bicycle-rack barriers he had seen earlier were already gone. Capitol Police repeatedly lifted and moved the remaining barricades backward, approximately three steps at a time, from beyond the sidewalk toward the building and eventually up the Capitol steps, while the crowd advanced on the other side of the barricades. The crowd near the doors was so densely packed that each person had roughly two feet in which to move at all.

418. Officers deployed chemical spray and flash-bang devices near the Capitol doors. A Capitol Police officer used a clear shield to push Mr. Reda backward while telling him to "get back." One officer became trapped in the packed crowd and began hyperventilating; Mr. Reda used his arms to create four to six feet of breathing space and helped move that officer toward the Capitol doors. A second officer was pulled into the crowd and was hyperventilating severely; Mr. Reda again created space and helped that officer reach a corner near the door. For this, the United States prosecuted him.

419. After people exited through the door, Capitol Police began admitting groups of approximately four or five people at roughly ten-minute intervals. Mr. Reda believes he entered with one of the first ten such groups. Inside the Rotunda, when he asked an officer a question, the officer told him to "get the f— out of here." Another officer refused his request to use a restroom before he left the building. He was sprayed directly in the left eye, lost his eyeglasses in the crowd—never recovered, and likely trampled—and suffered burning, irritation, and vision problems he first described as lasting a day or two and later described as an eye that felt "burned" for weeks. He was exposed to substantial smoke and left with an orange residue on his clothing.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

420. After watching news coverage from his hotel, Mr. Reda feared that authorities would begin rounding people up, and he left Washington for Florida at approximately 4:00 a.m. the next morning.

421. FBI agents later told Mr. Reda they had used information from his telephone to track and establish his location. Agents retained his telephone for multiple weeks and showed him social-media posts they had obtained. His neighbor identified FBI personnel at his home on multiple occasions, and agents also went to his school. He saw government or police vehicles near his residence, and authorities referred to him as the "big Jeep guy"; when he left his Jeep running outside a school because of a battery problem, a police officer told him that authorities knew who he was.

422. Mr. Reda, his then-wife, his mother-in-law, and on one occasion his son were issued boarding passes bearing four "S" markings and were subjected to secondary screening. He and his then-wife underwent a complete public pat-down at Melbourne Airport, and the flight was delayed so screeners could finish—an experience he describes as humiliating. During an Atlanta connection, all passengers were purportedly selected at random for secondary screening, yet he and his then-wife were selected back-to-back. He saw the same two men, whom he thought looked like U.S. Marshals, on portions of his air travel. Returning through the Tijuana port of entry, officials stopped him after he had already passed the checkpoint, placed him in a holding area for approximately three hours, patted him down thoroughly, and took possession of his luggage. He repeatedly asked why he was being held and was told only that officials were trying to reach someone and could not; he was given no substantive explanation for the detention. The repeated scrutiny caused him and his companions to consider renting a car and driving home rather than face another airport.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

423. Authorities never asked Mr. Reda to surrender. Instead, when he arrived at a Florida airport, more than two officers or FBI agents changed from walking toward him to running toward him and took him into custody. He told the arresting agent he would have turned himself in had anyone asked. He was handcuffed—the cuffs were tight and officials refused his request to loosen them—escorted into a black Chevrolet Tahoe, transported to the federal courthouse in Orlando, processed, fingerprinted, held for several hours, presented to a judge, and released the same day. Officials collected an inner-cheek swab and his fingerprints. The holding cell was hot, had an exposed toilet, and was shared with a detainee who did not speak English. He was required to remove his firearms from his residence, and officials searched the house to verify it. His passport was taken and later returned. Agents also questioned his then-wife.

424. The morning after his arrest, four or five television vans, reporters, and camera crews were outside the Reda home before 7:00 a.m., repeatedly calling both spouses; a neighbor helped persuade most of them to leave after approximately two hours. Press personnel waited outside the courthouse after his release, and Mr. Reda physically ran away to avoid being interviewed. He received repeated interview requests from the New York Times, the Los Angeles Times, and others, and acquaintances in California contacted him in Florida after seeing the national coverage. Strangers approached him in restaurants. Social-media commentary attacked his character and questioned whether he should be teaching children. He and members of his family received threatening and hostile communications, including multiple death-threat letters mailed to their household.

425. Mr. Reda was charged in United States v. Reda, No. 1:21-cr-00452-TFH (D.D.C.), before Judge Thomas F. Hogan, with four counts. An attorney he had consulted told him he could not continue the representation because he feared professional blowback from representing a



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

person labeled a domestic terrorist. Retained counsel was unprepared. Counsel pressed Mr. Reda to confirm another individual's identity, told him investigators already knew who the person was, and warned that a failure to cooperate would have "consequences"; it was insinuated that his sentence would be worse if he did not cooperate, and counsel told him cooperation would produce a lighter sentence—a benefit that never materialized. Investigators repeatedly questioned him about the Proud Boys.

426. Mr. Reda had already incurred approximately $20,000 in attorney fees—money he did not have on a teacher's income—and borrowed money and liquidated retirement funds to pay them. Financial exhaustion and his fear of a biased process pressured him into pleading guilty on November 4, 2021, to a single petty count of parading, demonstrating, or picketing; Counts 1 through 3 were dismissed after the plea.

427. Mr. Reda suffered what he describes as a minor stroke during the week set for his sentencing, was hospitalized for four days, and had sentencing postponed. He attributes the stroke to the stress of the case. He was left with serious balance problems that ended his lifelong practice of surfing.

428. On March 30, 2022, Mr. Reda was sentenced to 36 months' probation, 60 days of home detention with an ankle monitor, 60 hours of community service, and monetary assessments. Counsel had led him to expect a lighter sentence, which he views as a sentencing "bait and switch." Immediately after arrest he had been prohibited from leaving the county. Home confinement permitted him to leave only for work, and consequently prevented him from attending church in person. Release conditions restricted his travel, required reporting, limited association with designated people, and required the removal of firearms from his home.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

429. The damage to Mr. Reda's profession was severe. The school district conveyed through Mr. Reda's attorney that resignation might permit him to regain his job later, and he resigned because he did not want the school or the principal to suffer further repercussions. His teaching credential was reviewed and later suspended. He could not teach or coach, could not find a job, and lost a full school year of work. He took work for a fire-sprinkler company outside his profession. The following year he taught at a small Lutheran school for substantially less pay. He received a teaching offer from St. Cloud High School that lasted less than twenty-four hours before the principal rescinded it, and an HR email implied that people like him were not welcome to teach in that district. A longtime head coach told him a coaching position was his and that the principal knew his history—and he received no interview after applying. He remains unable to obtain comparable public-school teaching or coaching work. He lost employer-provided medical insurance, Florida retirement accrual, and other employment benefits. He has no continuing-education credits toward maintaining his certification and can obtain them only by paying for them himself, which is substantially harder because he cannot obtain public-school work. He now works as a public adjuster and does not regard it as the work he was meant to do.

430. Mr. Reda's then-wife was called into the Osceola School District office after a false anonymous accusation that she was teaching far-right beliefs, though she was not even in a classroom at the time; Mr. Reda later learned that his stepsister had made anonymous complaints against both spouses. His then-wife sought a vice-principal position and, even after passing the required examination, could not obtain one. His thirty-three-year marriage ended, shattering a family that included three adult children and grandchildren. Wells Fargo terminated its banking relationship with him. Facebook would not permit him to establish a new account until he changed email addresses and submitted photographs in which he looked different. A popular fundraising

platform refused to host a legal-fee fundraiser because he was a January 6th defendant; an alternative raised little more than $1,000. Financial strain left him housing-unstable, living first with his daughter and later with his mother.

431. Mr. Reda fell into a deep depression. He startles at loud noises, has difficulty sleeping, and suffers anxiety, panic, nightmares, and symptoms he understands as post-traumatic stress. He experienced suicidal thoughts during the period when his career, marriage, and character were collapsing. He drank substantially more alcohol than before and later sought recovery help. He obtained therapy and states that the January 6th matter strongly contributed to his need for it. He lost weight from approximately 225 pounds to 187 and regained only part of it. He has become hypervigilant about whether federal or other law enforcement is nearby, and answered "100%" when asked whether uncertainty about future election cycles perpetuates that fear. He withdrew from public life and has difficulty forming new relationships. He characterizes his emotional injury as extreme and, in his own assessment, permanent: the loss of his career, his marriage, and his reputation took his identity and, as he puts it, his "whole everything." His case was terminated by the President's pardon proclamation of January 20, 2025.

**Michael Nelson Sparks**

432. The Plaintiff Michael Nelson Sparks is a self-employed construction and excavation contractor who lives in Cecilia, Kentucky with his wife Amanda and their twin sons, and who also has an adult daughter, an adult stepdaughter, and a grandchild. His elderly mother lives beside the family and depends on him for assistance. For nearly ten years before January 6th he worked at Altec, rising from the floor to group leader with responsibility for approximately twenty-five workers—a career that required no college degree and that in one year paid him nearly

$200,000. He traveled to Washington, D.C. with coworkers because he believed the 2020 election required further investigation and he wanted his voice heard.

433. On the Capitol grounds Mr. Sparks was exposed to gas and chemical spray, and rubber or hard-plastic projectiles struck him on the arm and the head, causing bruising. Officers struck him repeatedly on the back with batons as he approached the police line on the upper terrace. Flash-bang or concussion devices detonated near enough to shake the ground beneath him, and he believed at the time that a bomb or a grenade had gone off beside him. An officer sprayed him directly as he came through a window, leaving him coughing with the spray dripping out of his hair. His skin was irritated for approximately a month afterward and his eyes burned for weeks. His ears still ring intermittently to this day; he has not obtained a medical evaluation and does not contend that the cause can be established.

434. Mr. Sparks saw one man with blood running from his face or ear after a blast nearby, and another man bleeding from the mouth after a projectile struck him. He saw a man receiving cardiopulmonary resuscitation and, being certified in CPR himself, took a place in the line of people waiting to relieve the person performing it, until medical personnel removed the man.

435. Mr. Sparks entered the Capitol through a broken window and continued after officers directed the group to stop. He did so because he wanted Congress to investigate the election before the certification was completed. He does not contend otherwise, and he disputes that his purpose was violent or that his conduct and his words were accurately characterized at his trial. After he left the building, blocked stairs kept him from finding a route off the terrace for approximately an hour, and he disputes the government's characterization of that delay as a refusal to leave.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

436. Before Mr. Sparks had even returned home, he saw his own photograph on national television, identified as a person of interest, and learned of it in a motel room. His wife and his adult daughter saw the same coverage, feared for his safety, and could not reach him because his telephone was dead.

437. The threats began almost at once. Mr. Sparks and his family received death threats, including from people in other states. Hostile postcards arrived at his home, one of them expressing the writer's wish that he be gang-raped in prison—correspondence that frightened him because it meant strangers had his mailing address. He deleted his Facebook account because of the threats and asked his wife to display her maiden name rather than his so that she would be harder to find. Newspaper and television coverage was extensive and included the publication of his employer's identity. People shouted accusations of insurrection at him as he walked toward the courthouse, and he hurried inside.

438. Mr. Sparks received notice from Verizon and, to the best of his recollection, from Meta that his information had been requested, along with bank notifications, and extensive financial records were used in his case. Agents remarked to him that the new house he was building looked good, at a time when he did not believe they had ever been to it, and he understood the remark as evidence that he was being watched. Black sport-utility vehicles with dark windows passed his rural home. An unfamiliar car bearing the words "death rattle" passed him slowly twice while a friend was with him, and days later he saw its driver standing behind him at a hardware store. A sheriff's deputy stopped him at night, on a trip to collect a generator, without any traffic violation he could identify and without a clear explanation, checked his vehicle and his license, and released him.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

439. Mr. Sparks self-surrendered on January 19, 2021. He was processed by the State Police, then at the FBI office in Louisville, and then taken to the jail at LaGrange, and approximately twenty hours passed before he was brought before a judge. When he was told the first fingerprint machine was not working and was taken down into the lower levels of the FBI building, he was frightened. He was fingerprinted and subjected to a retinal scan, and he is approximately ninety percent certain that a DNA sample was taken from him. The government's retention of his biometric information continues to trouble him deeply.

440. Mr. Sparks spent that night in an overcrowded holding room with approximately fifteen other men, without enough space for him to lie down without touching someone, while one man paced and stepped over the others all night. There was vomit and urine on the floor. He was offered no food and no water. He did not sleep.

441. At the jail Mr. Sparks was required to accept an injection over his objection. He was not told what the substance was, he still does not know, and he has not been able to obtain the medical record of it.

442. For more than three years Mr. Sparks lived under release conditions. He reported weekly by telephone, could not leave Kentucky without permission, and was forbidden contact with other January 6th defendants. The restrictions cost him a visit to his closest friend in Alabama and family holiday gatherings in Indiana; one trip to Florida was allowed and other requests were denied. Before his release his wife and a friend had to remove the firearms and ammunition from his home, after which many of them were sold and the sentimental ones stored with a friend; he lost his concealed-carry permit and the hunting he had done with his children. He experienced the first judge's remarks as degrading and threatening, including a warning that a minor violation

could result in his detention. His trial was postponed repeatedly, and he estimates that he made approximately forty court appearances.

443. Mr. Sparks was pressed to plead guilty and to cooperate by identifying other people who had traveled with him, and he associates the addition of the charge under 18 U.S.C. § 1512(c)(2) with his refusal to do either. He was alarmed to learn that the obstruction count carried exposure of up to twenty years, and he understood the plea he was offered to carry approximately five. When a text message from his elderly mother was discussed during plea negotiations, he feared she too could be drawn into the case.

444. Mr. Sparks was unable to obtain discovery he wanted, including video he believed would show a handshake or fist bump with officers, and was told repeatedly that the material was not available. He contends the video the government did use was selected to omit context or audio and made his statements appear threatening or racist, and that an FBI witness acknowledged on the stand that footage had been edited. He contends that words and conduct belonging to his co-defendant—a vest, statements about entering the building—were used to imply that he shared the same intentions, and he disputes the attribution of a particular voice to him. Trial discussion of a backpack and an explosive-device incident left him afraid the jury would connect him to a bomb, although he acknowledges that prosecutors never said his backpack contained one. A message he had sent to his own daughter was described as a message to a woman, and his counsel clarified the relationship on cross-examination only because he insisted.

445. Mr. Sparks's appointed counsel made repeated hostile remarks to him about the President he had supported, failed to object as witnesses testified to what other people had been thinking, and left him begging for objections that were never made. He did not ask for replacement counsel because he feared that asking would make his position worse. During a lunch break, while



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

he was praying on a bench around the corner in a courthouse hallway, he overheard his own lawyer tell the prosecutor that if he decided to testify counsel would miss his flight home. He did not testify. He also reports that a juror slept through portions of the trial and that counsel declined his request to raise it, and that the jury seated in his case had connections to the Capitol and reacted to him with what he understood as hostility from beginning to end.

446. Mr. Sparks was distressed by what he perceived as a change in the testimony of the Capitol Police officer whose encounter with him had been the centerpiece of the coverage, between another defendant's proceeding and his own. The depiction of that encounter as a chase caused coworkers to regard him as a racist and to refuse to work with him.

447. Mr. Sparks was prosecuted in United States v. Sparks, No. 1:21-cr-00087-TJK (D.D.C.), before Judge Timothy J. Kelly, and was named with a co-defendant in a second superseding indictment returned November 9, 2022. On March 1, 2024, a jury returned guilty verdicts against him on six counts. On August 5, 2024, the count charging obstruction of an official proceeding under 18 U.S.C. § 1512(c)(2) was dismissed on the government's own unopposed motion.

448. On August 27, 2024, Mr. Sparks was sentenced on the five remaining counts to 53 months' imprisonment, 36 months of supervised release, $2,000 in restitution, and a $170 special assessment. He was stunned. With the obstruction count gone he had expected a substantially shorter term, and the court nonetheless weighed the conduct underlying the dismissed count and the social-media account he had deleted—an account he had deleted because his family was receiving death threats.

449. Mr. Sparks surrendered to FCI Ashland in October 2024. Staff who had been friendly in his wife's presence began shouting, swearing, and threatening him with consequences

as soon as the gate closed behind her. He was strip-searched at intake—required to undress completely, bend, spread his buttocks, and cough—and estimates that he was searched that way approximately five times, including in connection with family visits. He was left to find his way through a crowded dormitory without adequate instruction, and other inmates demanded to know his offense and threatened to kill him if his paperwork showed a crime involving a child. On one occasion he was attacked by another inmate. He believes his classification kept him out of a camp for which his points should have qualified him.

450. Fights, blood, open drug use, and nighttime activity in Mr. Sparks's first housing unit left him afraid to sleep and constantly watchful. He woke at approximately three in the morning to find men gathered at his bunk and believed he was about to be attacked; he ordered them away and then feared retaliation. He watched an inmate plant a water bottle under another man's pillow, and then watched the accusation of theft, the group beating, the man's removal, and the theft of his commissary property that followed. He saw an older man dragged into the yard and beaten for speaking during a count. Being known as a January 6th defendant drew hostility he had to avoid or confront in order to protect himself.

451. There were insects in the food Mr. Sparks was served, including in the fruit and the meat, and much of what the cafeteria offered was inedible. He ate very little and lived largely on tuna obtained from the commissary or by trade. He lost between thirty and thirty-five pounds. Red bumps and bites appeared over his body and his hair fell out onto his pillow. Mold covered the shower surfaces and ceilings so extensively that an inspector remarked on the amount of it. The bathrooms were fouled with human waste. His sleep was broken by noise, fighting, and drug activity, compounded by his fear of attack and his fear of falling from a narrow top bunk. Outdoor recreation amounted to approximately one hour a day. He was threatened with discipline over the



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

shoes he had been issued, was refused help by a staff member when he tried to obtain his own identifying number, was confronted against a wall by a guard over his footwear, and skipped an evening meal to avoid discipline until the shoe problem was resolved. He wanted a Bible urgently and had great difficulty navigating the process to get one; after he obtained it he stopped using the chapel, because he believed it was being used for sexual encounters, and the same concern kept him out of the library.

452. Leaving his twin sons in order to surrender was the hardest thing Mr. Sparks has done, and he believed he would miss more than four years of their childhood. His wife collapsed emotionally when a guard arrived to take him inside. He feared he would never see his mother again—she was seventy-nine and in poor health when he left. Approximately a week passed before he could telephone his wife, and a month or more before the first family visit, which required a drive of three to three and a half hours and a motel stay. He missed Halloween, Thanksgiving, and Christmas. The family decided to homeschool the twins because of what was being said in the community. His middle daughter was harassed at school. His wife returned to work after five years at home. His twin sons, now eight, still speak of it every day and tell him they are glad he is home.

453. Within weeks of January 6th, Altec demoted Mr. Sparks from group leader after the company reacted to his appearance in the coverage. It required him to sign a final written warning although he had never been written up in ten years, and told him he would be terminated if he refused to sign or committed any further infraction. Coworkers refused to work with him. He was reassigned to lower-level work and finally isolated in an open garage with very little work given to him. He submitted two weeks' notice and the company required him to leave that same day. After the pardon, an inquiry about returning to their former jobs drew the answer that rehiring them was too political. He has not been able to obtain comparable employment since.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

454. Mr. Sparks expanded his construction and dirt-work business after leaving Altec and then lost large customers and contractors because of the case and the publicity. He turned down larger house-building jobs because the scheduled trial dates made completion uncertain, and the postponements then left him without the work he had already declined. He sold equipment in anticipation of trial, bought some of it back when the proceedings were postponed, and sold it again before he went to prison, losing approximately $20,000 on two pieces of equipment and approximately $5,000 on two trailers, along with a further loss on his dump truck—approximately $80,000 in equipment losses by his estimate. He liquidated his 401(k) for household needs. After his release he borrowed $135,000 against his home to pay credit-card and equipment obligations and to start over. His credit score fell from the 800s to approximately 600. Magnolia Bank declined him a construction loan because of the case, limiting his ability to build houses at all. His Chase credit card was cancelled and PayPal banned him indefinitely, and his Facebook and Twitter accounts were restricted or banned. He had been working toward paying off his house; instead he took on new debt.

455. Mr. Sparks is estranged from several members of his extended family. He lost a longstanding personal and business relationship with a man who made hostile comments about the case, and a friendship dating to his childhood, including that friend's presence in his children's lives. A former Bible-study friend confronted him over remorse and his political beliefs, ending the conversation and deepening his sense of rejection. At the Baptist church where he and his wife had been involved for decades, they met cold treatment and remarks about insurrectionists, and they left; they were never formally asked to leave, and few members contacted the family afterward. They have since found a supportive new congregation.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

456. Mr. Sparks suffers nightmares, broken sleep, humiliation, and recurring thoughts about the prosecution and what it did to his family. He identifies what the government did after January 6th, rather than January 6th itself, as the worst part of the entire ordeal. He distrusts courts, counsel, law enforcement, and government, and he watches for vehicles and strangers he fears may be monitoring him. He will not read his own trial transcript, because thinking about the trial makes him feel sick.

457. Mr. Sparks was called out of his unit before midnight on January 20, 2025, and walked out of the prison near three o'clock in the morning to his waiting family, having served approximately three months of the 53-month term. The pardon returned to him the vote he had been unable to cast in the 2024 election and, after a three-day wait, the ability to buy a firearm to protect his house and the carry permit he had lost. It did not return his career at Altec, the customers and contractors his business lost, the equipment he sold at a loss, his credit, the church of three decades, or the friendships.

**Casey Jane Tryon-Castro**

458. The Plaintiff Casey Jane Tryon-Castro is a United States military veteran with a ninety-percent Veterans Affairs disability rating, a mother of five—three of her children born before January 6, 2021—and, before January 6, 2021, a finance professional in an executive office at Wells Fargo with a promising career, benefits, and a retirement trajectory ahead of her. She lives in Roanoke, Virginia.

459. Walking toward the Capitol, Ms. Tryon-Castro saw individuals changing clothes in bushes—something she considered strange at the time. She saw people positioned on a media tower urging the crowd to advance on and confront police while she and other nearby attendees opposed violence. The police line and barricades initially held while the crowd stood, chanted, and

protested; then officers began striking hands placed on a guardrail and launching salt-pellet projectiles at people who were still behind the barricade. She saw a salt-pellet projectile pass through the cheek of the man standing next to her. Officers attempted to pepper-spray the crowd, wind blew the spray back toward the officers, and the scene became chaotic. An officer struck Ms. Tryon-Castro with a baton, sprayed her in the face, and pushed her down the stairs—while she was still behind the police line. She was struck by police shields and subjected to pushing, crushing, and pinning. Cellular service failed in the Capitol area, leaving her unable to call out.

460. Ms. Tryon-Castro entered the Lower West Terrace tunnel three times searching for the people from whom she had been separated, retreating from the first two attempts because crowd pressure and chemical spray made it impossible to see or breathe. She was smashed among predominantly male attendees in the tunnel, where her height made it impossible to see ahead. She saw a bleeding man at the officers' feet and asked, with both hands raised, whether she could remove him so that people outside could render aid; an officer authorized her to approach, took her by the back of the arm, and directed her toward the injured man, who declined her help. The back-and-forth pushing then trapped her between the civilian and police lines, with shields on both sides and no route out of the tunnel. Pepper spray poured down from both sides, leaving her unable to see or breathe and convinced that she was about to die. While blinded and disoriented, she briefly tugged twice on a shield held by another civilian and released it. That two-second act became the government's "robbery" charge against her.

461. Ms. Tryon-Castro then saw Officer Hodges trapped by his own protective equipment in a doorway while another person raised his face shield, sprayed him, and attempted to strike his face with a baton. She cried and called for help, shielded the officer's face, and worked to free his arm from his equipment. He thanked her. She was sprayed directly in the face

approximately sixteen times that day—a count documented on video and discussed at her trial. As officers forced people from the tunnel she watched a woman fall and be trampled while officers continued to kick and strike her with batons. In approximately four-degree weather Ms. Tryon-Castro stripped down to a tank top because the chemical agents burned her skin so severely; orange pepper spray dripped from her saturated clothing and white CS powder coated her body. She lost her contaminated clothing and purchased souvenirs. A professional cameraman stood undisturbed on a ledge inside the tunnel recording the events, including her effort to free Officer Hodges. Footage later shown in a congressional proceeding depicted Officer Hodges pinned in the doorway but cut out Ms. Tryon-Castro's effort to free his arm.

462. A family member or family friend called an FBI tip line, identified Ms. Tryon-Castro, and characterized her prior posts as showing she was dangerous. Facebook notified her of government access to her account. FBI personnel contacted her employer, her neighbors, and her family. Air travel produced repeated SSSS designations, secondary screening, pat-downs, chemical swabs, baggage searches, and additional screening at the gate—directed at her and not at the children traveling with her. She was suddenly pulled over by police with unusual frequency, with little or no explanation, and officers routinely waited for a second law-enforcement vehicle before proceeding.

463. An FBI agent telephoned Ms. Tryon-Castro and warned that unless she cooperated and self-surrendered, agents would make her life "a living hell," embarrass her before her neighbors, kick in her door, and point guns at her children. At the later in-person interview the agents' tone was reassuring, characterizing her exposure as a possible trespassing matter and mentioning that an agent's father held similar beliefs—which she understood as an effort to lower her guard. Three agents came to her home; two entered while a third looked around her vehicle;



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

their guns were drawn. They took the clothing she had worn on January 6th and kept it, and asked to inspect her telephone. The night after the FBI home visit, her vehicle was broken into and a firearm she routinely kept in it was stolen; it has never been recovered.

464. Ms. Tryon-Castro self-surrendered at an FBI facility in Roanoke, where more than ten officers were present. She was handcuffed and shackled and remained restrained in a cell and throughout the initial court appearance for approximately six hours, with no food or water. Officers would not remove her restraints for restroom use, so that the waist-connected handcuffs and leg shackles made it difficult and humiliating to lower and raise her clothing and clean herself. Officials collected her fingerprints, palm prints, and a cheek-swab DNA sample and required a full-body scan. Several media representatives were present at her initial court proceeding, and the court denied her request to close the proceeding to the media.

465. Pretrial conditions confined Ms. Tryon-Castro to the Western District of Virginia and prevented her from visiting out-of-state relatives, taking a vacation, traveling to Washington, or attending protests and political events; she feared the travel restriction would prevent her from seeing her aging grandmother before a possible prison sentence. She was subject to drug and alcohol testing. Officials inventoried her firearms and required her to sell or transfer them so that she no longer owned them. She surrendered her passport, which has never been returned.

466. Ms. Tryon-Castro was charged in United States v. Tryon-Castro, No. 1:23-cr-00035-RC (D.D.C.). The government offered her a resolution under which she would plead to one felony and testify against other January 6th defendants in exchange for probation or no incarceration. She rejected it because she did not know the people against whom she was expected to testify and could not truthfully describe their identities or intent. A few weeks later, a superseding indictment added the robbery charge and dramatically increased her exposure. Her



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

appointed lawyer repeatedly pressured her to admit that her conduct was stupid, to apologize, and to accept guilt in terms she did not believe were true, and became angry when she would not.

467. The government presented fabricated evidence: selectively shortened video clips and still frames without the surrounding sequence. The video chronology presented at trial did not match the order of events Ms. Tryon-Castro witnessed, and her lawyer declined her requests to challenge the timeline. The prosecution prompted the jury to hear particular words in indistinct crowd audio without presenting any audio expert who could isolate the voice or establish the words spoken—yet when she located a tunnel video in which a female voice repeatedly yelled for people to stop pushing, she was prevented from using it on the ground that her face was not visible and the voice was unidentifiable. The government attributed other recorded statements to her on the basis of voice alone.

468. Ms. Tryon-Castro's lawyer promised a thumb drive containing discovery, but repeated efforts to retrieve it failed. She was permitted to review discovery only in counsel's office under supervision, which left inadequate time to search thousands of hours of video and prevented her from preserving evidence she identified; she was reduced to searching the public internet for her own defense evidence. She asked counsel to call Officer Hodges, because she believed her assistance had protected him from grave harm. Counsel declined—and the officer was later permitted to submit a victim-impact statement concerning her. Counsel became difficult to reach, did not meaningfully prepare her for trial or cross-examination, told her to shut her mouth when she tried to raise issues during trial, instructed her not to look at the jury while testifying, declined to object to evidence and testimony she disputed, and told her that evidence she had found could not be used. The court denied a defense motion seeking to rely upon constitutional arguments.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

469. Jury selection consumed nearly a week, and the court seated people who had expressly stated that their strong January 6th views would prevent them from being fair. The jury included a Department of Homeland Security employee; a person who had worked on President Biden's campaign and had been inside the Capitol on January 6th; a person who taught January 6th as domestic terrorism; and lawyers working in Democratic political circles. A prospective juror Ms. Tryon-Castro perceived as more receptive to her position was removed because that person had previously practiced law—although other lawyers remained on the jury. An FBI agent who had assisted the prosecution's investigation testified as though he were an audio-and-video expert despite lacking such expertise, and was the only person she observed communicating with the jury before, during, and after deliberations. Officer Forrester testified that, based on his law-enforcement and military experience, he knew as a fact that Ms. Tryon-Castro intended to murder every officer present. Cameras were excluded from her trial, preventing out-of-state relatives from watching, while a reporter in plain clothes spoke with her grandmother throughout the trial without disclosing the purpose of the conversation and later used the interaction in an article.

470. On June 10, 2024, the jury convicted Ms. Tryon-Castro on all eight counts. She received less than forty-eight hours' notice of a presentence interview that would affect prison classification, placement, medication, and accommodations, and entered the process unprepared because she had not been told to obtain supporting medical records and could not obtain her Veterans Affairs records on such short notice. She therefore entered custody without documentation and without established arrangements for her serious, documented medical conditions. On November 20, 2024, she was sentenced to 31 months' imprisonment, 36 months' supervised release, and $2,000 restitution.

471. During transport from the courthouse to the District of Columbia jail, Ms. Tryon-Castro was the only woman among male prisoners, who reached through cage openings to pull her hair, tried to smell her and force her attention, and masturbated behind her. She cried out to the transport officers for help and called the conduct an assault; the officers looked at her in the rearview mirror and turned up the radio. She heard other prisoners threaten to rape a male prisoner who objected to their conduct toward her. On arrival she was placed in a holding cell covered with blood, vomit, and feces.

472. Ms. Tryon-Castro was transferred among approximately six facilities in roughly three months, with moves every two to three weeks that prevented her from settling, receiving commissary, establishing communications, or addressing medical needs. She took approximately three Con Air flights in addition to repeated ground transports. On one ten-hour ground transport overseen by two male United States Marshals she was again the only woman among male prisoners, with no cage separating her from them, no food or water, and no female officer or separate arrangement available to escort her to a restroom; she believes she avoided sexual harm only because most of the other passengers were January 6th prisoners who stopped two men from making vulgar comments toward her. Two male Marshals searched her and oversaw her change of clothing before one transport. She was made to walk past rows of male prisoners in narrow aircraft aisles while shackled and without a bra, including when she needed a restroom. She was strip-searched on entering and leaving facilities throughout her custody and transfers, with the exception of her final release following the pardon. Officers fastened her handcuffs tightly enough to cut off circulation, left her restrained for extended periods, grabbed her arms roughly, and dragged her when she stumbled while accusing her of deliberately dropping her weight. She was



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

issued no underwear on arrival, placed in ill-fitting clothing, and had to wash her only underwear in a sink and wear an institutional smock without undergarments while it dried.

473. Ms. Tryon-Castro spent roughly half of her custody in isolation or restrictive housing, including a period associated with her refusal of a COVID-19 vaccination. Isolation deprived her of showers, telephone calls, hygiene supplies, books, paper, a Bible, and even a blanket while the cell was kept at approximately sixty degrees. Her first general-population cellmate appeared to need inpatient mental-health care and behaved violently. Other prisoners entered her cell, shut the door, and threatened to fight her because they associated her political views with racism. After news of the pardons spread, inmate confrontation increased. She witnessed a stabbing, fights among prisoners, fights between prisoners and guards, and a guard entering a prisoner's cell, closing the door, and fighting the prisoner. She saw a prisoner fall headfirst from an upper bunk and split her head open; staff supplied no gloves, bleach, or biohazard equipment and ordered prisoners to clean another person's blood with paper towels. Staff used a paralyzed prisoner's wheelchair to move the injured woman, left its owner without it for four days, and returned it covered in blood.

474. Ms. Tryon-Castro was recurrently exposed to blood, feces, urine, vomit, spit, used menstrual products, and sewage overflows. An Oklahoma holding cell confined approximately twenty-seven women in a small room with two benches, one exposed toilet and sink, and no soap, where she was required to hold an open cup of urine for approximately an hour while other prisoners spilled their samples nearby. Showers frequently did not work, and prisoners were blamed, made to clean sewage, and punished when toilets overflowed. She initially slept directly on a metal surface with only a sheet and a wool blanket. Menstrual-hygiene supplies were not provided. She was allotted one roll of toilet paper for a fixed period with no replacement—an acute



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

burden during Crohn's symptoms. A unit of approximately one hundred people sometimes had a single water fountain, and a drinking container had to be purchased through a commissary account she could rarely establish before the next transfer. She encountered rancid food and rodent droppings at nearly every facility. She was housed in an open dormitory and shared facilities with prisoners she understood to have male anatomy and convictions for violent sexual offenses, and observed that prisoners who voiced discomfort in that setting were threatened with isolation or hate-crime allegations.

475. Ms. Tryon-Castro entered custody with Crohn's disease requiring infusion therapy, steroid medication during flare-ups, and dietary restrictions, together with chronic migraines, traumatic brain injury, cervical-spine injury with bilateral-arm radiculopathy, tinnitus, and post-traumatic stress disorder. She received access to none of her established treatments. Medical intake staff told her that because her needs were not documented in transferred records she would have to submit sick-call requests and wait for specialists—even though she was expected to be moved before any appointment could occur. Sudden dietary change, custodial stress, and lack of treatment triggered severe Crohn's symptoms, and correctional staff delayed responding for two days while an unmedicated flare caused her to vomit on herself, lose bowel control, and develop blood in her vomit. Medical staff accused her of intoxication or drug withdrawal rather than treating her, even after she offered to submit to testing. She filed a complaint about the medical response and was transferred to another facility the following day. The only gastrointestinal medication she received in custody was a single dose of a Pepto-Bismol-like product. She received none of her chronic-migraine medication. The January 6th blasts had already aggravated her chronic tinnitus. Since release she has suffered pneumonia twice, strep throat, continuing sinus problems, and a diagnosis of bilateral carpal tunnel syndrome she attributes to prolonged, tight handcuffing. Custody



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

aggravated her preexisting post-traumatic stress disorder connected to military sexual trauma, because officials repeatedly required her to undress under authority and in coercive circumstances.

476. The violent-felony allegations were used against Ms. Tryon-Castro in repeated child-custody proceedings involving the three children born before January 6th. She was brought into custody court several times before trial and could not participate meaningfully when a custody proceeding occurred while she was imprisoned. She lost custody of the three older children and was reduced to visitation. The pardon did not restore custody, because the violent character of the charges continues to appear in records, and she cannot afford counsel to seek restoration. Her youngest daughter was only a few months old when she entered prison, and she feared the baby would no longer remember her. She had no communication or visitation with any of her children during her incarceration; her family was not permitted to speak with the children or deliver Christmas gifts; and she learned that the children had been told she had gone to Disney World without them.

477. Wells Fargo opened an ethics investigation during the January 6th investigation and terminated Ms. Tryon-Castro for a stated code-of-conduct violation—before she was charged with any crime. It marked her ineligible for rehire, so that employment-verification responses tell prospective financial-industry employers she is not hireable for ethical reasons. Wells Fargo also terminated her banking relationship. Geico tripled her insurance premium and then terminated her coverage. She lost access to Uber and Lyft. Her landlord severed ties with her while indictments were pending, when she was renting and in the process of purchasing a home. Two vehicles were stolen from her driveway before trial. Her home and vehicles were repeatedly egged and vandalized, and graffiti was put on her vehicles and her driveway. Lawn ornaments, yard signs, items from her shed, and her children's bicycles were stolen or destroyed. Her dog was stolen after



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the local publicity began. People began bringing dogs to defecate in her yard. She incurred thousands of dollars in hotel and travel expenses to remain in Washington for trial, and carries substantial credit-card debt and a continuing financial hole. An IRS audit produced an approximately $8,000 assessment connected to a Wells Fargo retirement account, which she paid. She cannot contest it: the records that would show she had already paid the tax on the cashed-out account were held in the Wells Fargo work email she lost with her employment, and she cannot afford to litigate the question. Her incarceration suspended the monthly compensation associated with her ninety-percent Veterans Affairs disability rating, which had not been restored as of her interview, and she cannot afford professional assistance to restore it.

478. Sedition Hunters publicly tagged Ms. Tryon-Castro and associated her online with labels tied to alleged officer assaults. Publications amplified her name, photograph, address, employer, telephone number, family information, and location. Reporters left business cards and copies of her indictment at her home, workplace, and vehicle. She was repeatedly misidentified online and had conduct involving other people attributed to her. Hostile messages and mail were directed not only to her but to her grandmother, aunts, mother, and other relatives. Her children were called names and treated differently at school. She was asked to stop participating in the Parent-Teacher Association, the Rotary Club, and Veterans Affairs-related activities, and experienced pressure and distrust at church. She was excluded from local online yard-sale groups solely because of her January 6th participation. In her small community she is commonly treated as a domestic terrorist. She learned of a New York monument bearing January 6th defendants' names.

479. Ms. Tryon-Castro describes the prosecution and trial as horrendous and traumatizing, and reports feeling shell-shocked as her confidence in the justice system gave way



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

to the belief that nothing she said or did could affect the outcome. She experienced terror, helplessness, and fear of sexual assault during transport; humiliation from strip searches, restraints, and forced movement past male prisoners while inadequately clothed; and periods of suicidal ideation and hopelessness during the prosecution and confinement, including thoughts that others might be better off without her. She suffers worsened nightmares, panic attacks, depression, hopelessness, dissociation, and a reduced capacity to feel joy. After the pardon she received a letter stating that she could not vote. She keeps her head on a swivel because people have threatened that January 6th defendants' lives would not return to normal after the pardons. She feels she is no longer a full American citizen, and that the cumulative consequences stole and rearranged her identity and diverted the trajectory of a life built around military service, education, career, family, and community. What she grieves most is the time with her children that cannot be recovered—the relationship itself, and the ordinary days she was not there for, including a first day of school. Ms. Tryon-Castro received a full presidential pardon dated January 20, 2025.

480. As a direct result of these malicious, selective, and vindictive prosecutions, each of the Plaintiffs suffered severe damages, including loss of liberty (incarceration or pretrial detention), loss of employment and income, emotional distress, reputational harm, legal defense costs exceeding hundreds of thousands of dollars, and ongoing collateral consequences.

481. The criminal proceedings have terminated in all the Plaintiffs' favor.

482. As a direct result of these malicious, selective, and vindictive prosecutions, each of the Plaintiffs suffered severe damages, including loss of liberty (incarceration or pretrial detention), loss of employment and income, emotional distress, reputational harm, legal defense costs exceeding hundreds of thousands of dollars, and ongoing collateral consequences.

483. The criminal proceedings have terminated in all the Plaintiffs' favor.

## CLAIMS FOR RELIEF

### Count I – Malicious Prosecution
### (FTCA: All the Plaintiffs Against United States)

484. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 483, above and incorporate them in this Count as though they are fully restated herein.

485. United States' employees (including all the officials described above) initiated criminal proceedings against all of the Plaintiffs.

486. The proceedings were initiated without probable cause.

487. The proceedings were continued with actual malice and for improper purposes (political persecution, retaliation, and to deter protected First Amendment activity).

488. The proceedings terminated in the Plaintiffs' favor.

489. The Plaintiffs suffered damages as a direct and proximate result.

490. The United States is liable under the FTCA for these torts committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. §2680(h). The United States' officers and agents fabricated and exaggerated evidence, withheld exculpatory material, and pursued the cases despite the absence of probable cause that the Plaintiffs had committed the crimes alleged.

491. The criminal proceedings have terminated in the Plaintiffs' favor through acquittals, dismissals, and presidential pardons issued on January 20, 2025, which constitutes a favorable termination for purposes of a malicious-prosecution claim.

492. As a direct and proximate result of the Government's tortious conduct, each the Plaintiff has suffered and continues to suffer damages in excess of $1 million, including but not limited to medical expenses, lost wages, pain and suffering, emotional distress, loss of liberty, loss of consortium, and other consequential damages.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

**Count II – Selective Prosecution/Abuse of Process**
**(FTCA – All Plaintiffs Against United States)**

493. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 483, above and incorporate them in this Count as though they are fully restated herein.

494. The United States used the legal process improperly (to wit: criminal prosecutions) in a manner that is not justified by the underlying legal action.

495. The United States had ulterior motives and used the legal system to harass, intimidate, coerce, and inflict emotional distress upon the Plaintiffs rather than to achieve a legitimate legal objective.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

496. The Plaintiffs suffered harm as a result of the misuse of the legal process. This harm included economic injury, emotional distress, and other damages as described in this complaint.

497. The defendant United States acted intentionally or with a reckless disregard for the consequences of its actions.

498. The prosecutions described in this complaint were selectively and vindictively initiated, maintained and pursued against the Plaintiffs because of the Plaintiffs' political affiliation, viewpoint, and association with the Trump candidacy or movement, while similarly situated individuals of opposing political views were not prosecuted. This constitutes selective and vindictive prosecution and abuse of process under District of Columbia common law and violates the Fifth Amendment's equal protection and due process guarantee.

499. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

500. The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

501. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

502. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5)



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

503. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

**Count III - Federal Tort Claims Act – Negligence involving Personal Property**
**(All Plaintiffs Against the United States of America)**

504. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 483, above and incorporate them in this Count as though they are fully restated herein.

505. The United States had a duty to exercise reasonable care in handling the Plaintiffs' seized property.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

506. The FBI, an agency of the United States government, seized the Plaintiffs' personal property following the events of January 6, 2021.

507. The FBI seized cell phones, computers, mail and other items of property from the Plaintiffs.

508. The United States breached its duty by failing to exercise reasonable care in handling the Plaintiffs' property.

509. While in federal custody, the Plaintiff's property was damaged, lost, or stolen.

510. The United States' breach of its duty caused damage to, loss of, or theft of the Plaintiffs' property.

511. As a direct and proximate result of the United States' breach of its duty, the Plaintiffs have suffered damages in the amounts to be established at trial.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

**Count IV - Federal Tort Claims Act – Intentional Infliction of Emotional Distress**
**(All Plaintiffs Against the United States of America)**

512. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 483, above and incorporate them in this Count as though they are fully restated herein.

513. The United States and its officers described in Paragraphs 1 through 483 engaged in extreme and outrageous conduct.

514. The United States' officers engaged in this conduct intentionally.

515. The Plaintiffs each suffered public ridicule, mockery, and severe humiliation due to the branding of them as insurrectionists, rioters, being anti-American, seditionists, traitors, violent, and besmirching the label of J6er and attaching that label to the J6ers with the negative ramification, imprisonment, wrongful arrest, from which the Plaintiffs have suffered emotional paid, a loss of enjoyment of life, lost income, loss of their choices of means of earning a living, loss of revenue from failed businesses and unobtainable employment.

516. The conduct of the conspirators was outrageous.

517. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

518. The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

519. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

520. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

521. The United States' conduct caused the Plaintiffs to have severe emotional distress.

522. The Plaintiffs demand trial to show and establish the evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

**Count V –Abuse of Process/ Vindictive Prosecution**
**(FTCA – all plaintiffs against the United States)**

523. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 483, above and incorporate them in this Count as though they are fully restated herein.

524. The United States and its prosecutors retaliated against plaintiffs for defending themselves by filing vindictive, malicious, bogus superseding felony indictments or punishing them for exercising their constitutional rights.

525. This was in accordance with a knowingly unconstitutional pattern and practice of the Garland Justice Department in J6 cases. The majority of J6ers who exercised their right to misdemeanor trials were similarly punished with false felony charges.

526. Word of this unconstitutional program and abuse of process spread widely among J6ers, compelling other accused J6ers to falsely plead guilty to crimes they didn't commit.

527. The United States, implemented, directed, or failed to adequately train and supervise a policy, custom, or practice within the DOJ and U.S. Attorney's Office for the District of Columbia whereby federal prosecutors were encouraged or permitted to file superseding indictments adding felony charges against January 6 Defendants who were initially charged only with misdemeanors and who refused to plead guilty and instead demanded their constitutional right to trial.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

528. This policy constituted abuse of process, and vindictive prosecution in violation of the Fifth Amendment's Due Process Clause and was the moving force behind the unconstitutional actions against the Plaintiffs.

529. These false felony prosecutions were vindictively initiated and pursued against the majority of similarly situated J6 Defendants) because they exercised their constitutional right to refuse a misdemeanor plea and demand a trial. Misters Garland and Graves, through unwritten policy, custom, directive, or deliberate indifference in training and supervision, caused federal prosecutors to file superseding false felony indictments in retaliation. Garland and Graves failed to properly train and supervise prosecutors regarding the prohibition on retaliatory charging decisions, despite the obvious risk of tortious and constitutional injury.

530. In each case, the criminal proceeding terminated in the Plaintiffs' favor, either by dismissal with prejudice, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

531. The United States is liable under the FTCA for these torts (abuse of process and malicious prosecution) committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. § 2680(h).

532. In every essence, this insidious practice deprived J6ers of their constitutional right to demand that allegations be subjected to fair adversarial trials.

533. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

534. The above-named employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

535. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

536. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

537. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;

e. Award pre- and post-judgment interest;



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

**Count VI - Tortious Civil Conspiracy (under law of District of Columbia)**
**(All Plaintiffs versus the United States of America)**

538. The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 483, above and incorporate them in this Count as though they are fully restated herein.

539. The United States and its officers described in Paragraphs 1 through 483 forged a cooperation and meeting of minds between two or more of its officers to commit a wrongful act, and an overt act in furtherance, resulting damages.

540. The United States is liable for the tortious conspiracy of its employees, including all branches of government which resulted in the wrongful arrest, the wrongful imprisonment, the wrongful branding as criminals, insurrectionists, seditionists, traitors, impeding their rights by such labeling or by making records and including the Plaintiffs on lists which made it difficult to travel, to run a business, or earn a living.

541. Wrongful acts by the United States include Malicious Prosecution, Abuse of Process, Intentional Infliction of Emotional Distress, and Trespass to Chattels.

542. Overt acts by United States officers include:

a. Brady violations and the withholding of exculpatory evidence on a mass scale.



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

b. Unlawful searches and seizures (and trespasses) based on bogus general "geofence warrants" whereby the government seized every cell phone number at the Capitol on January 6th.

c. Falsifying evidence and the notion that the Secret Service had restricted vast areas of the U.S. Capitol on January 6, 2021—while knowing the Secret Service had never cast such restrictions.

d. Intentionally destroying, stealing, or breaking the property of J6ers, including that of the plaintiffs.

e. The imposition of a bogus "obstruction of official proceedings" statute, knowing that the statute was never intended to apply to disorderly conduct by protestors.

f. The rigging of trials so that J6ers could not prevail.

g. The false placement of court venue in the courthouse where every judge in the courthouse was an interested witness to the events.

h. The burying of terabytes of discovery in databases which were inaccessible to the vast majority of J6ers. i. The control and monitoring of defense attorneys use of discovery databases. j. The monitoring of attorney/client communications of J6ers. k. The concealment of hundreds of undercover government operators and provocateurs among the crowds on January 6th.

543. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

544. The above-named employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

545. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

546. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and mental injury, including, but not limited to: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that the Plaintiffs were unable to function in their daily lives as they did before the injuries.

547. The United States' conduct caused the Plaintiffs to have severe emotional distress.

548. The Plaintiffs demand trial to show and establish the evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b. Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c. Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d. Award attorneys' fees and costs pursuant to applicable law;



THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

e. Award pre- and post-judgment interest;

f. Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

Respectfully submitted, Dated: September 24, 2026

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (954) 570-6757

_/s/ *Peter Ticktin*________
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
Serv512@LegalBrains.com
ROGER ROOTS, ESQUIRE
Rhode Island Bar No. 6752
Serv517@LegalBrains.com